**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                    :

TEAM NEW ZEALAND LIMITED,       :
                                    :

                Plaintiff,     :  Case Nos. 08-Civ-2228, 08-Civ-4215
                                    :

           v.              :  **AFFIDAVIT OF**
                                    :  **JONATHAN K. YOUNGWOOD**

SOCIÉTÉ NAUTIQUE DE GENÈVE, TEAM    :
ALINGHI, S.A., AC MANAGEMENT, S.A.,    :
and ERNESTO BERTARELLI,        :
                                    :

                Defendants    :
------------------------------------------------------------x

STATE OF NEW YORK   )
                    : ss:
COUNTY OF NEW YORK )

     Jonathan K. Youngwood, Esq., being duly sworn, deposes and says:

     1.     I am a member of the law firm Simpson Thacher & Bartlett LLP, attorneys for

Defendants, Société Nautique de Genève, Team Alinghi, S.A., AC Management, S.A., and

Ernesto Bertarelli (collectively, "Defendants"). I respectfully submit this affidavit in connection

with Defendants' Memorandum of Law in Support of their Motion to Compel Arbitration. I am

fully familiar with the facts and circumstances stated herein, based on personal knowledge, the

attached documents, and review of the files maintained by my firm.

     2.     Attached hereto as Exhibit A is a true and correct copy of the Notice of Entry for

Team New Zealand and Royal New Zealand Yacht Squadron, dated July 25, 2007.

     3.     Attached hereto as Exhibit B is a true and correct copy the Protocol Governing the

33rd America's Cup, dated July 3, 2007.

     4.     Attached hereto as Exhibit C is a true and correct copy the Protocol Governing the

31st America's Cup, dated March 2, 2000.

5.      Attached hereto as Exhibit D is a true and correct copy of the 31st America's Cup Arbitration Panel Decision in Case No. ACAP 00/06, dated December 17, 2000.

6.      Attached hereto as Exhibit E is a true and correct copy of the Affidavit of Hamish Ross in Support of SNG's Motion to Dismiss and for Summary Judgment in *Golden Gate Yacht Club v. Société Nautique de Genève*, No. 602446/2007 (N.Y. Sup. Ct.), dated September 21, 2007.

7.      Attached hereto as Exhibit F is a true and correct copy of the Notice of Challenge of Club Nautico Español de Vela, dated June 29, 2007.

8.      Attached hereto as Exhibit G is a true and correct copy of the Notices of Entry for the following yacht clubs:  (1) Royal Thames Yacht Club; (2) Deutscher Challenger Yacht Club; (3) Circolo Vela Gargnano; (4) Gamla Stans Yacht Sällskap; (5) Club Nautico Gaeta; (6) Reale Yacht Club Canottieri Savoia; (7) Real Club Nautico Denia; (8) Yacht Club de Saint-Tropez; (9) Royal Belgian Sailing Club; (10) Royal Cape Yacht Club.

9.      Attached hereto as Exhibit H is a true and correct copy of the 33rd America's Cup Arbitration Panel Decision in Case No. ACAP 33/01, dated September 7, 2007.

10.      Attached hereto as Exhibit I is a true and correct copy of the Notice of Appeal of Société Nautique de Genève, dated May 13, 2008.

11.      Attached hereto as Exhibit J is a true and correct copy of the transcript of the pre-motion conference, dated June 20, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Jonathan K. Youngwood, Esq.

Sworn to before me this
3rd day of July, 2008.

Notary Public

STEPHANIE Y. CROSSKEY
NOTARY PUBLIC, State of New York
No. 01CR6157453
Qualified in New York County
Commission Expires December 11, 2010

3

# EXHIBIT A

## Notice of Entry

1.  **Background**

    This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33rd America's Cup for application by yacht clubs to become a Challenging Competitor.

    Definitions used in the said Protocol shall apply to this Notice of Entry.

2.  **Application**

    I, John Crawford am the Commodore of the Royal New Zealand Yacht Squadron and I am duly authorised by such yacht club to submit this Notice of Entry, as confirmed by [*Notary*] hereunder.

    2.1  **Yacht Club:** Royal New Zealand Yacht Squadron (RNZYS) hereby makes application to AC Management SA to become a Challenging Competitor in the 33rd America's Cup.

    2.2  **Deed Of Gift:** Royal New Zealand Yacht Squadron is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular;

    (i)    is not domiciled in Switzerland;
    (ii)   is an organised yacht club;
    (iii)  is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and
    (iv)   has an annual regatta on the sea or an arm of the sea.

    2.3  **Certificate of Incorporation:** An original notarized certified copy of the RNZYS certificate of incorporation as well as of the trade register extract is/are annexed to this Notice of Entry.

    2.4  **Annual Regatta:** The Notice of Race of the RNZYS annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Entry.

    2.5  **Organised:** Details, such as the RNZYS existing by-laws, as well as its organization regulations and events calendar, demonstrating how the RNZYS is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry.



**2.6    Representation:**

RNZYS will be represented by Team New Zealand

All communications and notices are to be sent to:

Royal New Zealand Yacht Squadron
PO Box 46182
Herne Bay
Auckland , NZ
PH   09 360 6800

**3.    Bound By Protocol**

The RNZYS and Team New Zealand each hereby unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

**4.    Arbitration and Dispute Resolution**

The RNZYS and Team New Zealand each hereby unconditionally agree and accept to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. RNZYS further unconditionally submit to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

**5.    Entry Fee and  Performance Bond**

RNZYS submits an entry fee of Euro 50,000.00 with this Notice of Entry and agrees a performance bond will be required to be posted by us to AC Management SA of up to Euro 950,000.00 at a later date on at least 30 days prior notice.

**6.    Challenger of Record**

The RNZYS and Team New Zealand each acknowledge and agree that the Club Nautico Español de Vela ("CNEV") is the Challenger of Record under the terms of the Protocol, but that in the event of the withdrawal or disqualification of CNEV, RNZYS may become the Challenger of Record, as provided under Article 3.3 of the Protocol.

The RNZYS and Team New Zealand  also acknowledge that Golden Gate Yacht Club ("GGYC") is claiming that CNEV is not a valid Challenger of Record and has commenced a lawsuit in New York State court seeking to have CNEV removed as Challenger of Record and to have GGYC inserted in its place.

The RNZYS and Team New Zealand further acknowledge that Société Nautique de Genève ("SNG") has commenced an arbitration proceeding before the Arbitration Panel



constituted under the Protocol in which it asks the Panel to confirm CNEV's status as Challenger of Record.

The RNZYS and Team New Zealand each accept and agree that AC Management SA, SNG, Team Alinghi and their affiliates are not responsible for any losses or damages that the RNZYS and/or Team New Zealand may incur as a result from GGYC's actions or from any court or arbitration proceedings in connection therewith.

**Signatures:**

**RNZYS:**

Name: J. C. CRAWFORD
Office: COMMODORE - RNZYS
Date: 25/07/07

**[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]**

**Team New Zealand**

By countersigning this Notice of Entry Team New Zealand confirms its agreement with its provisions and in particular unconditionally agrees and accepts to be bound by the terms and conditions of sections 3, 4 and 6 above.

Name: GRANT DALTON
Office: MANAGING DIRECTOR
Date: 25/7/07

**[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]**



**EXHIBIT B**

# The Protocol Governing The Thirty Third America's Cup



# TABLE OF CONTENTS

1.    BACKGROUND

2.    PART A – DEFINITIONS – GENERAL PRINCIPLES – AMERICA'S CUP
      AUTHORITIES

3.    PART B – COMPETITION

4.    PART C – COMMERCIAL

5.    PART D – DISPUTE RESOLUTION AND ENFORCEMENT

6.    PART E – MISCELLANEOUS

## THE PROTOCOL GOVERNING THE
## THIRTY THIRD AMERICA'S CUP

(i)    **Société Nautique de Genève** ("SNG")

(ii)   **Club Náutico Español de Vela** ("Challenger of Record")

### BACKGROUND

A.    Société Nautique de Genève is the current holder and trustee of a silver trophy known as the "America's Cup" in accordance with the terms of a Deed of Gift dated 24 October 1887.

B.    Société Nautique de Genève has received and accepted a notice of challenge from the Challenger of Record in accordance with the Deed of Gift.

C.    Société Nautique de Genève and the Challenger of Record record in this Protocol the arrangements they have mutually agreed in accordance with the terms of the Deed of Gift.

### AGREED AS FOLLOWS

## PART A

## DEFINITIONS - GENERAL PRINCIPLES - AMERICA'S CUP AUTHORITIES

### 1.    INTERPRETATION

1.1    In the interpretation of this Protocol:

(a)    **ACC Rules** means, unless otherwise specified, version 5.0 of the Rules Governing America's Cup Class Yachts or as the case may be new Rules Governing America's Cup Class Yachts to be issued by ACM, as interpreted by the Measurement Committee and amended from time to time;

(b)    **ACC Yacht** means a yacht that complies with the ACC Rules;

(c)    **ACM** means a Swiss limited liability company with headquarters in Geneva, Switzerland, appointed by SNG to help SNG organize, manage and fulfill all of



3

SNG's obligations under the Deed of Gift;

(d) **Applicable Document** means any document made under authority of this Protocol and includes the documents referred to in Article 2.5;

(e) **Arbitration Panel** means the Arbitration Panel referred to in Article 22;

(f) **Challenger** means, except where inconsistent with the context, the Challenger of Record and all Challenging Competitors;

(g) **Challenger of Record** means **Club Náutico Español de Vela** and includes any person or entity which undertakes that yacht club's challenge as its representative, or such other Challenger as determined by Article 3.3;

(h) **Challenger Selection** means the selection series referred to in Article 13.4;

(i) **Challenging Competitor** means a qualified yacht club whose entry has been accepted by ACM under Article 4, and includes any person or entity which undertakes that yacht club's challenge as its representative, but does not include the Defender or Challenger of Record;

(j) **Competition Regulations** means the regulations issued by ACM pursuant to Article 17.1;

(k) **Competitor** means the Defender or a Challenger or any one or more of them as the case may be;

(l) **Competitors' Commission** means a forum of all Competitors and ACM for the exchange of information and consultation, established pursuant to Article 10;

(m) **Course Area** means one or more circles within the Race Area on which courses for racing during the Event may be set at the Venue;

(n) **Deed of Gift** means a Deed of Gift dated 24 October 1887 between George L Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985;

(o) **Defender** means the entity selected by SNG to defend the America's Cup in the Match on its behalf;

(p) **Designer** means a person who has or is intended to apply substantial intellectual creativity and judgment to the determination of the shape or structure of the following: a yacht's hull, deck, cockpit, mast tube, geometry of the mast rigging, appendages or sails (excluding battens and sail hardware). For the avoidance of doubt, Designer does not mean a person who designs any other components other than those listed above, or who develops, modifies, operates, analyses the results of, or provides instructions for the use of, any design tool or resource including but not limited to computer software or hardware, tow tanks or wind

4

tunnels or any other testing facility;

(q) **Event** means the Regatta, all Qualifying Regattas, any defender trials at the Venue as determined by the Defender and SNG pursuant to Article 12, and any events that may be announced by ACM from time to time;

(r) **Event Authority** means the person or body appointed by ACM pursuant to Article 6;

(s) **Event Regulations** means regulations issued by ACM pursuant to Article 18;

(t) **Hull** shall have the same meaning as ascribed in the ACC Rules. If no meaning is defined in the ACC Rules, Hull shall mean the fair body of the yacht up to the sheerline, except for the deck, appendages, mast or other equipment that may be installed;

(u) **Match** means the 33rd match between the Defender and the winner of the Challenger Selection, subject to Article 13.4;

(v) **Measurement Committee** means the committee appointed by ACM pursuant to Article 5.4 (a) (iii);

(w) **Net Surplus Revenue** means the revenue available for distribution to Competitors as calculated pursuant to Article 19;

(x) **Notice of Entry** means the document required from Challenging Competitors by Article 4.1;

(y) **Notice of Race** means the Notice of Race for the Regatta and the Qualifying Regattas issued by ACM pursuant to Article 2.5 ;

(z) **Meteorological Data Service** means the meteorological and oceanographic data collection service described in Article 15;

(aa) **Protocol** means this Protocol together with any amendment, or any replacement Protocol agreed by the parties that is to govern the 33rd America's Cup;

(bb) **Qualifying Regattas** means the regattas referred to in Article 11;

(cc) **Race Area** means the area of water on which Course Areas may be set;

(dd) **Race Committee** means the committee appointed by ACM pursuant to Article 5.4 (a) (ii);

(ee) **Racing Rules** means the rules to govern racing in the Event to be issued by ACM pursuant to Article 2.5 ;

(ff) **Regatta** means Trials, Challenger Selection and the Match;



5

(gg) **Regatta Director** means the person appointed by ACM pursuant to Article 7;

(hh) **Regatta Officials** means any persons appointed by ACM pursuant to Article 5.4 (a), but does not include members of the Sailing Jury or the Arbitration Panel;

(ii) **Sailing Instructions** means the rules to be issued by ACM pursuant to Article 2.5 ;

(jj) **Sailing Jury** means the Sailing Jury referred to in Article 22;

(kk) **Schedule** means the Event schedule to be announced by ACM pursuant to Article 13.2;

(ll) **SNG** means Société Nautique de Genève of Geneva, Switzerland, as holder of the America's Cup;

(mm) **Technical Director** means the Technical Director of the America's Cup Class appointed by ACM pursuant to Article 8;

(nn) **Trials** means regattas forming part of the Regatta and held prior to the Challenger Selection

(oo) **Venue** means the venue to be determined by and announced by ACM pursuant to Article 13.1 and comprises the Competitors' bases, public areas, all berthage areas, water space, airspace and all other areas under the control of ACM. Where the context so requires, Venue shall also mean the venue of any Qualifying Regatta, and any special event announced by ACM that is not held at the Venue.

1.2 **Singular/Plural:** Terms defined above shall include the singular and the plural version of that defined term where the context requires.

1.3 **Cross reference:** Unless otherwise specified, reference to an Article is a reference to an Article in this Protocol.

1.4 **Official dictionary:** The English language shall prevail in the interpretation of this Protocol. The meaning of any word used in this Protocol and any Applicable Document, unless defined in Article 1.1, shall be determined by reference to the Oxford English Dictionary, Second Edition – CD Rom Version 3.1 (Oxford University Press 2004) or any later issued version.

1.5 **Appendixes:** A reference to an Appendix is a reference to an Appendix to this Protocol.

## 2. GENERAL PRINCIPLES

2.1 **Protocol purpose and intent:** The general underlying purpose and intent of this Protocol shall be to promote a friendly competition between foreign yacht clubs, to realize the sporting and commercial potential of the America's Cup, and to encourage world-wide growth and interest in the America's Cup as the premier

6

event in the sport of sailing, consistent with the provisions of the Deed of Gift.

2.2 **Allocation principle:** The spirit of the Event is to organize the Match between the Defender and a Challenger and a process to select such Challenger. Except as otherwise indicated in this Protocol, the interest of the Defender in the Event is one half, and the interest of the Challenger of Record is one half. This proportion of interest shall be applied, as the circumstances sensibly require, in all matters, commercial or competitive.

2.3 **Fair Competition:** A Competitor shall compete in compliance with recognized principles of sportsmanship and fair play.

2.4 **Event Support:** All parties to this Protocol and all Competitors shall act in a manner that supports and promotes the Event and shall not do any act or thing that damages the image or reputation of the America's Cup or the Event or brings it into disrepute.

2.5 **Applicable rules:** The Event shall be governed by:

    (a)  the Deed of Gift;

    (b)  this Protocol;

    (c)  the Competition Regulations, the Event Regulations and the ACC Rules:

    (d)  the Notices of Race;

    (e)  the Sailing Instructions;

    (f)  the Racing Rules.

2.6 **Precedence of rules:** Unless expressly provided otherwise, the documents referred to in Article 2.5 shall have precedence in the order the documents are listed with the intent that any express conflict between the provisions of such documents shall be resolved in favour of the document first listed.

2.7 **Binding rules:** The Protocol is:

    (a)  Between SNG and the Challenger of Record, a bilateral agreement under which both parties have rights and obligations and which cannot be modified unilaterally by either party, and records the terms and conditions agreed pursuant to the mutual consent provisions of the Deed of Gift.

    (b)  For any other entity which is not a party hereto (especially the Challenging Competitors), a set of rules, which governs the Event and which has full binding effect over all Challenging Competitors based on their acceptance of those rules upon registration in the Event.

    (c)  Further rules, such as the ACC Rules, the Event Regulations. the Competition Regulations, the Notices of Race, the Sailing Instructions, the



7

Racing Rules and any other Applicable Document shall be binding for all Competitors. As signing parties to this Protocol, SNG and the Challenger of Record commit to exercise their best endeavors to fully enforce those rules over all Competitors and in all respects.

(d) If a Challenger disputes the binding effect of the Protocol, SNG shall be entitled to disqualify such Challenger to participate in the Event.

2.8    **Applicable law:** This Protocol, the Event and any dispute related hereto shall be subject to New York law.

## 3.    CHALLENGER OF RECORD

3.1    **First challenge accepted:** The challenge received by SNG from the Challenger of Record was the first challenge received by SNG, and met the requirements of the Deed of Gift.

3.2    **Notice of withdrawal of the initial challenge:** The Challenger of Record shall give 120 days written notice of an intention to withdraw its challenge. The Challenger of Record's challenge shall remain valid until expiry of the 120 days notice period. Withdrawal of the challenge without giving notice of an intention to withdraw the challenge in accordance with this Article shall be always deemed to be a notice of intention to withdraw the challenge in compliance with this Article. SNG may by written notice to the Challenger of Record waive or shorten the notice period.

3.3    **Selection of an alternative Challenger of Record:** Upon the withdrawal or disqualification of the Challenger of Record, SNG shall select, at its sole and exclusive discretion, a new or an existing Challenging Competitor to be the new Challenger of Record. If no Challenging Competitor is willing to become the new Challenger of Record, the new Challenger of Record shall be the Challenging Competitor who was the first in time to submit to ACM a completed Notice of Entry. The new Challenger of Record shall execute this Protocol and shall be deemed to entirely replace the previous Challenger of Record in its contractual rights and duties.

3.4    **Challenger of Record duties:** The Challenger of Record shall not owe any additional duties to the Challenging Competitors over and above any duties that may be owed as between Competitors generally.

## 4.    CHALLENGING COMPETITORS

4.1    **Notice of Entry:** Other yacht clubs may become a Challenging Competitor by applying to enter the Event on or before the date to be defined by ACM pursuant to Article 4.2. Applying to enter the Event means completing and submitting a completed Notice of Entry in a form to be issued by ACM.

4.2    **Meet Challenge requirements:** To the extent any accepted Challenging Competitor might become the Challenger for the Match, any Notice of Entry will only be taken into consideration by ACM if the applicant yacht club meets all the




8

requirements to be the Challenger in the Match, as set out in the Deed of Gift, this Protocol and the Applicable Documents.

4. 3  **Powers of ACM:** As part of the Event Regulations, ACM shall define at its sole discretion:

    (a)   The content of the Notice of Entry form including unconditional acceptance of the dispute resolution provisions of this Protocol;

    (b)   The documents that will be presented with the Notice of Entry;

    (c)   The time limits for registering;

    (d)   An entry fee and a late entry fee to be paid to and to form part of the revenue of ACM;

4. 4  **Acceptance of Challenging Competitors:** ACM may, at its sole and entire discretion, accept or reject any entry received.

4. 5  **Rights and duties of Challenging Competitors:** Upon acceptance by ACM, the following duties and rights apply to each Challenging Competitor:

    (a)   The Challenging Competitor must comply with the Applicable Documents.

    (b)   The Challenging Competitor shall only acquire the specific and limited rights that are expressly allocated to the Challenging Competitors under this Protocol and the Applicable Documents.

    (c)   Provided the Challenging Competitor has not been disqualified until the end of the Match, neither has withdrawn his entry, it shall be entitled to a share in the distribution of the Net Surplus Revenue as provided for in Article 19.2.

    (d)   A Challenging Competitor is not party to this Protocol. The Challenging Competitor has an expectation to become the Challenger for the Match, provided the Challenging Competitor wins the Challenger Selection.

4. 6  **Withdrawal by a Challenging Competitor:** A Challenging Competitor may withdraw its entry as a Competitor by written notice to ACM. Any Challenging Competitor withdrawing its entry as a Competitor before being eliminated in competition will forfeit all fees paid on or after submitting the Notice of Entry to ACM. A Challenging Competitor which fails to participate in the Event (even partially) without the approval of ACM shall be deemed to have given notice of withdrawal of its entry and of further participation in the Event.

4. 7  **Entry recourse:** There shall be a right of recourse to the Arbitration Panel for any matter related to the entry into the Event. The Arbitration Panel decision shall be final and binding on the parties.




9

5.    **SNG AND ACM**

5. 1    **Organizing responsibilities:** SNG shall have the sole responsibility to organize and manage the Event in such manner as it shall in its discretion determine consistent with the Deed of Gift general principles set out in Article 2.

5. 2    **Appointment of ACM:** To meet its obligations set out in this Protocol, the Parties agree that SNG shall appoint ACM to provide professional commercial management expertise and financial resources to minimise the risk of losses. All losses, expenses and costs incurred in organising and managing the Event shall be the sole responsibility of ACM.

5. 3    **Management of the Event:** ACM shall have the ultimate responsibility for the management, organization, and financing of the Event. ACM shall act in a manner that is consistent with the provisions of the Deed of Gift and this Protocol.

5. 4    **Powers of ACM:** For the purpose of fulfilling the duties set out in Article 5.3, ACM is granted the following powers:

(a)    the power to appoint the following persons and bodies:

(i)    the Event Authority (see Article 6);

(ii)    the Race Committee (see Article 7);

(iii)    the Measurement Committee (see Article 8);

(iv)    the umpires (see Article 9);

(v)    such other persons as are reasonably necessary in discharging the duties outlined in Article 5.3 and in meeting the purpose and intent set out in Article 2.1.

If the Challenger of Record objects to the appointment on grounds of neutrality of any person to a senior position on the Race Committee, the Measurement Committee, or as an umpire, it may within seven (7) days of the appointment, refer the appointment to the Sailing Jury who shall determine whether such person is capable of exercising neutral judgment to hold the position to which it is appointed.

(b)    the power to unilaterally establish the rules listed under Article 2.5 (c) to (f);

(c)    the power to amend such rules, provided any material amendment shall require the approval of the Defender and the Challenger of Record. If the Defender and/or the Challenger of Record unreasonably withhold their consent, the Arbitration Panel shall make, upon ACM request, the final decision on the proposed amendment;

(d)    When establishing and amending those rules, ACM may impose any rule and restriction on the Competitors that are necessary to the fulfillment of its

10

duties under the Deed of Gift and this Protocol;

(e) the power to enforce the terms of the rules listed under Article 2.5. ACM shall be entitled to fine Competitors for non-compliance. Fines and penalties shall be determined taking into account the principles referred to in Article 31. A Competitor shall be entitled to appeal any fine or penalty imposed at any time to the Arbitration Panel within seven (7) days of being notified of a fine being imposed. ACM shall be entitled to deduct the fine from any moneys due at anytime to be paid to the Competitor, or otherwise take any legal action necessary to recover the fine. No Competitor shall be entitled to participate in the Event where a fine remains outstanding for more than 30 days, unless an appeal has been lodged with the Arbitration Panel and remains to be decided.

(f) the power to exercise any competence and to take any decision in relation to the Event, provided such power has not been attributed to another body or person by this Protocol.

5. 5 **Management fee:** ACM shall be paid a management fee of 10% of the Net Surplus Revenue.

5. 6 **Commercial rights:** To assist ACM to raise all necessary funds to organise and manage the Event, all commercial rights of such Event shall vest in ACM. Such commercial rights shall include (without limitation):

(a) funds and services (if any) provided by authorities related to the Venue;

(b) sponsorship and official supplier agreements of the Event;

(c) global media rights including, but not limited to, mobile telephone rights, still images and moving images;

(d) Event merchandising;

(e) ticketing and entry fees;

(f) entertainment;

(g) concessions;

(h) such other commercial rights and fundraising opportunities as ACM or the Event Authority may identify.

## 6.    EVENT AUTHORITY

6.1 **Appointment:** ACM shall appoint an Event Authority to organize and manage the Event.

6.2 **Event Authority's duties:** The Event Authority's duties which shall be discharged as it shall in its discretion determine consistent with the general principles set out




11

in Article 2 and the directions of ACM, shall include:

(a)    organizing and managing the Event;

(b)    establishing the timing of the Event consistent with the Schedule to be announced by ACM pursuant to Article 13.2;

(c)    endeavouring to make available space at the Venue for the Competitors at reasonable cost to establish an operational base;

(d)    raising funds to meet the costs of the Event by developing the commercial rights referred to in Article 5.6 to best advantage;

(e)    promoting the Event;

(f)    meeting its other obligations under this Protocol.

## 7.    RACE COMMITTEE

ACM shall appoint a Race Committee to conduct the races of the Event. The Race Committee shall comprise a Regatta Director who shall be Chairman, a Principal Race Officer and such other officers as may be reasonably required.

## 8.    MEASUREMENT COMMITTEE

ACM shall appoint a Measurement Committee to ensure compliance with the ACC Rules and other measurement requirements, comprising the Technical Director as its Chairman, and not less than 2 additional persons. The members of the Measurement Committee shall be appointed by ACM in consultation with the Technical Director.

## 9.    UMPIRES

ACM shall appoint a Chief Umpire and, in consultation with the Chief Umpire, such other umpires as may be reasonably required to umpire races of the Event.

## 10.    COMPETITORS' COMMISSION

10.1    **Forum:** ACM shall establish and invite a Competitors' Commission which shall hold regular meetings, not less than two per year, as a forum to exchange information and to consult. The Competitors' Commission shall have no voting powers.

10.2    **Representatives:** Each Competitor and ACM shall have the right to appoint up to two representatives to the Competitors' Commission. The Regatta Director may attend to the meeting of the Competitors' Commission. ACM may invite such other persons as may from time to time be appropriate. ACM, the Defender and the Challenger of Record shall collectively appoint by a majority vote a Chairman to conduct the meetings of the Competitors' Commission.

12

10.3 **Membership to cease on elimination:** Upon a Challenger (including the Challenger of Record) withdrawing, being excused, eliminated, or disqualified by the Sailing Jury or the Arbitration Panel from further participation in the Event, such Challenger shall, unless otherwise agreed by the Sailing Jury or the Arbitration Panel, cease to be a member of the Competitors' Commission.

10.4 **No power to amend:** The Competitors' Commission has no power to amend this Protocol or any other Applicable Documents.

10.5 **No right of making an application:** The Competitors' Commission shall have no right to make application to or make any submission to the Sailing Jury or the Arbitration Panel.

10.6 **Minutes:** Minutes of the Competitors' Commission shall be taken and distributed by ACM to all Competitors represented in the Competitors' Commission.

10.7 **Funding of Competitors' Commission:** The costs of the meetings of the Competitors' Commission shall be borne by ACM as an expense under Article 19.1.

# PART B

# COMPETITION

## 11. THE QUALIFYING REGATTAS

11.1 **Qualifying Regattas:** There may be Qualifying Regattas prior to the commencement of the Challenger Selection. The Qualifying Regattas shall be held as advised by ACM when announcing the Schedule referred to in Article 13.2.

11.2 **Purpose of the Qualifying Regattas:** Competitors may be required to compete in the Qualifying Regattas as determined by ACM. Such Qualifying Regattas may determine which Challengers will proceed to the Regatta. The scoring during the Qualifying Regattas may be differentially weighted as determined by ACM.

11.3 **Yachts:** The Qualifying Regattas held in the years prior to the Regatta are likely to be held in ACC Yachts which comply with version 5.0 of the ACC Rules.

## 12. DEFENDER TRIALS

SNG with the approval of the Defender may at its sole option require ACM to organize defender trials at the Venue or elsewhere in such manner and at anytime prior to the Match as it shall in its sole discretion determine, either with one or multiple defender candidates.

## 13. THE REGATTA

13.1 **Venue:** ACM will select and announce the Venue for the Regatta on or before 31st December 2007, or such later date announced on 31st December 2007 as may be reasonably necessary to complete selection and contracting. In the event that the



13

authorities at the Venue fail to meet their contractual obligations arising from the selection of the Venue, or it becomes impossible or difficult to hold the Regatta at the Venue, ACM may, on at least 90 days notice, select an alternative venue and/or dates for the Regatta consistent with the provisions of the Deed of Gift.

13. 2 **Schedule:** The dates of the Event including the Qualifying Regattas and the Regatta will be announced by ACM on or before 31st December 2007 or such later date announced on 31st December 2007 as may be reasonably required, provided that the Match will not be held before 2009 nor after 2011, and the Challenger Selection will not commence within 16 months from the announcement of the Venue and the Schedule. ACM will give the Challenger of Record an opportunity (not being less than seven days or more than 14 days) on a strictly confidential basis to make recommendations to ACM on the draft Schedule before it is published.

13. 3 **Trials :** There may be Trials  forming part of the Regatta which may be compulsory for all Challenging Competitors. The results of the Trials  may select the Competitors for the Challenger Selection. The Trials  may be held as advised by ACM when announcing the Schedule in accordance with Article 13.2.

13. 4 **Selection of the Challenger for the Match:** SNG and the Challenger of Record have agreed to hold a selection to select one Challenger to compete in the Match (the Challenger Selection). The winning Challenger of the Challenger Selection shall become the challenger under the Deed of Gift in the Match. If the winning Challenger of the Challenger Selection is for any reason ineligible to be the challenger in the Match, then the Challenger which placed second in the Challenger Selection, or failing the eligibility of that Challenger, the Challenger which gained the next highest place in the Challenger Selection and which is eligible, shall become the challenger in the Match. If no Challenger is eligible, SNG will be declared the winner of the Match.

13. 5 **Trials and Challenger Selection format:** The Trials and Challenger Selection format shall be announced by ACM when announcing the Schedule. It may provide for the Defender an option to participate wholly or partly at its discretion in the Trials and Challenger Selection other than the final between the two Challengers to select a Challenger for the Match.

13. 6 **Match format:** The winner of each race in the Match scores one point, the loser scores no points, and the winner of the Match will be decided by the first yacht to score five points.

13. 7 **Race Area:** The Race Area and the Course Area including their format and dimensions for the Qualifying Regattas and the Regatta, as well as the use outside those periods, shall be defined by ACM in the Competitions regulations.

## 14.   COMPETING YACHTS

14.1 **Revision of the ACC Rules:** ACM shall issue new ACC Rules on or before 31st December 2007, or such later date announced on 31st December 2007, as it may





14

be reasonably necessary to complete review and revision of the ACC Rules. There will be a minimum of 18 months between the issue of the new ACC Rules and the first race of the Regatta in ACC Yachts measured under the new ACC Rules. The new ACC Rules may provide for yachts having a maximum length overall of ninety feet in length overall, a draft whilst racing of 6.5m, but with a compulsory sliding keel system capable of reducing the draft to 4.1m for entering port and docking. All racing in the Regatta shall be undertaken in ACC Yachts that comply with the new ACC Rules.

14.2 **Sliding keels:** Centre-board or sliding keel vessels are permitted provided they meet the requirements of the ACC Rules.

14.3 **Number of authorized yachts:** The Competition Regulations issued by ACM shall determine the number of ACC Yachts that can be built, acquired or otherwise obtained by each Competitor. Such rules shall include

   (a) a prohibition on the building of a new yacht that complies with or is intended to comply with ACC Rule Version 5.0 for use in the Qualifying Regattas; and

   (b) to permit the modification of one Version 5.0 or any earlier version ACC yacht up to 50% of the original hull surface for use in the Qualifying Regattas.

14.4 **Construction in country:**

   (a) **Lamination of Hull:** The requirement of the Deed of Gift that the ACC Yacht of a Competitor be constructed in the country of the yacht club the Competitor is representing, shall be deemed to be satisfied by the lamination or another form of construction of all parts of the Hull in such country; materials, moulds and other components and hardware used in or during the lamination or other form of construction of the Hull may be obtained from any source. There is no restriction on the locality of assembly, or modification of any other part of an ACC Yacht.

   (b) **Inspection:** each Competitor shall arrange for a member of the Measurement Committee to inspect the Hull of that Competitor's ACC Yacht at its place of construction to affirm that the Hull has been constructed in accordance with Article 14.4 (a). Affirmation by the Measurement Committee shall be final and conclusive evidence of compliance with Article 14.4 (a).

   (c) **Free access:** the fabrication, acquisition or use of any component, materials or resources used to complete an ACC Yacht may be sourced without restriction as to their country of origin, place of fabrication, assembly, construction or development; for the avoidance of doubt, any such component, materials or resources must nevertheless comply with the restrictions set out in the Competition Regulations and the ACC Rules.

## 15. METEOROLOGICAL DATA SERVICE

**Meteorological Data Service:** The Event Authority shall establish and manage a meteorological and oceanographic data collection service at the Venue and make the data available to Competitors electronically (the Meteorological Data Service).



15

The service shall be provided with the specifications and procedures announced by ACM. Net costs of the Meteorological Data Service will be borne by ACM as an expense under Article 19.1. Competitors will be restricted as to other sources of meteorological and oceanographic data as set out in the Competition Regulations.

### 16. CREW MEMBER AND DESIGNER RESTRICTIONS

16.1 **General provisions**:

(a) The America's Cup is partly a design competition and partly a sailing competition. To preserve and protect the America's Cup as a bona fide design competition between the Competitors, and not a competition between combinations of Competitors, a Designer or a crew member who contracts with a Competitor for at least the duration of the Event, or in the case of a Challenging Competitor, until its elimination from the Event (whether before or after becoming a Challenger), may not be employed or engaged in any capacity by another Competitor without the prior written consent of the first contracting Competitor which may be given at the time of contracting.

(b) Notwithstanding the above, on or following 1 October 2008 (or such later date as may be announced by ACM), no Competitor shall engage a crew member, who was engaged by another Competitor after 31st of August 2007 (whether before or after becoming a Competitor in the 33rd America's Cup)..

(c) Notwithstanding the above, on or following 30 days after issuance of the new ACC Rules pursuant to Article 13.1 (or such later date as may be announced by ACM), no Competitor shall engage a designer, who was engaged by another Competitor after 31st of August 2007 (whether before or after becoming a Competitor in the 33rd America's Cup).

(d) Competitors shall promptly file with the Event Authority the names of persons contracted for the periods described above. The Event Authority shall maintain a register which shall be available electronically for inspection by any Competitor or bona fide intending Competitor.

16.2 **Penalty for breach:** A Competitor that breaches this Article shall be ineligible to compete, or to continue to compete, in the Event unless the Sailing Jury is satisfied that the breach was caused by error or oversight, that the person that was wrongfully engaged has terminated all involvement with the Competitor in breach, and that no material advantage was gained.

16.3 **No nationality rules:** In accordance with past practice in America's Cup competition, and following repeal of all past Trustee Interpretative Resolutions on 2 March 2003, there shall be no requirement regarding the nationality or residency of any crew member, or any Designer, of a Competitor's ACC Yacht.

16.4 **Power of ACM:** The restrictions regarding crew members and Designers set out in this Article may be detailed or amended in the Competition Regulations to be issued by ACM to reinforce the purpose and intent of the restriction set out in



16

Article 16.

## 17.   FURTHER RULES AND RESTRICTIONS

17. 1 **Competition Regulations:** Upon announcing the Schedule, ACM shall publish the Competition Regulations consistent with the provisions of this Protocol, which shall contain further competition rules and restrictions which may include (but not limited to) limiting the number of support boats; limiting the number of sails: limiting modification of yachts; training and testing restrictions; meteorological and oceanographic data restrictions, reconnaissance restrictions, further crew and designer restrictions, anti-doping restrictions, and anti-gambling restrictions. ACM may amend the Competition Regulations from time to time.  The Competition Regulations may be published in parts at various times as may be required to guide Competitors and intending Competitors.  ACM will give the Challenger of Record an opportunity (not being less than seven days or more than 14 days) on a confidential basis to make recommendations to ACM on draft Competition Regulations before they are published.

17. 2 **Notice of Race and Sailing Instructions:** ACM shall issue within approximately 60 days before the first race of the Event a Notice of Race and Sailing Instructions for each race of the Event which shall be consistent with the terms of this Protocol.

17. 3 **Racing Rules:** ACM shall publish the Racing Rules that shall apply to the Event within approximately 60 days before a race of the Event in which they are applicable.

# PART C

# COMMERCIAL

## 18.   EVENT REGULATIONS

No later than 31st December 2007 or such later date announced on 31st December 2007 as may be reasonably required, ACM shall publish the Event Regulations that will apply to all Competitors and will define the scope of the Competitors' commercial rights to allow ACM to exploit the full commercial potential of the Event for the benefit of all Competitors collectively.  ACM may amend the Event Regulations from time to time.  ACM will give the Challenger of Record an opportunity (not being less than seven days or more than 14 days) on a confidential basis to make a submission to ACM on draft Event Regulations before they are published.

## 19.   NET SURPLUS REVENUE

19. 1 **Calculation of the Net Surplus Revenue:** The Net Surplus Revenue shall be the total of all revenue received by ACM for the Event, less the costs of:

(a)   Salaries and bonuses of staff and management engaged by ACM or its subsidiaries for the purposes of the Event;




17

(b)  The Regatta Officials;

(c)  The Dispute resolution and enforcement costs;

(d)  The Race Committee;

(e)  The Measurement Committee;

(f)  TV and other media production;

(g)  Sponsor fulfillment obligations;

(h)  Administration;

(i)  Promotion;

(j)  Insurance;

(k)  Interest, finance and banking charges;

(l)  All taxes, duties, levies and social services charges payable, including any taxes incurred by ACM or its subsidiaries; for the avoidance of doubt, any VAT due or paid by ACM or its subsidiaries shall be considered as an expense to be deducted under this Article;

(m)  Expenses incurred by SNG in discharging its duties as holder and trustee of the America's Cup;

(n)  Costs and expenses related to the Meteorological Data Service;

(o)  Costs of liquidating the Event-related assets at the end of the Match; and

(p)  Other expenses incurred by ACM or its subsidiaries in organising or promoting the Event.

but shall not include the costs of any Competitor to compete in the Event.

19.2 **Distribution of the Net Surplus Revenue:** The Net Surplus Revenue shall be determined (at least on a provisional basis) within 180 days after the last race of the Match and paid within 90 days of its determination in the following priority:

(a)  the payment of the management fee referred to in Article 5.5 to ACM;

(b)  the residual of the Net Surplus Revenue shall be paid to the Competitors as follows:

(i)  one half to be distributed to the Defender;

(ii)  the remainder shall be distributed to the Challengers as follows (the same distribution structure that applied for the Challenger Selection for




18

the 30th, 31st, and 32nd America's Cups);

- 40% divided equally amongst all Challengers;

- 30% divided equally amongst all Challengers semi-finalists in the Challenger Selection;

- 20% divided equally amongst both Challengers finalists in the Challenger Selection;

- 10% to the winner of the Challenger Selection;

(iii) notwithstanding the provisions of Article 19.2 (b) (ii), any Challenger that has withdrawn, or deemed to have withdrawn, or that has been disqualified from competing further in the Qualifying Regattas or the Regatta by the Sailing Jury or the Arbitration Panel, shall not be entitled to receive any part of the Net Surplus Revenue unless the Sailing Jury or the Arbitration Panel orders the restoration in whole or in part of such entitlement where the Sailing Jury or the Arbitration Panel, as the case may be, is satisfied that forfeiture arose through inadvertence or was beyond the reasonable control of the Challenger, and has not resulted in ACM or its subsidiaries incurring any significant actual or contingent liability, expense or lost revenue; insufficient funds shall not be grounds for the Sailing Jury or the Arbitration Panel to restore in whole or in part the entitlement of a Challenger to receive any part of the Net Surplus Revenue.

(c) ACM may at its sole absolute discretion make interim distributions at any time on such terms and conditions as it may determine.

19. 3 **Basis of payment:** The amount payable to Competitors pursuant to Article 19.2 (b) shall be paid as a contribution to the gross expenses of each Competitor. Any amount in excess of a Competitor's gross expenses shall only be paid to such Competitor if ACM is satisfied on reasonable grounds that such payment would not breach any duty or obligation to which SNG and/or ACM is subject.

19. 4 **Half yearly reports:** ACM shall, from 30 June 2008, prepare and distribute to each Competitor six-monthly reports of the forecasted Net Surplus Revenue available for distribution at the conclusion of the Event. The final report containing only the actual Net Surplus Revenue available for distribution and the distributing calculations shall be audited and distributed to each Competitor with a copy of the audit report. All reports shall be strictly confidential to the Senior Management of a Competitor. ACM may require persons having access to the reports first sign a confidentiality agreement.

19

## PART D

## DISPUTE RESOLUTION AND ENFORCEMENT

### 20.  MEASUREMENT COMMITTEE

20. 1 **Jurisdiction:** Except as set out in Article 20.2, all matters relating to the measurement of the ACC Yachts, the interpretation of the ACC Rules, or the determination as to whether a yacht meets the ACC Rules, or the Racing Rules referred to in Article 17.3 insofar as they relate to a yacht's equipment, shall be determined by the Measurement Committee. The Measurement Committee shall have no power or authority to amend, alter, cancel or add to the ACC Rules or the Racing Rules relating to a yacht's equipment, but shall be entitled to interpret the words used in such documents. The Measurement Committee may remedy a procedural defect resulting in non-compliance by a Competitor, other than when racing, provided following the procedural defect being remedied, there will be no material advantage or prejudice to any Competitor and the remedy results in full compliance with the ACC Rules. All decisions of the Measurement Committee shall be determined by majority vote.

20. 2 **Appeal:** Decisions of the Measurement Committee within its jurisdiction shall be subject to appeal to the Sailing Jury, which shall have full powers to determine any appeal including replacing any determination or interpretation made by the Measurement Committee as it considers fair and reasonable to do so.

20. 3 **Delegation:** The Technical Director may delegate one or more of the members of the Measurement Committee to carry out measurement or inspection on behalf of the Measurement Committee. The Measurement Committee shall be entitled, in the absence of manifest error, to act on a report of any such delegated member(s).

20. 4 **Payment of Measurement Committee's fees and expenses:** Competitors shall pay reasonable fees as determined by ACM and the expenses incurred for the services of the Measurement Committee outside the time period during which the Regatta is held.

### 21.  RESOLUTION BY ARBITRATION

Any dispute, protest or claim arising out of or in relation to this Protocol and/or the Applicable Documents, the interpretation or breach thereof, shall be resolved by arbitration in accordance with the provisions of this Protocol, except if and where otherwise expressly set forth in this Protocol. Such arbitration shall be final and binding.

### 22.  ARBITRATION BODIES

There shall be two dispute resolution bodies: a Sailing Jury, which shall interpret provisions or resolve disputes of a sporting or technical nature arising under the

20

Competition Regulations, the Notices of Race, the Sailing Instructions and the Racing Rules, and an Arbitration Panel, which shall interpret all other provisions of this Protocol or resolve other disputes. The Sailing Jury and the Arbitration Panel shall in making any determination give effect to all provisions of this Protocol.

### 23. JURISDICTION

The Sailing Jury and the Arbitration Panel shall have the power to determine their respective jurisdiction upon receiving an application. In case of doubt on whose jurisdiction shall prevail, the Arbitration Panel shall determine jurisdiction. Its decision shall be final and binding.

### 24. APPOINTMENT

24.1. **Composition :** the Sailing Jury and the Arbitration Panel shall each comprise three (3) members. Members may be

(a) citizens of any country including a country of a Competitor in the Event,

(b) residents of any country, except the State of New York without the prior approval of ACM, including a country of a Competitor in the Event.

(c) members of a yacht club represented by a Competitor in the Event.

A person shall not be member of both the Sailing Jury and the Arbitration Panel, at the same time, provided that a person may resign from one of the bodies and be appointed to the other.

24.2. **Appointment:** Upon signing the Protocol, the Parties hereto have agreed in a separate document on the names of the Arbitration Panel members. The Parties will agree on the names of the Sailing Jury members no later than December 31st, 2007.

24.3. **Dismissal and replacement :**SNG and the Challenger of Record acting jointly shall also be competent to dismiss and replace the members of the Sailing Jury and the Arbitration Panel at their discretion at any time.

Upon the resignation, death or dismissal of any of the members of the Arbitration Panel or the Sailing Jury, a replacement shall be selected and appointed by SNG and the Challenger of Record acting jointly.

In case of deadlock between SNG and the Challenger of Record as to the appointment or the dismissal of a member of the Jury, the Arbitration Panel shall dismiss or appoint the juror.

In case of deadlock between SNG and the Challenger of Record as to the appointment of a member of the Arbitration Panel, SNG or the Challenger of Record may request that the International Center for Dispute Resolution (ICDR) of the American Arbitration Association appoint such member, and the parties herby



21

agree that the ICDR shall act as appointing authority for such purpose.

## 25.  SEAT

Both the Sailing Jury and the Arbitration Panel shall have their seat in New York, however they may act in any other place, or by correspondence or other means of communication at distance.

## 26.  RULES OF PROCEDURE

(a)  Both the Arbitration Panel and the Sailing Jury shall act in accordance with New York arbitration law.

(b)  The Sailing Jury shall establish the rules of procedure of the Sailing Jury consistent with this Protocol and otherwise with the rules of natural justice

(c)  The Defender and the Challenger of Record shall agree on the rules of procedure of the Arbitration Panel. If none are agreed, the Arbitration Panel and the Jury shall apply the New York arbitration law procedures.

## 27.  LANGUAGE

All proceedings of the Sailing Jury and the Arbitration Panel shall be in the English language.

## 28.  STANDING TO MAKE AN APPLICATION

All Competitors, SNG, ACM and the Event Authority, shall have standing to make applications before the Sailing Jury and the Arbitration Panel subject to their respective jurisdictions. The Race Committee and the Measurement Committee shall have standing to bring an application before the Sailing Jury to enforce any of the documents referred to in Article 2.3.

## 29.  APPEAL

The decision of the Sailing Jury and the Arbitration Panel shall be final and binding, except that an appeal may be lodged before the Arbitration Panel against any determination or award of the Sailing Jury. The Arbitration Panel shall have the power to decide on the admissibility of the appeal and its competence. The Arbitration Panel appeal awards shall then be final and binding.

## 30.  TIME LIMITS

All rights to lodge and application or appeal shall be subject to the following time limits:

(a)  The time limit to lodge an application with the Sailing Jury shall be seven (7) days from when the applicant was or could with reasonable diligence have been aware of the circumstances justifying the protest.



22

(b)   The time limit to lodge any appeal with the Sailing Jury or the Arbitration Panel shall be seven (7) days from the time of communication of a decision or award of the Measurement Committee or the Sailing Jury.

(c)   The time limit to lodge an application with the Arbitration Panel shall be three (3) months from when the applicant was or could with reasonable diligence have been aware of the circumstances justifying the protest.

(d)   The Sailing Jury and the Arbitration Panel may extend the time limits if there is good reason.

(e)   During regattas, the aforementioned time limits shall be reduced as follows, unless otherwise specified in the Notice of Race by ACM:

(i)    Any protest or appeal to the Jury during regattas shall be made within a time limit to be set in the Notice of Race;

(ii)   Any appeal to the Arbitration Panel during regattas shall be made within 12 hours from the communication of the award or decision of the Sailing Jury.

## 31.   NATURE OF DECISION

The decisions of both the Sailing Jury and the Arbitration Panel shall constitute binding and final arbitration awards.

## 32.   PENALTIES

The Arbitration Panel and the Sailing Jury may at their discretion penalise a Competitor in breach of this Protocol or any Applicable Document. Penalties shall be determined taking into account the surrounding circumstances, any advantage gained or disadvantage sustained by other Competitors or parties, and as may be necessary, the need to encourage future compliance with this Protocol or any Applicable Document.

## 33.   PREVIOUS DECISIONS

The Sailing Jury and the Arbitration Panel shall not be bound by decisions or awards of any dispute resolution bodies of preceding competitions for the America's Cup.

## 34.   COSTS AND EXPENSES

The costs and expenses of the Sailing Jury and the Arbitration Panel shall be subject to the following rules:

(a)   The Sailing Jury shall only proceed upon payment of an application fee which shall be fixed by and payable to ACM. ACM shall remunerate the members of the Sailing Jury and shall reimburse their expenses.



23

(b) The Arbitration Panel shall only proceed upon payment of an application fee by the applicant which the Arbitration Panel shall fix being its estimate of total costs to resolve an arbitration. Such application fee shall be paid to the Arbitration Panel. The Arbitration Panel shall award all costs it has or will incur to resolve the arbitration to one or more parties to an application as it considers equitable provided that the starting basis shall be that the losing party or a party seeking an interpretation will be liable for all costs to resolve the arbitration.

(c) Except as provided above, all revenue generated by the Sailing Jury and/or the Arbitration Panel shall be paid to ACM and be included in ACM's revenue for the calculation of the Net Surplus Revenue.

## 35. RESORT TO COURTS PROHIBITED

Each person or entity, including its officers, members and employees, having the right to make an application to the Sailing Jury or the Arbitration Panel hereunder shall not resort to any other court or tribunal than the Sailing Jury and the Arbitration Panel. Any such resort shall constitute a breach of this Protocol. Notwithstanding the above, nothing shall prevent SNG from making any application it considers in its sole discretion appropriate regarding the administration of the Deed of Gift.


# PART E

# MISCELLANEOUS


## 36. AMENDMENTS

36. 1 **Amendments by the parties:** SNG and the Challenger of Record may from time to time amend this Protocol by the deletion of terms and/or the addition of new terms.

36. 2 **Amendments required by authority:** SNG may, after providing notice to the Defender and the Challenger of Record, modify this Protocol to meet the requirements of any authority having jurisdiction over the Deed of Gift as to the manner in which SNG is to administer the Deed of Gift.

## 37. COSTS AND EXPENSES TO COMPETE

Unless expressly provided otherwise in writing by ACM, all costs and expenses incurred in competing in the Event, including any Qualifying Regatta, and in meeting all obligations under this Protocol and the Applicable Documents shall be the sole and exclusive responsibility of the Competitor incurring such costs.

## 38. LIABILITY AND INSURANCE

24

38. 1 **Own risk:** Every Competitor taking part in the Event does so at its own risk and responsibility.

38. 2 **Indemnity:** Each Competitor shall protect, indemnify and hold harmless SNG, the Defender, the Challenger of Record, any other Competitor, the Competitors' Commission, ACM, the Event Authority, the Sailing Jury, the Arbitration Panel, any Regatta Official, their respective directors, officers, employees and contractors, from and against any and all liabilities, damages, indemnity, compensation, costs and expenses (including all legal fees incurred) whatsoever resulting from any claims, proceedings or actions brought by such Competitor and arising directly or indirectly out of or in any way connected with the acceptance of their challenge and performance in the Event or other associated event provided that such indemnity shall not apply to any proceedings in front of the Sailing Jury or the Arbitration Panel.

38. 3 **Insurance:** ACM shall obtain from third party a liability insurance cover for the Event and for all Regatta Officials, the Sailing Jury and the Arbitration Panel on such commercial terms as it shall determine. The cost of insurance cover shall be borne by ACM as an expense under Article 19.1.

38. 4 **Postponement or cancellation:** Neither SNG, nor the Defender, nor ACM, nor the Event Authority, nor any Regatta Official, nor any of their directors, officers, employees, agents or contractors shall be liable to any Competitor or Regatta Official or any of their directors, officers, employees, agents or contractors for any losses, damages, injury, loss of profits, loss of prospective profits, consequential damages, penalties or inconvenience, whether direct or indirect, however arising, as a result of the postponement or cancellation of the Event or part thereof due to any event, occurrence or circumstances beyond the reasonable control of SNG, the Defender, ACM or the Event Authority including but not limited to acts of God, terrorism, war, government intervention or regulation, public health, environmental conditions, strikes, lockouts, other industrial acts or any other force majeure circumstance.

DATED this ̶3̶rd̶ day of ̶July̶ ̶2007̶  at Valencia, Spain

̶Third̶_____ Copy (three original copies on total)

Société Nautique de Genève
by:

**The Challenger of Record**
by:

25

EXHIBIT C

## 4.1    The Protocol of 2 March 2000 (Consolidated Version)

INDEX

*ARTICLE:*

1.  Acceptance of Challenges
2.  Entry Fees and Performance Deposits
3.  Initial Challenger of Record and Mutual Consent
4.  Provision for Challenger of Record Committee
5.  Race Conditions
6.  Challenger Selection Series
7.  Common Declaration of Yachts
8.  Measurement of Yachts
9.  Site and Timing of the XXXI America's Cup
10. Acceptance of Protocol and Prohibition on Proceedings
11. Interpretive Resolutions
12. Advertising and Names of Yachts
13. Reconnaissance
14. Rules
15. Eligibility of Yachts
16. Modification to Yachts
17. Number of Sails
18. Television and Technical Equipment
19. Other Conditions
20. License Agreement
21. Measurement Committee
22. America's Cup Arbitration Panel and Dispute Resolution
23. Interpretation

BACKGROUND

A.   The Royal New Zealand Yacht Squadron ("RNZYS") believes that a form of protocol (as it has come to be known), is a desirable way of mutually consenting to

48

the various items that, in accordance with the Deed of Gift of the America's Cup dated 24 October 1887 ("Deed of Gift"), may be agreed between the yacht club holding the America's Cup and the yacht club challenging for that Cup.

B. RNZYS has received from Yacht Club Punta Ala ("YCPA") a notice of challenge which proposes that the terms of this protocol ("Protocol") should apply to the XXXI America's Cup match ("Match"), together with other items required by the Deed of Gift and this Protocol to be provided by a challenger for the America's Cup, and RNZYS has consented to the class of yacht and other proposals put forward by YCPA.

ARTICLES

*1.  ACCEPTANCE OF CHALLENGES*

1.1    RNZYS shall accept every bona fide notice of challenge for the Match from an organised yacht club from a foreign country ("Yacht Club") as more particularly required by the Deed of Gift, which is either:

(a)    received by RNZYS, together with payment of the entry fee of US $150,000 prescribed by Article 2.1 and a declaration in writing by such Yacht Club that it accepts, and will be bound by, this Protocol and all subsequent decisions pertaining, thereto, no later than 1700 hours on 1 March 2001 New Zealand standard time; or

(b)    received by RNZYS, together with payment of the entry fee of US $300,000 prescribed by Article 2.2, no later than 1700 hours on 1 March 2002 New Zealand standard time provided RNZYS (i) is satisfied that the spirit and intent of this Protocol has been complied with by such Yacht Club until the date that the notice of challenge is received, and (ii) has received from such Yacht Club a declaration in writing that it has, from the completion of the last race for America's Cup XXX ("Final Race in 2000") until the date its notice of challenge is received, complied with the spirit and intent of this Protocol and that it accepts, and will be bound by, this Protocol and all subsequent decisions pertaining thereto.

1.2    Notwithstanding Article 1.1 RNZYS shall not accept a challenge from a Yacht Club unless as at the earlier of the date on which it delivers its challenge and 1 March 2001 it meets each of the following criteria:

(a)    it must have been in existence for a minimum of five years;

(b)    it must maintain a membership of at least 200 members;

(c)    it must be financially supported by a majority of its membership on a prorata basis;

*Protocol XXXI America's Cup*

    (d)   it must operate as a yacht club and have objectives consistent with the furtherance of yachting activities; and

    (e)   it must be a member of the national sailing authority of its country.

1.3    For the purposes of the Deed of Gift, all challenges accepted under Article 1.1 ("Challenges") shall be deemed to have been received at the same time, being the time of the conclusion of the Final Race in 2000.

1.4    Entry fees must be paid to RNZYS in cleared funds in US dollars and deposited into a bank account to be nominated by RNZYS.

## 2.  ENTRY FEES AND PERFORMANCE DEPOSITS

2.1    All notices of challenge lodged under Article 1.1(a) shall be accompanied by a US $150,000 entry fee.

2.2    All notices of challenge lodged under Article 1.1(b) shall be accompanied by a US $300,000 entry fee.

2.3    If a challenge is accepted, the entry fee shall be non-refundable and shall be applied as follows:

    (a)   US $75,000 in the case of an entry fee payable under Article 2.1, and US $225,000 in the case of an entry fee payable under Article 2.2, shall be for use by the Challengers and shall be held by RNZYS in a separate account from its normal operating accounts until written instructions regarding disposition are received by RNZYS from the Challenger of Record;

    (b)   US $25,000 shall be held by RNZYS for defraying costs associated with maintenance of America's Cup Properties, Inc. ("ACPI"), the holder of the America's Cup trade marks (including the image and silhouette of the America's Cup) worldwide, and the preservation of those marks, as deemed necessary and approved by ACPI, and RNZYS shall ensure that ACPI makes annual reports to the Challenger of Record regarding the disposition of those funds;

    (c)   US $50,000 shall be held in a joint bank account ("Joint Account") in the name of RNZYS and the Challenger of Record to be applied towards the payment of any joint costs associated with the Challenger Selection Series to be held in accordance with Article 6, the Defender Selection Series, if there is one, and the Match and such funds may be used to prepare and refine the racing rules and in the training and engagement of officials.

2.4    RNZYS shall make a single payment of US $50,000 as a contribution, to be held in the Joint Account and applied with the other funds held in that Joint Account.

2.5    In addition to the entry fees specified above he following payments will be required:

50

*Protocol XXXI America's Cup*

(a)  Each Challenger shall pay the sum of US $25,000 to the Joint Account prior to its yacht commencing to race in the Challenger Selection Series;

(b)  Prior to the Match Unveiling Ceremony as specified in Article 7.3 the selected Challenger in the Match shall pay the sum of US $75.000 and the Defendant shall pay the sum of US $100,000 to the Joint Account.

These payments are an eligibility requirement and together with the amount specified in article 2.3(c) and 2.4, shall be applied by COR/D to the payment of the International Sailing Federation ("ISAF") sanctioning fees due under the agreement between COR/D and ISAF dated 19th September 2000.

2.6  The Challengers may, by a majority vote, require additional funds from each Challenger in the form of cash, a performance bond, or a letter of credit, for the purpose of assuring an individual Challenger's participation in the Challenger Selection Series. Those funds or financial instruments may be required at such time and in such amount as is agreed by a majority vote of the Challengers and approved by RNZYS.

2.7  As well as the amounts referred to in Article 2.3(a) the Challengers shall share equally all further costs of the Challenger Selection Series and other activities of the Challengers as a group associated with the challenge for the XXXI America's Cup. Such costs may be offset from money raised from Challenger group commercial activity.

## 3.  INITIAL CHALLENGER OF RECORD AND MUTUAL CONSENT

3.1  YCPA, having submitted the first valid notice of Challenge to RNZYS, is appointed by RNZYS as the Initial Challenger of Record ("Initial Challenger of Record").

3.2  The Initial Challenger of Record shall represent all Challengers whose notices of challenge are accepted under Article 1 unless the Initial Challenger of Record relinquished its position and a Challenger of Record is appointed under Article 4.1(c) or a Challenger of Record Committee is formed or deemed to be formed under Article 4.

3.3  The Challenge received by RNZYS from YCPA, together with the other items required by the Deed of Gift, specified the class of yacht for the Match and contained the proposals for the dates, the number of races, and the types of courses as set out below:

(a)  yachts of the International America's Cup Class ("ACC"), as used in America's Cup XXVIII, XXIX and XXX;

(b)  at the location and on the dates specified in Article 9;

(c)  the winner of each race in the Match scores one point, the loser scores no points, and the winner of the Match will be decided by the first yacht to score five points;

51

*Protocol XXXI America's Cup*

    (d)   the course to be a windward-leeward configuration, 18.5 nautical miles in length with the first leg to windward of 3.25 nm, then four leeward/windward legs of 3.0 nm and a final leeward leg of 3.25 nm;

    (e)   the Challenger of Record and RNZYS (together "COR/D") may by mutual consent agree to amend those matters more particularly set out in paragraphs (c) and (d) of this Article 3.3 to include the possibility of increasing the number of races, with some of those races being sailed over a shorter windward/leeward course.

## 4.  PROVISION FOR CHALLENGER OF RECORD COMMITTEE

4.1   If at any time the Initial Challenger of Record wishes to relinquish its position as Initial Challenger of Record, the following provisions shall apply:

    (a)   The Initial Challenger of Record shall convene a meeting ("Challengers Meeting") of all of the then Challengers, to take place within 60 days after the day that it gives notice of its intention to relinquish its position as Initial Challenger of Record.

    (b)   The Initial Challenger of Record shall relinquish its position as the Initial Challenger of Record at the Challengers Meeting, but shall retain the status of a Challenger under this Protocol and retain the rights and powers specifically conferred on the Initial Challenger of Record as such, including, without limitation, those in Article 22.

    (c)   At the Challengers Meeting the Challengers shall vote either to elect one of the Challengers as Challenger of Record ("Challenger of Record") or alternatively to establish a Challenger of Record Committee or other organisation or entity ("CORC").

    (d)   All Challengers present or voting by proxy at the Challengers Meeting or any other duly convened meeting of Challengers shall be entitled to one vote each. If a Challenger is unable to be represented in person at any meeting of Challengers, that Challenger may appoint another Challenger to vote as its proxy. All matters shall be determined by a majority of votes.

    (e)   If the Challengers at the Challengers Meeting do not either elect a Challenger of Record or vote for the establishment of a CORC, a CORC shall be deemed to be formed at that meeting consisting of all the Challengers. Any Challenger whose notice of challenge is accepted by RNZYS after the Challengers Meeting shall automatically become a member of the CORC.

    (f)   The outcome of the Challengers Meeting shall be notified to RNZYS within seven days after the date of the Challengers Meeting.

    (g)   All Challengers present or voting by proxy at any meeting of the CORC shall be entitled to one vote each and all matters shall be determined by a majority of votes. The CORC shall determine in all other respects its own constitution, By-Laws and all other rules of internal administration.

## 5.  RACE CONDITIONS

5.1    RNZYS and the Challenger of Record shall agree upon the Notice of Race and Conditions and the Sailing Instructions governing the races for the Match (together, the "Conditions"). The Conditions, with such modifications as are necessary to accommodate such matters as dates, times, and the number and series of races, shall also govern the races for the Challenger Selection Series and the Defender Selection Series, if there is one. Any such modifications shall be subject to the approval of RNZYS, which shall ensure that they are equitable to all Challengers.

5.2    The Conditions, which shall be similar to the Conditions governing America's Cup XXX, shall be finalised by 30 September 2001 ("Match Conditions Date"). RNZYS and the Challenger of Record shall endeavour to resolve any differences between them as to the terms of the Conditions through negotiation.

5.3    If on or before the Match Conditions Date such negotiations have been unsuccessful and the Conditions have not been finalised, then the America's Cup Arbitration Panel constituted under Article 22 ("Arbitration Panel") shall commence mediation of all such differences. If that mediation is unsuccessful then the Arbitration Panel shall, no later than three months after the Match Conditions Date, decide the unresolved issues on which RNZYS and the Challenger of Record differ by choosing between the respective positions of RNZYS and the Challenger of Record on those issues and the Conditions governing the Match shall be finalised accordingly.

5.4    Each of the Challengers and RNZYS shall, either within four weeks after agreement has been reached by the Challenger of Record and RNZYS, or within four weeks after the date the Arbitration Panel has determined any unresolved issues, whichever is the later, sign the Conditions and acknowledge that those conditions shall govern the races in the Challenger Selection Series, the Defender Selection Series, if there is one, and the Match.

## 6.  CHALLENGER SELECTION SERIES

6.1    Prior to the Match, the Challenger of Record shall organise and conduct a Challenger Selection Series for all Challengers, at the venue and within the course areas in the coastal waters of New Zealand specified under Article 9, under the Conditions agreed under Article 5. The winning Yacht Club and its winning yacht shall, subject to Articles 6.3 and 6.4, become the Challenger under the Deed of Gift for the Match.

6.2    The format of Challenger Selection Series shall be as follows:

(a)    There will be two round robins. In each round robin each Challenger will sail every other Challenger once (or more than once if there is a small number of Challengers) and a win will carry the same points. The purpose

*Protocol XXXI America's Cup*

of the round robins is to establish a seeding or ranking for each Challenger. To the extent necessary for the application of Article 6.2(b) an appropriate method will be adopted to resolve any ties;

(b) Following the round robins there will be quarter-finals and thereafter semi-finals. The participants in the quarter-finals will be the eight top scorers as 4 result of the round robins referred to in Article 6.2 (a). The quarter-finals and semi-finals shall be conducted on seeded ladder basis, which may include repechages, to be determined by the Challengers and approved by RNZYS.

(c) The finals of the challenge selection series will be between the two top yachts in the semi-finals. The winner of each race in the finals will score one point. The loser scores no point. The winning yacht will be decided by the first yacht to score five points.

The Challenger of Record with the agreement of all Challengers and with the consent of RNZYS may change the format of the Challenger Selection Series.

6.3 If the winning Yacht Club and its winning yacht are for any reason ineligible to be the Challenger then the Challenger Yacht Club and its yacht which placed second in such Series, or falling the eligibility of that Yacht Club and its yacht, the Yacht Club and its yacht which gained the next highest place in the Series and which are eligible, shall, subject to Article 6.4, become the Challenger.

6.4 No Challenger shall be accepted as Challenger under the Deed of Gift unless it shall first have declared in writing that it has until that time complied, and will thereafter until the conclusion of the Match comply, with the terms of the Conditions, this Protocol, the Deed of Gift, the Interpretive Resolutions and the decisions of the Arbitration Panel (excluding, however any non-compliance by the Challenger with any of those documents which has already been ruled on or determined in accordance with the terms of those documents by the appropriate body or entity, provided the Challenger has fully complied with such ruling or determination and has fully satisfied any penalty imposed and provided that the Arbitration Panel has not expressly ruled or determined that the particular non-compliance by a Challenger makes it ineligible to become the Challenger under the Deed of Gift for the Match).

## 7. *COMMON DECLARATION OF YACHTS*

7.1 RNZYS and the Challenger of Record shall:

(a) name the Yacht Clubs and their respective yachts which will participate in the finals of the Challenger Selection Series, and the finals of the Defender Selection Series, if there is one, at least four clear days prior to the first race of the finals in which they are to participate; and

    (b)   have each nominated yacht involved in a public unveiling ceremony on an agreed date at least three clear days prior to the first race of those finals.

7.2    If there is no Defender Selection Series then RNZYS shall nominate one or two yachts which will be involved in a public unveiling ceremony on the agreed date of the public unveiling of the yachts participating in the Challenger Selection Series.

7.3    In addition, the challenging and defending yachts for the Match shall be involved in a public unveiling ceremony which shall be held three clear days prior to the first day of the Match. Prior to the date of that ceremony both the challenging and defending yachts must have been through the official pre-match measurement provided for in Article 8 and have been accepted by RNZYS as Challenger and Defender for the Match. If RNZYS nominated only one yacht under Article 7.2, that yacht shall be the defending yacht. If it nominated two yachts, it shall select, in its absolute discretion, one of those two yachts to be the defending yacht.

7.4    Underbodies may be shrouded until the yachts have been measured, accepted, and unveiled for the finals in a Selection Series or, in the case of defending yachts if there is no Defender Selection Series, until the public unveiling ceremony prior to the finals of the Challenger Selection Series.

7.5    Underbodies may not be shrouded again after the yachts have been so unveiled until in the case of a challenging yacht, the conclusion of the final race in the Challenger Selection Series and, in the case of a defending yacht, the conclusion of the final race in the Defender Selection Series, if there is one, or if not the earlier of (i) the conclusion of the final race of the Challenger Selection Series, and (ii) the eighth day after of the day on which the first race in that Selection Series was scheduled to be held.

7.6    After the challenging and defending yachts have been unveiled for the Match, they may not be shrouded again until after the conclusion of the Match.

7.7    If RNZYS is the eventual winner of the Match, it shall continue the common declaration provisions of this Article 7 so long as it continues to hold the America's Cup. If a Challenger is the eventual winner of the Match, it shall continue the common declaration provisions of this Article 7 so long as it continues to hold the America's Cup.

## 8.   MEASUREMENT OF YACHTS

8.1    Prior to each public unveiling ceremony in which it is required by Article 7 to participate, each participating yacht to be unveiled shall be remeasured (even though it then has a valid measurement certificate) and the resulting measurement certificate or revalidated measurement certificate shall be marked on the front page thereof as the "Unveiling Measurement Certificate".

8.2    After an Unveiling Measurement Certificate has been issued in respect of a yacht, no changes may be made to that yacht which would invalidate that certificate until:

*Protocol XXXI America's Cup*

> (a)  in the case of a challenging yacht, the conclusion of the last race in the Challenger Selection Series;
>
> (b)  in the case of a defending yacht, the conclusion of the last race in the Defender Selection Series, if there is one, or if not, the earlier of (i) the conclusion of the last race in the Challenger Selection Series, and (ii) the eighth day after the day on which the first race in that Challenger Selection Series was scheduled to be held; and
>
> (c)  in the case of the yachts participating in the Match, the conclusion of the last race in the Match.

8.3  Despite Article 8.2, chances may be made to a challenging or defending yacht which would otherwise invalidate its Unveiling Measurement Certificate:

> (a)  If those changes are required by the Measurement Committee referred to in Article 21, to enable a yacht to comply with the Intentional America's Cup Class Rule ("ACC Rules"); or
>
> (b)  in the case of unintentional damage beyond that covered in ACC Rule 49.3(b), if the Measurement Committee approves the repairs as necessary.

## 9.   SITE AND TIMING OF THE XXXI AMERICA'S CUP

9.1  The XXXI America's Cup Regatta shall be held in the coastal waters of New Zealand. The Match shall be held in late February/early March 2003 and the Challenger Selection Series shall be held in late 2002 early 2003.

9.2  The venue for the Match, the course areas for the Challenger Selection Series and the precise dates for the Match shall be announced by RNZYS within one year after the Final Race in 2000, subject, however, to any changes in venue and/ or course areas and/or those dates which may be agreed by RNZYS and the Challenger of Record.

## 10.   ACCEPTANCE OF PROTOCOL AND PROHIBITION ON PROCEEDINGS

10.1  As a condition of entry as a Challenger in the XXXI America's Cup and in addition to all other requirements under the Deed of Gift, all Challengers are required under Article 1 to agree that they accept and will be bound by all of the provisions of this Protocol. In particular such acceptance includes an acknowledgement that all decisions rendered by the Arbitration Panel be binding on all Challengers and RNZYS and shall not be subject to appeal or be referred to any court or other tribunal for review in any manner.

10.2  Any Challenger who resorts to any court or tribunal, other than the Arbitration Panel or any other dispute resolution body agreed by RNZYS and the Challenger

of Record will, except as permitted by Article 10.4, be in breach of this Protocol and will accordingly be ineligible to make the declaration provided in Article 6 and to be the Challenger for the Match.

10.3    Without in any way limiting Articles 10.1 and 10.2, each Challenger and each Candidate for the Defence, by agreeing to be bound by this Protocol, is deemed to have undertaken on its own behalf and on behalf of each of its officers, members, employees, agents and contractors, that they will not, at any time, in relation to any matter governed by this Protocol, or in relation to any other matter concerning the XXXI America's Cup, issue proceedings or suit in any court or other tribunal against all or any of the following:

(a)    RNZYS or any of its officers, members, employees, agents or contractors;

(b)    ACPI or any of its officers, members, employees, agents or contractors;

(c)    any other Challenger, the Challenger of Record, or the CORC or any of their respective officers, members, employees, agents or contractors;

(d)    any other Candidate for the Defence or any of its officers, members, employees, agents or contractors;

(e)    any race official involved in a Selection Series or the Match;

(f)    the Measurement Committee or any of its members; or

(g)    the Arbitration Panel or any other dispute resolution body agreed by RNZYS and the Challenger of Record or any members of such entities.

10.4    The preceding provisions of this Article 10 do not limit the right of any Challenger or Candidate for the Defence or any of their respective officers, members, employees, agents or contractors, to issue proceedings or suit in relation to:

(a)    any loss or damage in respect of usual marine risks and in respect of which claims would ordinary be the subject of Hull, War Risk and P&I cover;

(b)    any loss or damage to any other property used in connection with a Challenge or the Defence;

(c)    any injury, loss or damage to a person, boats or other property as a result of wilful or negligent acts; or

(d)    any person who is allegedly in breach of any confidentiality undertaking or restrictive covenant entered into with any Challenger or Candidate for the Defence.

## 11.    INTERPRETIVE RESOLUTIONS

11.1    In an effort better to maintain the stipulation in the Deed of Gift that the America's Cup is for "Friendly competition between foreign countries" the Interpretive Resolutions of the Deed of Gift issued by prior Trustees of

*Protocol XXXI America's Cup*

the America's Cup and by RNZYS as the present Trustee are retained subject to the alterations contained in this Article 11.

11.2   The First 1984 Resolutions are altered so that Footnote (1) of the 1982 Amendments is replaced with the words "The requirement that a person be a national will be satisfied if the person has been domiciled in, or has had a principal place of residence in, or has had a valid passport of that country for no shorter period than the period commencing on 1 March 2001 and ending on the date of the first race of the Match".

11.3   The Second 1990 Resolutions are altered so that:

(a)   Each Challenger and Candidate for the Defence of the Cup shall submit to RNZYS the names and the details of the designers of the hull, appendages, rig, and sails of its yacht who satisfy the conditions of nationality for more than one country and who elect and declare their nationality as that of the country in which the particular Challenger or Candidate for the Defence is located:

(i)   by 30 August 2001 where a person has been engaged as such a designer on or before that date; and

(ii)   not more than 10 days after the date of engagement where a person has been engaged as such a designer after 30 August 2001.

(b)   Each Challenger and each Candidate for the Defence shall submit to RNZYS the names and details of all persons in their organisations who could sail as a member of their competing yacht's crew in any Selection Series or the Match who satisfy the conditions of nationality for more than one country and who elect and declare their nationality as that of the country in which the particular Challenger or Candidate for the Defence is located:

(i)   by 30 August 2002 where a person has been engaged on or before that date; and

(ii)   not more than 10 days after the date of engagement where a person has been engaged after 30 August 2002.

(c)   A person who is a designer and whose name has been properly submitted by a Challenger or Candidate for the Defence under Article 11.3(a) on or before 30 August 2002 is not required to have his or her name submitted under Article 11.3(b). Unless successfully challenged under Article 11.3(e) such a person shall be deemed to be eligible to shall as a member of the competing yacht's crew of the particular Challenger or Candidate for the Defence in any Selection Series or the Match.

(d)   A person whose name has been properly submitted under Article 11.3(b) and who subsequently is engaged as a designer is not required to have his or her name submitted under Article 11.3(a). Unless successfully challenged under Article 11.3(e) such a person shall be deemed to be eligible to design for the particular Challenger or Candidate for the Defence.

58

*Protocol XXXI America's Cup*

(e)  RNZYS shall promptly provide copies of the names and details of all designers and potential crew which have been submitted to it under Article 11.3(a) and (b) to the Challenger of Record for dissemination to all Challengers and to all Candidates for the Defence, respectively. A person whose name and details have been properly submitted to RNZYS and copied to the Challenger of Record shall be deemed eligible to be a designer for the particular Challenger or Candidate for the Defence, or to participate in a Selection Series and the Match, as a national of the country so declared unless within 28 days after the names and details have been copied to the Challenger of Record ("Challenge Period") there is a challenge to the person's eligibility. A person who has been determined to be otherwise eligible under this process, either because no challenge has been made or because a challenge was resolved in favor of eligibility, may become ineligible if, subsequent to a determination of eligibility, his or her actions violate the nationality requirements set out in the amendments to Footnote (1) amplification of the 1980 Resolutions contained in the First 1984 Resolutions and the Second 1990 Resolutions.

(f)  A person who satisfies the conditions of nationality for more than one country but whose name is not submitted by a Challenger or Candidate for the Defence when required under Article 11.3(a) shall be ineligible to design for the country in which that Challenger or Candidate for the Defence is located, with the consequences set out in Footnote (2) in amplification of the 1980 Resolutions including the Amendments of 15 May 1984 and 1 July 1990.

(g)  A person who satisfies the conditions of nationality for more than one country but whose name is not submitted by a Challenger or Candidate for the Defence when required under Article 11.3(a) or Article 11.3(b) shall be ineligible to sail in the respective competing yacht's crew in any Selection Series or the Match. If a person who is not eligible to sail in a competing yacht's crew under this Article 11.3(g) does so in a race in any Selection Series or the Match, then that competing yacht shall be deemed not to have participated in that race, with all the consequences which that entails under the Conditions and racing rules adopted by COR/D.

(h)  For the purposes of this Article 11, the term "engaged", where it appears, shall mean involved in any capacity with a Challenger or Candidate for the Defence, whether as an employee, independent contractor or otherwise.

11.4  All disputes relating to the determination of the country which a designer or crew member may represent in the Thirty-first America's Cup shall:

(a)  if relating to a Challenger, be resolved by the Challenger of Record and be subject to ratification by RNZYS; and

(b)   if relating to a Candidate for the Defence, be resolved by RNZYS and be subject to ratification by the Challenger of Record.

If in either case RNZYS and the Challenger of Record cannot agree and do not ratify the other's decision, the matter shall immediately be referred to the Arbitration Panel for determination.

11.5   A designer, as more particularly defined in "The 1996 Resolutions", may only design or be engaged, or associated in any other capacity, for one Challenger or one Candidate for the Defence (but not both), from the date of the Final Race in 2000 until the conclusion of the Match.

11.6   Subject to the limitation imposed on designers in Article 11.5 and the further prohibition set out in this Article 11.6, and subject to compliance with the "1980 Resolutions" and "The 1982 Amendments" of the Deed of Gift, there shall be no restriction on any person who is engaged in any capacity by any Challenger or Candidate for the Defence ceasing to be so engaged and becoming engaged by another Challenger or Candidate for the Defence. However a person who was engaged by a Challenger or Candidate for the Defence and was eligible to be a member of their competing yacht's crew and who later becomes engaged by another Challenger or Candidate for the Defence of the same nationality as the country in which the first mentioned Challenger or Candidate for the Defence is located, is not eligible to become a member of the competing yacht's crew of such other Challenger or Candidate for the Defence during the Challenger Selection Series, the Defender Selection Series, if there is one, or the Match.

11.7   No person who has been a member of the Arbitration Panel, or a race official during any Selection Series or the Match, shall thereafter crew on any yacht of, or work as a designer or in any capacity for, any Challenger or any Candidate for the Defence.

11.8   The 1980 Resolutions and The 1982 Amendments are altered by replacing clauses (a) and (b) with the following:

(a)   A yacht shall be deemed to be "designed" in a country if the designers of the yacht's hull, deck, appendages (including keel fins, bulbs, canards, rudders, skegs, trim tabs, wings etc) rig and sails are nationals of that country.

(b)   A yacht shall be deemed to be "built" in a country if the hull of the yacht, including all framing and all planking, plating or other form of surfacing of the hull, the deck and all appendages (including keel fins, bulbs, canards, rudders, skegs, trim tabs, wings etc) have been fabricated and assembled in that country, provided that the foregoing provisions of this clause (b) shall not prevent:

(i)   the modification of the hull of any Challenger in the country in which the relevant America's Cup match is to take place, so long as the modification:

(A)   is effected when the Challenger is in such country; and

(B)   meets the requirements of clause (a) above, and

(ii)   further appendages for a Challenger's yacht being constructed in the country in which the relevant America's Cup match is to take place provided they meet the requirements of clause (a) above and that Challenger's yacht arrives in that country with all appendages (including keel fins, bulbs, canards, rudders, skegs, trim tabs, wings etc), designed by a national and manufactured in the country of the Challenger.

and by adding new clauses (c), (d), (e) and (f) as follows:

(c)   A yacht shall be deemed to be "built" in a country irrespective of where its sails and rigs are manufactured so long as the requirements of clause (a) above are met in relation to those sails and rigs.

(d)   For the purpose of clauses (a) and (c) above, a rig shall include the mast and main boom, mast and main boom tapers, mast and main boom moulds, shroud and spreader locations, laminate and other similar structural specifications, and nonstandard fittings, but shall not include spinnaker poles and reaching struts.

(e)   In relation both to rigs and yachts generally, standard fittings of different design origin are acceptable provided they are generally available.

(f)   If any sail or rig of a yacht of a Challenger or Candidate for the Defence is manufactured in a country other than that in which that Challenger or Candidate for the Defence is located, then any other Challenger or Candidate for the Defence shall, on request, be provided by the particular Challenger or Candidate for the Defence with written certification from the manufacturer that it received the sail or rig design from a designer satisfying the nationality requirements of the country in which the particular Challenger or Candidate for the Defence is located and that construction of the sail or rig complied with that designer's drawings and/or specifications.

## 12.   *ADVERTISING AND NAMES OF YACHTS*

12.1   There will be constraints on advertising in any form on the hulls, cockpits, appendages, sails, rigs, crew clothing or associated equipment of a yacht similar to those which applied in America's Cup XXX.

12.2   From the time of acceptance of a Challenger or Candidate for the Defence by RNZYS, advertising of, or other reference to, tobacco products by such Challenger or Candidate for the Defence is prohibited anywhere in New Zealand. This prohibition shall apply in a Challenger's or Candidate for the Defence's compound, on its boats, sails, and equipment, on its crew clothing, and in advertising material for either the printed or electronic media. The term advertising of tobacco products, as used in Article, includes, but is not limited to:

    (a)   the use or display of the name of any tobacco product;

    (b)   the use or display of the name of any company or other entity where such name is also, in whole or in part, the name under which a tobacco product is produced, sold, or otherwise distributed; and

    (c)   the use or display of a logo, trademark, device or design that is commonly used on tobacco products.

12.3   If a Challenger proposes to name its yacht, the proposed name must first be submitted to COR/D for approval. COR/D shall not approve any name of a yacht if in its opinion that name constitutes advertising. The decision of COR/D shall be final and conclusive.

12.4   If a yacht does not have a name that has been approved by COR/D it shall, for the purposes of the Thirty-First America's Cup, be called by its allocated sail number.

12.5   For the avoidance of doubt, a name that has not been approved by COR/D shall not be engraved on the America's Cup trophy.

12.6   Advertising, or any other graphic work shall, from the time of acceptance of a Challenger or Candidate for the Defence by RNZYS, always comply with generally accepted moral and ethical standards.

## 13.   RECONNAISSANCE

13.1   The purpose of this provision is to allow Challengers and Candidates for the Defence the opportunity to conduct on the water testing in private and to limit attempts to gather design and yacht performance data and information from or about another Challenger or Candidate for the Defence, its business operations, or its yachts, especially through illegal, clandestine, dangerous, or expensive means. It is intended that Challengers and Candidates for the Defence shall have the opportunity to develop their own design features, systems and techniques in private and not be subject to harassment while testing. Specified methods of information gathering are however permitted during the Observation Period as defined in Article 13.5.

13.2   This Article 13 applies throughout the world to all Challengers and Candidates for the Defence for the period from the completion of the Final Race in 2000 until the completion of the last race of the Match.

13.3   The following activities are prohibited at all times (whether they are directed against another syndicate's yacht, support boats or facilities for purposes contrary to the purpose of this Article 13):

    (a)   unless specifically permitted under this Article 13, persistent on the water observation (including photography or other methods of obtaining images) or tracking of yachts which are not participating in a race in the

Challenger Selection Series, the Defender Selection Series, if there is one, the Match, or any other event organised for ACC yachts (an "Official Race");

(b)    any intentional illegal act;

(c)    the use of listening devices for eavesdropping;

(d)    the use of satellites, aircraft (fixed or rotary winged), and/or other means to observe or record from above other participant's yachts when sailing or ashore in compounds;

(e)    the use of divers, submarines or other means to observe or record below or from below the surface of the water;

(f)    the capture, recording or analysis of performance data emanating from telemetry, instruments, computers, etc. from another competing syndicate;

(g)    the acceptance of any information from a third party that, under this Article, would have been improper for the syndicate to obtain directly;

(h)    other than from an opposing yacht in the same match the use of instruments such as laser range-finders and radar to attempt to gauge performance; or

(i)    the use of discarded waste material from syndicate compounds or any other source.

13.4    The following, activities are permitted at all times:

(a)    visual observation from ashore;

(b)    the visual observation of another syndicate's yacht, not intended to gather design and yacht performance information, and which is largely unavoidable due to the close proximity of compounds of competing syndicates or passages in the harbour or at sea or overflying, in the case of passages by air;

(c)    the visual observation (including photography, and other means of obtaining images) of another syndicate's yacht, when it is participating in an Official Race, from a surface vessel which is either stationary or maintains a distance of at least 200 metres from the racing yachts, provided the observing vessel is clearly identified with the syndicate's name or known flag; and

(d)    the receipt and use of casual gossip and press reports.

13.5    The following activities are permitted during the period commencing two months before the first race in the Challenger Selection Series and ending one month after the completion of the Match ("Observation Period"):

(a)    the visual observation from within the Racing, Area as defined in the Match Conditions (including photography and other means of obtaining images) of another syndicate's yacht from a surface vessel operated in a safe manner and in accordance with local regulations for separation of traffic and provided the observations are made from a distance of at least

*Protocol XXXI America's Cup*

           200 metres and the observing vessel is clearly identified with the syndicate's name or known flag;

(b)    the use of photography and other means of obtaining images of another syndicate's yacht from within the observing syndicate's shore compound and from any space accessible to the general public; and

(c)    The visual observation of another syndicate's yacht at a public unveiling referred to in Article 7.

13.6    The penalty for failing to comply with this Article shall be decided by the Arbitration Panel which may with the approval of COR/D, delegate that power under this Article to any other dispute resolution body established by COR/D. Penalties may be applied to the owner, the yacht, the crew, or all or any of them, and may include (but are not limited to), a loss of points, or exclusion or disqualification from a Selection Series or the Match.

## 14.   RULES

14.1    The conduct of the Challenger Selection Series, the Defender Selection Series, if there is one, and the Match shall be governed by:

(a)    the Deed of Gift, the Interpretive Resolutions and the decisions of the Arbitration Panel;

(b)    this Protocol;
        the Conditions; and

(c)    (i)    the racing rules as agreed and adopted by COR/D and administered by a Jury appointed by COR/D; and

        (ii)   the International America's Cup Class Rule Version 3.0 dated 1 July 1997, unless a new version of such rule is issued by COR/D within a period of nine months after the date of the Final Race in 2000,

    except so far as any of (i) and (ii) are altered by the Conditions;

## 15.   ELIGIBILITY OF YACHTS

15.1    Each Challenger and Candidate for the Defence may only build, acquire or otherwise obtain two New ACC yachts. A "New ACC yacht" is a yacht that either:

(a)    complies with ACC Rule 39.5, the construction of which is commenced after the completion of the Final Race in 2000; or

(b)    is deemed to be a New ACC yacht under Article 15.3(d) or Article 16.2.

64

15.2    Only a New ACC yacht which is built, acquired or otherwise obtained under Article 15.1, and an ACC yacht that complies with ACC Rule 39.5, the construction of which commenced prior to the Final Race in 2000, which yachts satisfy the design and other nationality requirements, shall be eligible to compete in the XXXI America's Cup.

15.3    In order to give full effect to the intent of this Article 15, which is to limit Challengers and Candidates for the Defence to building, acquiring, or otherwise obtaining the specified number of New ACC yachts, the following provisions shall apply:

(a)    The acquiring or obtaining of a new yacht (construction of which commenced after completion of the Final Race in 2000) capable of being measured as an ACC yacht without significant modification shall be deemed to be the acquisition of a New ACC yacht.

(b)    Once a person or entity, whether then a Challenger or Candidate for the Defence or not, has been allocated under ACC Rule 39.5, two sail numbers, no further sail numbers may be allocated to that person or entity. A person or entity shall only be entitled to be allocated a new sail number under ACC Rule 39.5 to the extent that, at the time of such allocation, that person or entity has not built, acquired or obtained (in each case through alteration or otherwise) two New ACC yachts.

(c)    Each person or entity whether then a Challenger, Candidate for the Defence, or not, shall engage separate and independent designers having no involvement with any other Challenger's or Candidate for the Defence's program to develop an ACC yacht its appendages, rigs and sails (in each case where referred to in this Article 15.3(c) having the meaning in clause (a) of The 1980 Resolutions and The 1982 Amendments as replaced by Article 11.8) or a yacht capable of being measured as an ACC yacht without significant modification. Design or performance information or equipment (including appendages, rigs and sails but excluding standard fittings which are generally available) of or in relation to such yacht of a person or entity may not be shared or exchanged with another person or entity except information which may be gleaned without assistance from the other person or entity in formal or informal or head-to-head competition. The acquiring or obtaining of an ACC yacht its appendages, rigs or sails (but not their plans, specifications or other design information), or a yacht capable of being measured as an ACC yacht without significant modification, which was either completed within the meaning of Article 16.4, or made or built, before the completion of the Final Race in 2000 shall not be an infringement of this Article 15.3(c).

(d)    Any scale model or scaled down version of an ACC yacht (or other yacht which could be measured as an ACC yacht without significant modification) which is greater than one-third of the size of an actual ACC yacht (or

such other yacht) is deemed to be a New ACC yacht for the purposes of this Article and shall be deemed to have been allocated a sail number under ACC Rule 39.5.

(e)    Any agreement, arrangement or understanding, whether legally enforceable or not, by one person or entity (in this paragraph "the first person"), whether then a Challenger or not, with any other person or entity (in this paragraph "the second person") that the second person will directly or indirectly build, acquire or otherwise obtain one or more yachts of whatever type (in this paragraph "other yachts") so that the first person can directly or indirectly obtain, in any manner whatever, design or performance information regarding the other yacht or yachts for use in the program of design, development or challenge of the first person, is prohibited.

## 16.    MODIFICATIONS TO YACHTS

16.1    The purpose of this Article 16 is to maximize the use of all ACC yachts, and to enable yachts to be reshaped in a cost effective manner.

16.2    Any ACC yacht may be altered after it is completed, without that yacht counting as a further New ACC yacht provided the total of all alterations (whether sequential or not) made after the completion of the Final Race in 2000 do not change more than 50% of the original laminate area of the hull as defined in ACC Rule 2.4. If the total of all alterations exceed this limit then the yacht shall be deemed to be a New ACC yacht within the terms of Article 15 and shall be deemed to have been allocated a new sail number under ACC Rule 39.5.

16.3    There is no limitation on alterations that may be made to a yacht's deck.

16.4    An ACC yacht is deemed to be completed on its launching date, or it's post construction inspection date, whichever is the earlier. There is no limitation on changes that may be made to the original laminate area of the hull of a yacht before it is completed.

16.5    Except for alterations to a yacht's deck, which do not require any approval, no alterations may be made to an ACC yacht after it is completed, without the prior written approval of the Technical Director appointed under the ACC Rules. In order that the Technical Director may determine whether such approval should be given he shall be provided with any information he requests that he believes is necessary to determine whether the alteration is permitted.

16.6    Without limiting the power of the Technical Director to request any information he considers necessary to determine whether or not any alterations are permitted under the above rules, the following procedure shall apply:

(a)    The Technical Director shall be provided with a copy of the lines plans for the canoe body of the yacht on the date the yacht is deemed to be completed,

*Protocol XXXI America's Cup*

or if the yacht was completed before the date of the Final Race in 2000 the lines plans for the canoe body of the yacht at the date of that race, redrawn, if necessary, to represent the accurate lines plans of the canoe body of that yacht as at the date of that race, and those lines plans shall be the base from which the percentage changes are determined.

(b) A plan of the proposed alterations and a new lines plan showing the cut lines and physical reference points (such as bulkheads) shall be provided to the Technical Director in respect of each proposed alteration. The Technical Director shall calculate both the change in the original laminate area of the hull resulting from the particular proposed alteration and the aggregate of all changes (including the particular proposed alteration) to the original laminate area of the hull from the lines plans which are the base under Article 16.6(a) and advise his approval or otherwise. The Technical Director may require a check measurement.

(c) The Technical Director shall hold all plans and lines plans provided under Articles 16.2 and 16.3 in strictest confidence and they shall normally be stored for safe keeping in a recognised safety deposit facility or filed in an electronic form protected by an appropriate security encryption.

16.7 In order further to give effect to the intent of this Article 16:

(a) there is no limit on the extent of fairing of yachts, and the laminate area of the hull may also be distorted without the distortion constituting an alteration; and

(b) a repair which is approved by the Technical Director as such, shall not be considered an alteration.

16.8 The Technical Director shall consult with RNZYS and the Challenger of Record and shall issue an explanatory interpretation of this Article 16, which shall be approved before issue by both RNZYS and the Challenger of Record.

## 17. NUMBER OF SAILS

17.1 ACC Rule 33.8 shall not apply. The maximum number of measured sails permitted for each Challenger and each Candidate for the Defence shall be 60, provided that in the Match the Challenger and the Defender shall each be limited to a sail inventory of no more than 30 measured sails ("Match Sail Inventory") from the maximum permitted number of 60 measured sails.

17.2 To be eligible for use in the Match, a measured sail must also be separately registered with the Technical Director as part of the Challenger's or Defender's Match Sail Inventory.

*Protocol XXXI America's Cup*

17.3   Sails may be measured and/or registered in the Match Sail Inventory at any time during the Match but no more than 30 measured sails shall be registered in their Match Sail Inventory by either the Challenger or the Defender.

17.4   In this Article 17 a "measured sail" is a sail measured by and registered with the Technical Director under the ACC Rules and, for the avoidance of doubt, once a sail has been measured by and registered with the Technical Director under the ACC Rules by a Challenger or a Candidate for the Defence, it may not be so measured or registered by any other person.


## 18.   TELEVISION AND TECHNICAL EQUIPMENT

18.1   During racing in the Challenger Selection Series, the Defender Selection Series, if there is one, and the Match, television, audio and other electronic equipment shall be carried on yachts and/or crew of both Challengers and Candidates for the Defence. The amount and manner of placement of such television, audio and other electronic equipment on yachts and crew shall be consistent for all Challengers and Candidates for the Defence.

18.2   All data and information of whatever nature, and for whatever purpose, produced by the television, audio and other electronic equipment carried on yachts and/or crew:

   (a)   participating in the Challenger Selection Series, shall be the property of the Challengers; and

   (b)   participating in the Defender Selection Series. if there is one, or in the Match, shall be the property of RNZYS.

18.3   The Challenger of Record in relation to Article 18.2(a), and the Challenger of Record and RNZYS in relation to Article 18.2(b), shall ensure that adequate measures are put in place so that performance information of individual yachts is not available to any other Challenger or Defender, other than such information that is available to the public.


## 19.   OTHER CONDITIONS

19.1   RNZYS and the Challenger of Record may, from time to time, determine such other conditions or matters as they agree are necessary or desirable for the XXXI America's Cup regatta provided always that if the Initial Challenger of Record has relinquished its position under Article 4.1(b) no provision or matter pertaining to the responsibilities or rights of the Initial Challenger of Record may be amended without the written consent of the Initial Challenger of Record.

68

20. *LICENSE AGREEMENT*

20.1   At the time of signing the Conditions, or by such later time as RNZYS requires, each Challenger shall execute a license agreement with ACPI relating to the America's Cup trademarks in such form as ACPI may reasonably require. Any dispute as to the terms of that agreement shall be determined by the Arbitration Panel.

21. *MEASUREMENT COMMITTEE*

21.1   All matters relating to the measurement of the ACC yachts, the interpretation of the ACC Rules, or the determination as to whether a yacht meets the ACC Rules, shall be determined by the measurement committee ("Measurement Committee") jointly appointed under the ACC Rules by RNZYS and the Challenger of Record.

21.2   Decisions of the Measurement Committee shall be final and shall not be subject to appeal or be referred to any court or other tribunal for review in any manner.

22. *AMERICA'S CUP ARBITRATION PANEL AND DISPUTE RESOLUTION*

22.1   An America's Cup Arbitration Panel ("Arbitration Panel") shall be established whereby the RNZYS, as holder of the Cup, and the Initial Challenger of Record, shall each select two members of a five person arbitration panel. The fifth member shall be selected by agreement of the four members already selected and shall be the Chairman of the Arbitration Panel.

22.2   Criteria for selection of all members shall include:

   (a)   they may be a resident or citizen of any country participating in the XXXI America's Cup competition or trials whether or not they have a significant interest in the dispute or issue;

   (b)   they shall possess knowledge of America's Cup history, the Deed of Gift, and the Interpretive Resolutions;

   (c)   they shall possess good general knowledge of yacht racing and yacht clubs; and

   (d)   they shall be known to be fair minded and possess good judgement.

22.3   The Arbitration Panel shall be empowered as follows:

   (a)   to resolve all matters of interpretation of any of the documents and rules referred to in Article 14 except where expressly excluded in the provisions

*Protocol XXXI America's Cup*

of such documents and rules and including, where necessary, the determination of the facts relevant to the matter of interpretation;

(b)  to resolve disputes (other than those concerning the racing rules or any applicable class or rating rule) between RNZYS and the Challenger of Record;

(c)  to resolve disputes (other than those concerning the racing rules or any applicable class or rating rule) between RNZYS and an individual Challenger when the Challenger of Record certifies in writing to RNZYS that a majority of the Challengers desire the issue to be resolved by the Arbitration Panel;

(d)  to resolve disputes (other than those concerning the racing rules or any applicable Class or rating rule) between individual Challengers when one of those Challengers so requests, or between an individual Challenger and the Challenger of Record;

(e)  to resolve any disagreement between RNZYS and the Challenger of Record and in particular settling the matters referred to in Article 5;

(f)  to determine matters of nationality and other issues under Article 11;

(g)  to determine the appropriate penalty under Article 13;

(h)  to resolve disputes under Article 20; and

(i)  to resolve any other matters which it is given jurisdiction to determine.

(j)  to fix or determine the fee payable in relation to any application made to the Arbitration Panel;

(k)  to fix or determine the costs in respect of an application payable by an applicant or a party directed to be served with an application;

(l)  to determine the penalty for failure to make any payment fixed or determined by the Panel.

22.4  When considering disputes involving an issue of a technical nature the Arbitration Panel shall consult with the Technical Director or other appropriate technical experts and shall be bound by the advice received when delivering their decision.

22.5  The Initial Challenger of Record and RNZYS shall have the right at any time to replace one or both of their respective Arbitration Panel members, in the event of de death, illness, loss of mental faculties, resignation or any other reason which, in the view of the respective entity which appointed the particular member, makes them unable or unwilling to exercise their powers and/or functions under this Article 22. Likewise the four members of the Panel appointed by the Initial Challenger of Record and RNZYS shall have the power to replace the fifth member of the Panel mutually appointed by them at any time in the event of death, illness, loss of mental faculties, resignation, or for any other reason which, in the view of those four members who appointed that fifth member, makes that fifth member unable or unwilling to exercise their powers and/or functions under this Article 22.

22.6    Meetings of the Arbitration Panel may be held by telephone or audio visual linkup. A quorum for meetings of the Arbitration Panel shall at all times be five, and each member shall be entitled to one vote. Decisions shall be made by a majority of votes. The Arbitration Panel shall draft its own procedural rules for approval by COR/D.

22.7    The net operating costs of the Arbitration Panel (in excess of application fees and costs received) will be met by COR/D

22.8    Where no penalty is specifically provided for a breach of any of the provisions of this Protocol, the Conditions, the Deed of Gift, the Interpretive Resolutions or decisions of the Arbitration Panel, the Panel shall determine and impose such penalty as it considers appropriate having regard to the nature and manner of the particular breach.

22.9    The Jury appointed by COR/D under Article 14.1(d)(i) shall not have the power to determine any of the matters set out in Article 23.3.


23.    INTERPRETATION

23.1    Whenever there is a conflict between the provisions of this Protocol and the Conditions or any other relevant racing rule or document (excluding the Deed of Gift but including the Interpretative Resolutions), the terms of this Protocol shall prevail.

23.2    In the interpretation of this Protocol all the provisions hereof shall be construed in such manner as will best promote the purpose and object underlying this Protocol or the particular provision and best ensure that they are given their true spirit, meaning and intent.

23.3    In the interpretation of this Protocol:

   (a)    all references to RNZYS, where the context so permits, includes any syndicate or other entity or entities which undertake the defence of the Cup on its behalf;

   (b)    the term "Challenger", except where inconsistent with the context, means a Yacht Club whose challenge has been accepted by RNZYS under Article 1.1 and includes any syndicate or other entity which undertakes that Yacht Club's challenge as its representative;

   (c)    the term "Candidate for the Defence" means a syndicate or other entity which represents or seeks to represent RNZYS as defender of the America's Cup;

   (d)    unless a Challenger of Record is appointed under Article 4.1(c) or a Challenger of Record Committee is formed or deemed to be formed under Article 4 all references to the Challenger of Record shall be read as references to the Initial Challenger of Record;

71

*Protocol XXXI America's Cup*

(e) if a CORC has been constituted under Article 4.1 then from that time all references to the Challenger of Record shall be read as references to the CORC;

(f) all references to an ACC yacht include any yacht constructed under any version of the ACC Rule;

(g) any reference to a particular ACC Rule shall, where the context permits, be read as a reference to the equivalent Rule in any new version issued by COR/D under Article 14.4(d)(ii).

*DATED this 2nd Day of March 2000*

*Royal New Zealand Yacht Squadron*
*Yacht Club Punta Ala*

72

## 4.2    Clarification #1 to the 2 March 2000 Protocol Governing the XXXI America's Cup ("Protocol")

**PARTIES:**

The Royal New Zealand Yacht Squadron ("RNZYS") of the one part and Yacht Club Punta Ala ("YCPA") of the other part.

**BACKGROUND:**

a)  Article 22.3(a) of the protocol provides that the Arbitration Panel shall be empowered:

> "to resolve all matters of interpretations of any of the documents and rules referred to in Article 14 except where expressly excluded in the provisions of such documents and rules and including, where necessary, the determination of the facts relevant to the matter of interpretation";

b)  Article 14 of the Protocol ("Rules") define the term "Conditions" to include the (i) Notice of Race and Conditions Governing the Races of the Louis Vuitton Cup ("the LVC Conditions") and the Notice of Race and Conditions Governing the XXXI America's Cup Match (the "Match Conditions"), and (ii) the Sailing Instructions Governing the Match Races Of The Louis Vuitton Cup and the Sailing Instructions Governing the XXXI America's Cup Match (collectively "Sailing Instructions").

c)  Article 22.3(b) (c) and (d) empowers the Arbitration Panel to resolve certain disputes "other than those concerning the racing rules or any applicable class or rating rule";

d)  Article 18.5(a) and (c) of the LVC Conditions states that the Jury's functions shall include (a) to decide such other matters in these Conditions not within the jurisdiction of the Measurement Committee or the Arbitration Panel and (c) such "other matters as COR or CORM may put before the Jury".

e)  Article 18.5(a) and (c) of the Match Conditions states that the Jury's functions shall include (a) to decide such other matters in these Conditions not within the jurisdiction of the Measurement Committee or the Arbitration Panel and (c) such "other matters as COR/D may jointly put before the Jury".

73

*Clarification to Protocol XXXI America's Cup*

   f)   Article 18.5(c) of both the LVC and Match Conditions and Article 19 of the Protocol permit RNZYS and YCPA to determine "such other conditions or matters as they agree are necessary or desirable for the XXXI America's Cup regatta".

   g)   RNZYS and YCPY desire to clarify their intentions regarding the functions of the Jury and the America's Cup Arbitration Panel, so that the functions of the Jury are consistent with the functions assigned to the Jury for the XXX America's Cup regatta, as modified by the Arbitration Panel in ACAP/99/12.

AGREED:

RNZYS and YCPA agree that, by executing the Protocol, they intended to, and hereby do, assign responsibilities for the interpretation of documents governing racing and the resolution of disputes as follows:

1.   The Americas' Cup Arbitration Panel ("ACAP") remains empowered to interpret and resolve disputes in accordance with Article 22.3 of the Protocol in connection with any matters relating to the Deed of Gift, Interpretive Resolutions, the decisions of the Arbitration Panel and the Protocol, and to mediate any differences in accordance with Article 5.3 of the Protocol.

2.   The Jury is responsible for interpreting and resolving the disputes on the LVC and Match Conditions, Sailing Instructions and Racing Rules of Sailing, except where any provision of these rules is in conflict or is originated or connected with provisions of any of the documents listed under 1 above. In this case any questions regarding interpretation of such documents shall be referred by the Jury to the ACAP. The Jury shall be bound by the ACAP's interpretation.

   Nothing in this clarification shall alter or modify the procedures for amending the Protocol, LVC and Match Conditions or Sailing Instructions.

   These Clarifications are applicable to the Louis Vuitton Cup and the XXXI America's Cup Match.

*DATED the 30th Day of October 2002*

*Royal New Zealand Yacht Squadron*
*Yacht Club Punta Ala*

74

**EXHIBIT D**

### 6.1.2 Reasons for Decision and Decision in Case No. ACAP 00/6 (17 December 2000)

**Applicants:**   Société Nautique de Genève
Royal New Zealand Yacht Squadron

**Panelists:**   *Chairman*:   Prof.dr.Fernando Pombo
*Arbitrators*:   Master John Faire
Mr Donald Manasse
Prof.dr. Henry Peter
Sir David Tompkins QC

**Subject Matter:**
− Deed of Gift
− Eligibility to Challenge
− Annual Regatta on the sea or an arm of the sea
− Validity of SNG challenge
− No Undertaking required as to where next match held

THE AMERICA'S CUP ARBITRATION PANEL

**IN THE MATTER** of the Protocol governing the XXXI America's Cup.

**AND**

**IN THE MATTER** of applications by

(1) Société Nautique de Genève seeking ratification of the validity of its challenge.
(2) Royal New Zealand Yacht Squadron regarding the validity of the challenge by Société Nautique de Genève and seeking interpretations of the Deed of Gift.

REASONS FOR DECISION AND DECISION OF THE AMERICA'S CUP ARBITRATION PANEL

[1]   The America's Cup Arbitration Panel ("the Panel") received the application by Société Nautique de Genève ("SNG") seeking ratification of the validity of its

84

*Reasons for Decision Case No. ACAP 00/6*

challenge. It also received the application by the Royal New Zealand Yacht Squadron ("RNZYS") regarding the validity of the challenge by SNG and seeking interpretations of the Deed of Gift relating to the criteria for future challengers by yacht clubs not located on the sea or an arm of the sea.

[2]   On 5 December 2000 the Panel delivered it decision on the validity of the challenge by SNG in these terms:

> The challenge for the America's Cup made by Société Nautique de Genève by letter of 18 August 2000 is a valid challenge entitling Société Nautique de Genève to challenge for the America's Cup.

[3]   The Panel now delivers its reasons for that decision, and its decision on other matters raised in the applications.


## BACKGROUND

[4]   By letter of 18 August 2000, SNG lodged a challenge for the America's Cup with RNZYS. By letter dated 4 October 2000 RNZYS advised:

> "We are pleased to advise that we will accept your challenge providing the validity of the challenge is first ratified by the America's Cup Arbitration Panel. It is noted that in your letter dated 12 September 2000 you suggested that a ruling from the Arbitration Panel would protect both SNG and Royal New Zealand Yacht Squadron from any third party challenge or criticism. We agree, and also agree that the Arbitration Panel has jurisdiction under Article 22 of the Protocol to issue such a ruling."

[5]   The Panel has received and considered submissions from:

a)   SNG
b)   RNZYS
c)   Yacht Club Punta Ala
d)   Seattle Yacht Club
e)   New York Yacht Club
      None of these submissions sought to object against the validity of the SNG challenge.

[6]   The applications involve matters of interpretation. Pursuant to Article 22.3 (a) of the Protocol Governing the XXXI America's Cup ("the Protocol"), the Panel is empowered to:

> "22.3(a) resolve all matters of interpretation of any of the documents and rules referred to in Article 14 except where expressly excluded in the provisions of such documents and rules and including, where necessary, the determination of the facts relevant to the matter of interpretation."

Article 14 refers to, *inter alia*, the Deed of Gift and the Protocol.

85

*Reasons for Decision Case No. ACAP 00/6*

## ELIGIBILITY TO CHALLENGE

[7]   The Deed of Gift dated 24 October 1887 contains the following provision relating to eligibility to challenge for the America's Cup:

> "Any organized Yacht Club of a foreign country, incorporated, patented, or licensed by the legislature, admiralty, or other executive department, having for its annual regatta an ocean water course on the sea, or on an arm of the sea, or one which combines both, shall always be entitled to the right of sailing a match for this Cup, with a yacht or vessel propelled by sails only and constructed in the country to which the Challenging Club belongs, against any one yacht or vessel constructed in the country of the Club holding the Cup." (emphasis added)

The issues in the present applications relate to the words emphasized. It is accepted that SNG is an organized yacht club of a foreign country and is incorporated.

[8]   The Protocol contains the following provisions relating to eligibility to challenge:

> "1.2 Notwithstanding Article 1.1 RNZYS shall not accept a challenge from a Yacht Club unless as at the earlier of the date on which it delivers its challenge and 1 March 2001 it meets each of the following criteria:
>
> (a)  it must have been in existence for a minimum of five years;
> (b)  it must maintain a membership of at least 200 members,
> (c)  it must be financially supported by a majority of its membership on a pro-rata basis;
> (d)  it must operate as a yacht club and have objectives consistent with the furtherance of yachting activities; and
> (e)  it must be a member of the national sailing authority of its country."

It is accepted that SNG complies with each of these requirements.

## ANNUAL REGATTA

[9]   The major issue on whether SNG's challenge is valid turns on whether it has complied with the "having for its annual regatta an ocean water course on the sea, or on an arm of the sea" requirement of the Deed of Gift.

[10]   SNG is a Swiss yacht club situated at Port Noir on Lake Geneva, Switzerland. It was formed on 3 March 1872. It is one of the oldest yacht clubs in Europe. It currently has 3,044 members. It generally holds its sailing regattas on Lake Geneva.

[11]   On 30 September 2000 SNG, for the first time, held a regatta at Cannes, France on the Mediterranean Sea. It was called and promoted as the "Annual Regatta

*Reasons for Decision Case No. ACAP 00/6*

of Société Nautique de Genève on the Sea" (a translation of "Regate Annuelle De La Société Nautique de Genève En Mer"). Although open to entries from several classes of yachts, because of a clash with another regatta, the regatta consisted of three races by 9 Toucan class yachts.

[12]    This regatta was held after SNG had challenged for the America's Cup by letter of 18 August 2000, and before the conditional acceptance of the challenge by RNZYS on 4 October 2000.

[13]    SNG has by notarized declaration of its Commodore Michel Toso, undertaken to continue to hold its Annual Regatta on the ocean, sea or arm of the sea until it ceases to hold the America's Cup or conclusion of its participation in the XXXI America' Cup regatta or preceding Challenger Selection Series whichever is the earlier.

[14]    Counsel for SNG referred to the definitions of "annual" and "regatta" in American dictionaries:

  (i)    "Webster's Third Edition International Dictionary of the English Language":

    (A)    **"Annual"**: "occurring, appearing, made, done, or acted upon every year or once a year."
    (B)    **"Regatta"**: "a rowing, speedboat or sailing race; *esp*; an organized series of races."

  (ii)    "The Random House Dictionary of the English Language":

    (A)    **"Annual"**: "occurring or returning once a year."
    (B)    **"Regatta"**: 1. "A boat race, as of rowboats, yachts, or other vessels."
                2. "An organized series of such events."

[15]    We conclude that, in the context of the Deed of Gift, the phrase "annual regatta" should be interpreted to mean an organized series of yacht races occurring once a year. Further, we consider that in judging whether a yacht club has complied with this requirement for the purposes of assessing eligibility, a liberal approach should be adopted. This is because, as the enquiries of counsel for SNG have revealed, many yacht clubs of the kind likely to be involved in the America's Cup do not hold what they term an "Annual Regatta", although they do, of course, hold organized series of yacht races on an annual basis. Of the trustees of the America's Cup, that is the yacht clubs that have held the Cup, and also Yacht Club Punta Ala and the Seattle Yacht Club, both of whose challengers have been accepted by RNZYS, only the New York Yacht Club holds an event known as its Annual Regatta as part of its annual race programme.

[16]    Neither the Deed of Gift nor the Protocol have any provision requiring the annual regatta to have been held prior to the lodging of a challenge, nor that the annual regatta must have been held more than once. The only requirement is that the

*Reasons for Decision Case No. ACAP 00/6*

challenging club must be a yacht club "having for its annual regatta an ocean water course on the sea [...]" If it has such a regatta, it is eligible.

[17]   SNG has such a regatta. It has held it once, and it has undertaken to continue to hold it annually for the period stated. It is therefore an annual regatta on an ocean water course on the sea.

[18]   It is for these reasons that we determined that the challenge by SNG was a valid challenge.

[19]   In view of this conclusion, it is not necessary for the Panel to consider whether, where a challenge is received from a club that does not comply with the requirements of the Deed of Gift, the defender has nevertheless a discretion to accept or reject such a challenge.

[20]   In its submissions, SNG made detailed and helpful references to the history of the "arm of the sea" provision in the Deed of Gift, and also referred to the challenge and potential challenge in America's Cup XXX by two clubs based in Switzerland. Whilst we are grateful for the information and submissions provided, we do not find it necessary to examine them in detail.

## THE CHICAGO YACHT CLUB *DECISION*

[21]   The decision we have reached makes it unnecessary for us to determine the alternative ground advanced on behalf of SNG, namely that the challenge should be declared valid because of the precedent created by the *Chicago Yacht Club* decision. However we consider that it may be helpful if we express our views on whether that decision should be regarded as a binding or persuasive precedent should the issue arise in the context of a future challenger.

[22]   The Royal Perth Yacht Club, as the holder of the America's Cup, received a challenge from the Chicago Yacht Club, a yacht club that is based on, and holds it regattas on, Lake Michigan in the United States. The Royal Perth Yacht Club petitioned the Supreme Court of the State of New York seeking an order whether the challenge was valid. That court had jurisdiction because the Deed of Gift constituting a trust had been executed in the State of New York.

[23]   On 20 September 1984 the Supreme Court made an order in these terms:

"Ordered and adjudged, that the petition of the Royal Perth Yacht Club of Western Australia incorporated is granted with the consent of the Attorney-General of the State of New York, representative of the public interest in the Deed of Gift, to the extent of declaring that the

Deed of Gift entitles the Chicago Yacht Club, a yacht club of a foreign (i.e. competing) country as contemplated in the Deed of Gift, to enrol and compete as a contestant for the 'America's Cup'."

[24]   No further reasons were given. It appears from the submissions of counsel for the Royal Perth Yacht Club that a number of grounds were advanced in support, including, for example, that Lake Michigan and the other Great Lakes were in effect seas, alternatively that the Great Lakes were arms of the sea, as they were subject to the admiralty jurisdiction of the US courts, and that Port Chicago had a significant volume of shipping from the Great Lakes to the ocean.

[25]   Because of the absence of reasons, it is not possible to discern upon what ground the New York Supreme Court reached the conclusion that it did. It is obvious that at least some of the grounds advanced in that case would have no application in the present case. There is another aspect. From the limited information available, it appears that the only parties appearing were the petitioner, the Royal Perth Yacht Club, supported by evidence from the Chicago Yacht Club, and the Attorney-General of the State of New York representative of the public interest, who consented. So it is probable that this was a consent order made without detailed submissions in support of opposing contentions.

[26]   SNG submitted that this decision removes the necessity for a challenger to hold their annual regatta on the sea or an arm of the sea. We do not accept this submission. On the contrary, it seems likely, although in the absence of reasons it is not possible to be certain, that the court may have made the order it did because it concluded that Lake Michigan was the sea or an arson of the sea. We do not accept, in the absence of detailed reasons, that the court intended, in effect, to amend the Deed of Gift by removing the requirement that a challenging club have for its annual regatta an ocean water course on the sea or on an arm of the sea.

[27]   For these reasons we consider that the *Chicago Yacht Club* decision is of limited if any value as a binding or persuasive precedent. Whether there should be an application to the Supreme Court of New York for its consent to an amendment to the Deed of Gin to give effect, whatever that effect may be, to the *Chicago Yacht Club* decision, as SNG submitted, is not a matter for the Panel.

## THE LOCATION OF A FUTURE DEFENCE

[28]   RNZYS has submitted that, in deciding whether a challenger complies with the arm of the sea requirements and the spirit and intent of the Deed of Gift, an undertaking should be given by the challenger at the time it lodges its challenge, that it will defend the cup at the location of its annual regatta.

*Reasons for Decision Case No. ACAP 00/6*

[29]   This submission confuses two elements. The first is the eligibility of a challenger to challenge. The second relates to the place at which a successful challenger should hold the next match following a further challenge. We accept that a trustee of the Cup has an obligation to ensure that the terms of the Deed of Gift are complied with, as far as it is proper for it to do so. If a challenger is eligible to challenge, the challenge must be accepted. The defender as trustee cannot impose conditions to the acceptance of the challenge relating to compliance with the Deed of Gift, if the challenge were to succeed.

[30]   The Deed of Gift is explicit concerning the place of a match. It provides:

> "The Club challenging for the Cup and the Club holding the same may, by mutual consent, make any arrangement satisfactory to both as to the dates, courses, number of trials, rules and sailing regulations, and any and all other conditions of the match, in which case also the ten months' notice may be waived.
>
> In case the parties cannot mutually agree upon the terms of a match, then three races shall be sailed, and the winner of two of such races shall be entitled to the Cup. All such races shall be on ocean courses, free from headlands, as follows:
>
> The first race, twenty nautical miles to windward and return; the second race an equilateral triangular race of thirty-nine nautical miles, the fast side of which shall be a beat to windward, the third race (if necessary) twenty nautical miles to windward and return, and one week day shall intervene between the conclusion of one race and the starting of the next race. These ocean courses shall be practicable in all parts for vessels of 22 feet draught of water, and shall be selected by the Club holding the Cup. [...]"

[31]   On this provision a number of matters are clear. First, by mutual consent of the challenging club and the challenged club, any satisfactory arrangements concerning the place and nature of the match can be agreed. Secondly, in the absence of mutual consent, the three races prescribed "shall be on ocean courses, free from headlands [...]". Thirdly, the three races shall be as prescribed. Fourthly, the ocean courses must be practicable for vessels of 22 feet draught of water. Finally, and importantly for present purposes, these ocean courses "shall be selected by the club holding the cup. [...]"

[32]   There is no requirement anywhere in the Deed of Gift requiring a challenged club to hold the match at the place or on the course where it holds its annual regatta. Nor do we find any basis upon which such a requirement should be implied. On the contrary, the provision to which we have referred makes it clear that, within the requirements set out in that provision, the challenged club is free to select the ocean courses upon which the match will be held.

[33]   RNZYS is not entitled to require SNG to give the undertaking it seeks, as a condition for the acceptance of the challenge.

### THE DATE OF THE CHALLENGE

[34]   SNG requests that its challenge be confirmed as having been accepted as at 4 October 2000, the date of RNZYA's letter to SNG advising that it had accepted SNG's challenge providing the validity of its challenge was first ratified by the America's Cup Arbitration Panel.

[35]   It is appropriate to do so: The provision that the validity of the challenge be ratified by the Panel having been satisfied, the challenge has been accepted as at the date of RNZYS letter, namely 4 October 2000.

### COSTS

[36]   The Panel's costs on the applications are fixed at US $2,000, payable equally by SNG and RNZYS, to be paid within 21 days of the issue of these reasons for decision. Pending completion of the administration arrangement for the Panel, these amounts are to be paid to RNZYS on behalf of the Panel.

91

**EXHIBIT E**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------X
                                                         :
GOLDEN GATE YACHT CLUB                                   :
                                                         :       Index No. 602446/07
                            Plaintiff,                   :       (IAS Part 49; Cahn, J.)
                                                         :
                                                         :
            -against-                                    :       **AFFIDAVIT OF**
                                                         :       **HAMISH ROSS**
SOCIÉTÉ NAUTIQUE DE GENÈVE                               :
                                                         :
                            Defendant.                   :
                                                         :
CLUB NÁUTICO ESPAÑOL DE VELA                             :
                                                         :
                            Intervenor-Defendant. :
---------------------------------------------------------X


## AFFIDAVIT OF HAMISH ROSS IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

HAMISH ROSS, being duly sworn, deposes and says:

1.      I am a citizen of New Zealand over the age of 18 and General Counsel to Team

Alinghi SA ("Alinghi"). I am a member of defendant Société Nautique de Genève ("SNG"), a

Swiss yacht club represented by Alinghi. I am also a Barrister of the High Court of New

Zealand. I submit this Affidavit in support of defendant SNG's Opposition to Golden Gate

Yacht Club's ("GGYC") Motion to Dismiss and for Summary Judgment.

2.      In my capacity as General Counsel, I provide Alinghi with advice on the Deed of

Gift (the "Deed"), the America's Cup rules and general issues of commercial law and also help

develop strategies to address competitive and operational issues. I am also familiar in detail of

the history of the America's Cup. I am a member of the Royal New Zealand Yacht Squadron

and am also a founder and current Patron of the New Zealand Class Yacht Association, which promotes New Zealand's yachting history and legacy.

3.    I have been involved with the America's Cup event since 1996, when I represented the New York Yacht Club Young America challenge. In 2000, I began working with the newly formed Alinghi.

4.    Alinghi won the 31st America's Cup on March 2, 2003 by defeating Team New Zealand. Alinghi defended its title in the 32nd America's Cup by again defeating Team New Zealand on July 3, 2007. Alinghi is now the holder of the America's Cup and the Defender for the 33rd America's Cup. Alinghi's interests are here represented by SNG.

**Background on the America's Cup and The Deed of Gift**

5.    The America's Cup is a silver trophy that the yacht America first won in a race against British vessels around the Isle of Wight in 1851. The five owners of the America and the Cup, including George Schuyler, donated the America's Cup to the New York Yacht Club in 1857. George Schuyler, as the last surviving owner, re-conveyed it in 1882 and again in 1887 in cooperation with the New York Yacht Club in order to amend its terms. The 1887 conveyance was by way of a Deed of Gift (the "Deed") dated October 24, 1887. The Deed was later modified by court orders dated December 17, 1956 and April 5, 1985. Attached hereto as Ex. A is a true and correct copy of the current version of the Deed. After the competition was resumed in 1958, following a 21 year hiatus caused by the Second World War and its aftermath, the America's Cup has been held approximately every three to four years.

6.    The Deed by its terms purports to establish a trust of the Cup and has been treated by the New York courts and authorities as a New York charitable trust with the holder of the Cup as trustee (also known as the "Defender").

7.     The Deed provides that the overarching purpose of the America's Cup is the promotion of friendly international sailing competition. "This Cup is donated upon the conditions that it shall be preserved as a perpetual Challenge Cup for friendly competition between foreign countries." (Ex. A.)

8.     The Deed also provides the qualifications for the challengers for the Cup:

> Any organized Yacht Club of a foreign country, incorporated, patented, or licensed by the legislature, admiralty, or other executive department, having for its annual regatta an ocean water course on the sea, or on an arm of the sea, or one which combines both, shall always be entitled to the right of sailing a match of this Cup, with a yacht or vessel propelled by sails only and constructed in the country to which the Challenging Club belongs, against any one yacht or vessel constructed in the country of the Club holding the Cup.

(Ex. A.)

9.     The first challenger to issue a challenge under the Deed in respect of any particular America's Cup is now generally referred to as the "Challenger of Record." Under the Deed, to be the Challenger of Record the challenger must be (i) organized as a yacht club, (ii) foreign, (iii) incorporated in its local jurisdiction, and (iv) having an annual regatta on the sea or an arm of the sea. As long as the challenging yacht club satisfies these requirements, the Deed provides that it is "entitled" to the right of a sailing match for the America's Cup.

10.    The Deed also provides what the contents of a challenge must contain:

> The Challenging Club shall give ten months' notice, in writing, naming the days for the proposed races . . . . Accompanying the ten months' notice of challenge there must be sent the name of the owner and a certificate of the name, rig and following dimensions of the challenging vessel, namely, length on load water-line; beam at load water-line and extreme beam; and draught of water; which dimensions shall not be exceeded; and a custom-house registry of the vessel must also be sent as soon as possible.

(Ex. A.)

11.    The Deed further provides that once a valid challenge has been received, the

Defender cannot entertain another Challenger of Record until the prior match has been decided:

> And when a challenge from a Club fulfilling all the conditions
> required by this instrument has been received, <u>no other challenge</u>
> <u>can be considered until the pending event has been decided</u>.

(Ex. A) (emphasis added).

12.    Once a valid challenge has been received, the Defender and the Challenger of

Record may agree to the terms of the race through "mutual consent":

> The Club challenging for the Cup and the Club holding the same
> may, by <u>mutual consent, make any arrangement satisfactory to</u>
> <u>both</u> as to the dates, courses, number of trials, rules and sailing
> regulations, and any and all other conditions of the match, in which
> case also the ten months' notice may be waived.

(Ex. A.) (emphasis added).

13.    If the Challenger of Record and the Defender cannot reach agreement by "mutual

consent," the Deed provides for a two-boat match race held under conditions specified in the

Deed.  The Challenger of Record has selected its vessel with the precise dimensions specified in

its notice of challenge and the dates for the match.  The Defender, having received notice of the

Challenger vessel dimensions, is free to select its vessel constrained only by the minimum and

maximum waterline length dimensions specified in the Deed of Gift, chooses the location of the

match subject to the constraints specified in the Deed of Gift, and provides the racing rules and

sailing regulations that apply to the match.  According to the Deed:

> <u>In case the parties cannot mutually agree</u> upon the terms of a
> match, then three races shall be sailed, and the winner of two of
> such races shall be entitled to the Cup.  All such races shall be on
> ocean courses . . . .  <u>These ocean courses . . . shall be selected by</u>
> <u>the Club holding the Cup; and these races shall be sailed subject to</u>
> <u>its rules and sailing regulations</u> . . . .

(Ex. A.) (emphasis added).

4

14.     Since the creation of a multi-challenger selection series first held in 1970, only the 27th Cup held in 1988 was limited to a two-boat match without a challenger selection series because the parties could not agree to terms by mutual consent. In the 27th America's Cup, the Challenger of Record sailed a monohull while the Defender raced a catamaran. The catamaran won the Cup by a wide margin. The 27th America's Cup is widely regarded as an infamous episode in the history of the America's Cup for the tactics employed and resort to the courts to resolve a sporting dispute. The 27th America's Cup was the subject of a number of judicial opinions, including the Mercury Bay decision by the New York Court of Appeals, named after the New Zealand challenger. GGYC's proceedings in this court are the first to be filed in a court regarding the conduct of the America's Cup since the 27th America's Cup.

**GGYC:  Challenger of Record for the 32nd America's Cup**

15.     Alinghi won the 31st America's Cup in March 2003 by defeating Team New Zealand. The same day that Alinghi won, GGYC tendered and SNG accepted GGYC's formal challenge and GGYC became the Challenger of Record for the 32nd America's Cup. Attached hereto as Ex. B is a true and correct copy of GGYC's challenge for the 32nd America's Cup. It was publicly announced at a press conference held approximately two days later that GGYC was the Challenger of Record for the 32nd Cup. At the same press conference, the Protocol governing the 32nd America's Cup, signed by SNG at the same time that GGYC's challenge was accepted, was publicly released and explained in general terms. GGYC and BMW Oracle, the team that races for GGYC, were represented at the press conference by Thomas Ehman who spoke at length. As has occurred in modern America's Cup protocols, the Protocol Governing the 32nd America's Cup was amended 11 times between its initial issuance and the conclusion of the 32nd America's Cup.

5

16.    On July 3, 2007, Alinghi defeated Emirates Team New Zealand, which

represented The Royal New Zealand Yacht Squadron ("RNZYS") to win the 32nd Cup and

defend its title. GGYC made it to the semi-finals in the Challenger elimination series, but did

not qualify to race in the America's Cup.

17.    The success and popularity of the 32nd America's Cup has been widely

recognized. Prior to filing this lawsuit GGYC credited the success to "SNG's stewardship,

[under which] the 32nd America's Cup delivered some of the most hotly-contested racing in

recent Cup history and brought Cup sailing to more people worldwide than ever before."

Attached hereto as Ex. C is a true and correct copy of GGYC's press release, "San Francisco's

Golden Gate Yacht Club Challenges for 33rd America's Cup," dated July 11, 2007.

18.    Indeed, for the first time in Cup history, surplus money raised during the overall

America's Cup event is going to be distributed to all competitors, which will help defray some of

the beneficiaries' costs of competing. According to the provisional calculations prepared by AC

Management SA, the event organizer for the 32nd Cup, a total of over €60,000,000 will be

distributed with approximately €30,000,000 going to the challengers, including over €9,000,000

to Team New Zealand as runner-up and over €3,000,000 to GGYC as a semi-finalist in the

challengers' series. A breakdown of the provisional distribution calculations prepared by AC

Management SA as of September 16, 2007, which has been provided to all the 32nd Cup

challengers, is attached hereto as Ex. D.

## CNEV:  Challenger of Record for the 33rd America's Cup

19.    The procedures followed for Club Náutico Español de Vela's ("CNEV")

challenge in the 33rd America's Cup were almost identical to those followed when GGYC

challenged for the 32nd.

20.    On July 3, 2007, immediately after the 32nd Cup ended with SNG/Alinghi's victory, CNEV tendered and SNG accepted CNEV's formal challenge. Attached hereto as Ex. E is a true and correct copy of CNEV's challenge for the 33rd Cup.

21.    SNG was very pleased to accept a challenge from a Spanish club to increase international diversity in the sport, as a Spanish club had never been the Challenger of Record, because the Spanish competitor had done well in the 32nd America's Cup on its first attempt, effectively placing fourth after winning two of seven semi-final races against Emirates Team New Zealand, and particularly because SNG wished to encourage the City and Region of Valencia to again agree to host the next America's Cup in Valencia Spain, which had been highly beneficial to all competitors and to the City and Region of Valencia and to Spain.

22.    After acceptance of CNEV's challenge, SNG and CNEV entered into a protocol for the 33rd Cup (the "33[rd] Protocol") which set out the terms of the 33rd America's Cup. The 33rd Protocol had been negotiated in the weeks leading up to CNEV's challenge. On June 14, 2007, Michel Bonnefous and I, on behalf of SNG and ACM, met with Agustin Zulueta, Jose Maria Alvarez and John Cutler on behalf of Desafio Español and CNEV (which was in the process of being formed), in person in Valencia to discuss the Protocol. On June 15, I forwarded to Messrs. Zulueta and Alvarez a draft of the proposed Protocol that had previously gone through several internal iterations within SNG. On June 19, representatives of SNG and CNEV met again in Valencia to discuss the draft Protocol circulated on June 16. At the meeting, CNEV negotiated for certain modifications a number of which were reflected in the next draft that I sent to Messrs. Zulueta and Alvarez and John Cutler (technical director for Desafio Español) on June 22. By email dated June 25, Mr. Alvarez related a series of further comments from CNEV to the Protocol which were discussed in another face-to-face meeting in Valencia later that same day.

On June 26, I forwarded to Messrs. Zulueta, Cutler and Alvarez a further revised version of the Protocol reflecting the parties' negotiations of the day before.  On June 27, a further revised version of the Protocol was provided to CNEV by Lucien Masmejan, external counsel for SNG. This led to the final agreed upon version that was executed by the parties on July 3, 2007.  (The documents reflecting these negotiations are attached hereto as Ex. F.)  The 33rd Protocol was then released publicly on July 5, 2007.  A copy of the executed 33rd Protocol is attached hereto as Ex. G.

23.    When CNEV delivered its formal challenge on July 3, it provided SNG with copies of its incorporation documents.  Attached hereto as Ex. H are true and correct copies of CNEV's incorporation and formation documents that were provided to SNG.

24.    I am also aware from media reports that CNEV has already arranged substantial sponsorship from the Spanish conglomerate Iberdrola.

## Preparations for the 33rd America's Cup

25.    Although the 32nd America's Cup ended less than three months ago, preparations are well underway for the 33rd Cup.  The 33rd Cup is to be raced in monohull vessels and will include a series of qualifying regattas and a challenger selection series.

26.    Since the 33rd Protocol was issued four teams have signed on to race for the 33rd America's Cup.

27.    The Royal Cape Yacht Club of South Africa entered the competition on July 18 and will compete again through Team Shosholoza, which competed in the 32nd Cup.  Attached hereto as Exhs. I and J are true and correct copies of The Royal Cape Yacht Club's Notice of Entry and the letter of acceptance issued by AC Management SA, dated July 26, 2007.

28.    The Royal Thames Yacht Club of England entered the competition on July 20, 2007 and will compete through TeamOrigin which competed in the 32nd Cup. Attached hereto as Exhs. K and L are true and correct copies of The Royal Thames Yacht Club's Notice of Entry and the letter of acceptance issued by AC Management SA, dated July 20, 2007 and July 26, 2007, respectively.

29.    RNZYS of New Zealand entered the competition on July 25, 2007 and will compete through Team New Zealand; RNZYS is a former Cup holder and was the runner-up in the 32nd Cup. Attached hereto as Exhs. M and N are true and correct copies of RNZYS' Notice of Entry and the letter of acceptance issued by AC Management SA, dated July 25, 2007 and July 26, 2007, respectively.

30.    The Deutscher Challenger Yacht Club e.V. of Germany entered the competition on August 10, 2007 and will compete through United Internet Team Germany, which is also a prior America's Cup competitor. Attached hereto as Exhs. O and P are true and correct copies of The Deutscher Challenger Yacht Club's Notice of Entry and the letter of acceptance issued by AC Management SA, dated August 9, 2007 and August 30, 2007, respectively.

31.    The challengers and their representatives are accomplished and experienced sailing teams that are prepared to and will spend tens of millions of dollars on boat design, testing and training, in preparation for the 33rd America's Cup.

32.    On July 25, 2007 the City of Valencia and other Spanish agencies announced an agreement to host the 33rd America's Cup in Valencia. I have been informed that the Spanish have agreed to commit a total cash sum of €160,000,000, infrastructure worth €50,000,000, and considerable value in kind in support of the event, which is to be held in May to July 2009 and

9

which will include a series of qualifying regattas and a challenger series to ensure wide participation and robust competition.

33.  Modern America's Cup protocols are "living" documents that are clarified and modified between the time they are first issued and the actual races. As mentioned above, the 32nd Protocol was amended eleven times. SNG and CNEV have held meetings and conversations with the other competitors that have signed up for the 33rd Cup and have already discussed ways to clarify and improve the 33rd Protocol. These discussions have led to a set of proposed amendments and clarifications to the 33rd Protocol. SNG has had numerous discussions with GGYC regarding GGYC's stated concerns over the 33rd Protocol, and GGYC would be welcome to participate in this process if it enters the 33rd America's Cup.

34.  A review of prior America's Cup protocols also shows that no two are alike. Rather, they are negotiated documents and the "mutual consent" process under the Deed of Gift can result in a variety of rules and approaches. Thus, the 32nd Protocol to which GGYC was a party is neither a model nor a standard version of a protocol. Indeed, it is noteworthy that the various protocols issued when the New York Yacht Club was the Defender were, as I understand it, not the subject of any negotiation with a Challenger of Record and rather were offered to all competitors (including any Challenger of Record) on a take it or leave it basis.

**GGYC's Claims, Challenge and This Action**

35.  On July 11, 2007, GGYC delivered a letter to SNG in which GGYC attacked the CNEV challenge as invalid because CNEV is a "new" club, because it has not yet held an annual regatta and because it does not appear to GGYC to have performed any of the duties of a Challenger of Record. Attached hereto as Ex. Q is a true and correct copy of GGYC's Letter to SNG, dated July 11, 2007.

36.    With its July 11, 2007 letter, GGYC also submitted its own purported challenge for the 33rd Cup demanding that it be considered the Challenger of Record. (Ex. Q.) On the certificate provided with GGYC's bid, the dimensions of the vessel GGYC proposes to race include a length on load water-line of 90 feet and a beam at load water-line of 90 feet. (Ex. Q.) These dimensions can only be for a multi-hulled vessel – presumably, a catamaran.

**The America's Cup Arbitration Panel**

37.    On July 20, 2007, prior to (and prior to being aware of) GGYC's proceedings in this Court, SNG initiated proceedings under the arbitration provisions in the 33rd Protocol seeking a ruling from the 33rd America's Cup Arbitration Panel (the "Panel") as to the validity of CNEV's challenge. SNG commenced the proceedings because arbitration is the dispute resolution and Protocol interpretive mechanism agreed to by the competitors in the 33rd America's Cup under the terms of the 33rd Protocol. This has been the case in all recent America's Cups since the Mercury Bay debacle, including the 32nd in which GGYC was Challenger of Record.

38.    The Panel is comprised of Professor Henry Peter, Luis Maria Cazorla Prieto, and Graham McKenzie. (Their respective CVs are attached as Exhs. R – T.) In addition to serving as a member of the 31st Cup Panel and the 32nd Cup International Jury, Professor Peter is a Swiss attorney, chairman of the Geneva Business Law Association, Vice-Chair of the disciplinary chamber of the chamber of the Swiss Olympic Association in charge of doping cases, commercial law professor at the University of Geneva, and Consul of Sweden for the Italian part of Switzerland. Luis Maria Cazorla Prieto is a well-known Spanish sports lawyer and author, professor of financial and taxation law at the King Juan Carlos University in Madrid, and Counsel to the Spanish Parliament. Graham McKenzie, a former New Zealand lawyer and

member of the 32nd Cup International Jury, is Director of the McMaster Trustee Company Limited, Deputy Chairman of the Saint Kentergin Trust Board, a substantial New Zealand educational trust, and Trustee of the Bruce McLaren Trust, a charitable trust in honor of the late motorsport legend. As mentioned, two of the three members of the 33rd Panel – Professor Peter and Mr. McKenzie – also served as jury members under the 32nd Protocol. Thus, as jury members under the 32nd Protocol they were nominated and/or accepted by GGYC as Challenger of Record under that Protocol.

39.    The America's Cup Arbitration Panel asked GGYC to participate in the proceedings and stated that it would accept submissions from GGYC even if GGYC elected not to submit to the jurisdiction of the Panel:

> GGYC is invited, by not later than Friday, July 27, 2007 at 5:00 p.m., to inform ACAP 33, SNG and CNEV whether they are willing to take part to these proceedings and, if so, (i) as a party, submitting to the jurisdiction of ACAP 33, or (ii) by presenting their case, without prejudice to the existence and/or jurisdiction of ACAP 33 including the basis and reasons therefore.

Attached hereto as Ex. U is a true and correct copy of the America's Cup Arbitration Panel's Direction No. 1 dated July 23, 2007. GGYC declined that invitation in a letter – accusing the Arbitration Panel of being, among other things, a "kangaroo court".

40.    On September 7, 2007, the Panel issued its decision concerning the validity of CNEV's challenge under the Deed. (A copy of the Panel's decision is attached hereto as Ex. V.) The Panel stated in the decision that it considered the submissions of the competitors as well as GGYC's submissions to this Court up to the date of the decision, all of which GGYC had posted on its website. (Id. Ex. V ¶ 42.) Following a detailed and thorough analysis of the issues and the parties' submissions, the Panel ruled that CNEV's challenge was valid under the Deed of Gift. (Id. Ex. V. ¶¶ 134-139.)

12

**The Participation of "New" Clubs in Previous America's Cups**

41.     The history of the Cup has numerous examples where "new" clubs and even clubs

incorporated well after the fact, or never "incorporated, patented, or licensed by any legislature,

admiralty, or other executive department," as required by the Deed, have been permitted to

compete as challengers.

42.     The Sun City Yacht Club from Western Australia was incorporated on December

23, 1974 and challenged on December 24, 1974 for the 1977 America's Cup.  Attached hereto as

Exhs. W and X are a copy of the Sun City Yacht Club Certificate of Incorporation from the

Registrar of Western Australia and correspondence with the New York Yacht Club referencing

Sun City Yacht Club's challenge for the 1977 America's Cup (obtained by counsel for SNG

from the New York Yacht Club archives), respectively.  It was established for the purpose of

challenging for the America's Cup and its challenge was accepted by the then Defender, the New

York Yacht Club.

43.     The Secret Cove Yacht Club was incorporated only three months prior to

challenging for the 1983 Cup and was openly established for the purpose of challenging for the

Cup as a national Canadian representative.  Attached hereto as Ex. Y is a copy of correspondence

from Secret Cove Yacht Club to the New York Yacht Club, dated March 30, 1981.  Also

attached as Ex. Y is correspondence from the New York Yacht Club accepting Secret Cove's

challenge, dated August 31, 1981.  (These documents were obtained by counsel for SNG from

the New York Yacht Club archives.)

44.     The Mercury Bay Boating Club was incorporated less than nine months before it

issued its challenge in 1987 and it was widely publicized during the Mercury Bay litigation to

have operated out of a car on a beach.  Attached hereto as Ex. Z is a copy of Certificate of

Incorporation for Mercury Bay Boating Club Inc., dated September 30, 1986, and obtained from the Registrar of Companies New Zealand.

45.    The Southern Cross Yacht Club was incorporated in April 1993 six months after its challenge was accepted by the San Diego Yacht Club.  Attached hereto as Ex. AA is a true and correct copy of a print out from the Australian Securities & Investments Commission, accompanied by a statutory declaration by Peter James Strickland, an Australian attorney.  Mr. Strickland also testifies about incorporation of the Australian Yacht Club which also specifically incorporated for the purpose of challenging for the 1995 America's Cup.

46.    RNZYS first challenged for the 1987 Cup and its challenge was accepted by the then trustee Royal Perth Yacht Club of Western Australia Incorporated.  RNZYS challenged twice more, for the 1992 America's Cup and the 1995 America's Cup, and its challenges were accepted by the then trustee San Diego Yacht Club, despite not ever being incorporated. Attached hereto as Ex. BB is a copy of the Certificate of Incorporation for RNZYS, dated February 28, 2003, and obtained from the Registrar of Companies New Zealand.  RNZYS won the America's Cup in 1995 and was the Defender/trustee in 2000 and in 2003 but was not incorporated until after it had lost the America's Cup to SNG and ceased to be the trustee.

47.    A challenge from the Cortez Sailing Association led by Dennis Conner was accepted by the Royal New Zealand Yacht Squadron although Cortez does not appear to have been incorporated until 2002, more than two years _after_ it competed in the 2000 America's Cup. Attached hereto as Ex. CC is a copy of the Cortez Sailing Association's Articles of Incorporation, dated August 12, 2002, and obtained from the California Secretary of State.

48.    I am advised by counsel in Japan that the Nippon Yacht Club which challenged for the 29th America's Cup in 1995 and whose challenge was accepted by San Diego Yacht Club,

and for the 30th America's Cup in 2000 and whose challenge was accepted by RNYS was specifically created solely to challenge for the America's Cup and has since been inactive. Also, it does not appear to have ever been "incorporated, patented, or licensed" as required by the Deed.

49.     According to the United Internet Team Germany website, the Deutscher Challenger Yacht Club e. V. was specially created on August 2, 2004 for the purpose of representing all of Germany for the 32nd America's Cup in 2005. (Id. Ex. DD.) Its challenge, which was accepted on April 29, 2005, was never questioned or protested by GGYC as Challenger of Record or any other competitor during the 32nd America's Cup.

**CNEV's Annual Regatta**

50.     CNEV could not have held an annual regatta prior to this year because it did not exist as an entity before this year. Attached hereto as Ex. EE is the Affidavit of Manuel Chirivella, Chairman of CNEV, sworn to on August 13, 2007 and submitted in the arbitration proceedings described above. Mr. Chrivella attests that CNEV is holding a regatta this month off of Spain and formerly undertakes on behalf of CNEV to hold an annual regatta at least until the 33rd America's Cup is completed. (Ex. EE, ¶ 5.)

51.    This very issue arose when SNG first challenged for the 31st America's Cup. Because SNG is located on Lake Geneva it had never regularly held a regatta on the sea or on an arm of the sea before challenging. The question of whether SNG satisfied the "annual regatta" requirement under the Deed was submitted to the America's Cup Arbitration Panel appointed under the Protocol for the 31st Cup. In its December 17, 2000 decision, the Panel ruled as follows:

> Neither the Deed of Gift nor the Protocol have any provision requiring the annual regatta to have been held prior to the lodging of a challenge, nor that the annual regatta must have been held more than once. The only requirement is that the challenging club must be a yacht club "having for its annual regatta an ocean water course on the sea . . . ." If it has such a regatta, it is eligible.

Attached hereto as Ex. FF is a true and correct copy of the 31st America's Cup Arbitration Panel Decision, dated December 17, 2000. GGYC was a competitor in the 31st America's Cup and abided by the ruling of the Panel despite a considerable incentive not to do so in that Alinghi eliminated BMW Oracle in the challenger finals for the 31st Cup.

52.    In addition, NYYC agreed to let the Secret Cove Yacht Club of Canada race in the 1983 Cup, even though Secret Cove had never before had an annual regatta on condition that it would have them annually going forward. (Ex. Y.)

Dated: September 21, 2007
    Auckland, New Zealand

                                                    _____
                                                    Hamish Ross



**AFFIDAVIT**

VENUE.

New Zealand
*(Country)*

—————————
*(State, province, etc.)*            )
                                     )
*(State, province, etc.)*            )
Auckland                             )  ss.
*(City)*                             )
                                     )
Consulate General of the U.S.A       )
*(Name of consular post)*            )

I certify that on this day the individual named below appeared before me and, being duly sworn, made the statements set forth in the attached instrument.

Hamish Graham Ross
*(Typed Name of Affiant)*

*(Signature of Consular Officer)*

Nuel L. Pazdral
*(Typed Name of Consular Officer)*

Consular Officer
*(Title of Consular Officer)*

09-21-07
*(Date (mm-dd-yyyy))*

(SEAL)

DS-1903
06-2008

EXHIBIT F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————x

GOLDEN GATE YACHT CLUB,

           Plaintiff,

      v.

SOCIÉTÉ NAUTIQUE DE GENÈVE,

           Defendant,

      v.

CLUB NÁUTICO ESPAÑOL DE VELA,

           Intervenor-Defendant.

———————————————————————x

INDEX NO. 602446/07

IAS Part 49

Hon. Herman J. Cahn

**NOTICE OF APPEAL AND
PREARGUMENT STATEMENT**

      PLEASE TAKE NOTICE that Defendant Société Nautique de Genève ("SNG")

hereby appeals to the Supreme Court of the State of New York, Appellate Division, First Judicial

Department, from the Decision and Order (the "Order") of the Hon. Herman Cahn, Justice of the

Supreme Court of the State of New York, County of New York, dated May 12, 2008. The Order

was entered in the above-titled action in the office of the Clerk of the Supreme Court of the

County of New York on May 13, 2008. Notice of entry was served on May 13, 2008. A copy

of the May 13, 2008 Order and Decision is attached hereto as Exhibit A. This appeal is taken

from each and every appealable part of the Court's Order as well as from the entire Order.

Dated: New York, New York
      May 13, 2008

                      SIMPSON THACHER & BARTLETT LLP

                      By: *Barry R. Ostrager*
                           Barry R. Ostrager
                           Jonathan K. Youngwood

George S. Wang
425 Lexington Avenue
New York, N.Y. 10017-3954
Tel: (212) 455-2000
Fascimile: (212) 455-2502

**Attorneys for Defendant**
**SOCIÉTÉ NAUTIQUE DE GENÈVE**

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------x

GOLDEN GATE YACHT CLUB,

               Plaintiff,

               v.

SOCIÉTÉ NAUTIQUE DE GENÈVE,

               Defendant,

               v.

CLUB NÁUTICO ESPAÑOL DE VELA,

               Intervenor-Defendant.

-------------------------------------------------x

INDEX NO. 602446/07

IAS Part 49

Hon. Herman J. Cahn

**PRE-ARGUMENT
STATEMENT**

        Defendant Société Nautique de Genève ("SNG") by its attorneys, Simpson

Thacher & Bartlett LLP, submit this pre-argument statement pursuant to 22 N.Y.C.R.R. §

600.17(b):

        1.       The full title of this action is set forth in the caption.

        2.       The full names of the original parties are Société Nautique de Genève and Golden

Gate Yacht Club ("GGYC").  Since commencement of this action, Club Náutico Español de

Vela ("CNEV") was added by stipulation between the parties on September 20, 2007.

        3.       The name, address and telephone number of counsel for Defendant- Appellant

SOCIÉTÉ NAUTIQUE DE GENÈVE is:

               SIMPSON THACHER & BARTLETT LLP
               Barry R. Ostrager, Esq.
               Jonathan K. Youngwood, Esq.
               George S. Wang, Esq.
               425 Lexington Avenue
               New York, NY 10017-3954

(212) 455-2000

4.    The name, address, and telephone number of counsel for Plaintiff-Appellee

GOLDEN GATE YACHT CLUB is:

> LATHAM & WATKINS, LLP
> James V. Kearney, Esq.
> Gina M. Petrocelli, Esq.
> 885 Third Avenue
> New York, New York 10022
> Telephone: (212) 906-1200

The name, address and telephone number of Intervenor-Defendant CLUB

NÁUTICO ESPAÑOL DE VELA is:

> DEBEVOISE & PLIMPTON LLP
> David W. Rivkin, Esq.
> Jeremy Feigelson, Esq.
> Catherine M. Doll, Esq.
> 919 Third Avenue
> New York, New York 10022
> Telephone: (212) 909-6000

5.    This appeal is taken from the Decision and Order of Hon. Herman Cahn, J.S.C. of the Supreme Court of the State of New York, County of New York, dated May 12, 2008, Notice of Entry of which was served by hand delivery on May 13, 2008.

6.    This is an action for breach of fiduciary duty and breach of the terms of the Deed of Gift governing the America's Cup. On July 20, 2007, Plaintiff-Appellee GGYC filed a complaint alleging that Defendant-Appellant SNG violated the terms of the Deed of Gift that governs the America's Cup by accepting a challenge from CNEV and seeking a declaratory judgment that CNEV's challenge for the Cup is void and GGYC's challenge is valid. It further sought an injunction directing SNG to reject CNEV's challenge and not promulgate rules pursuant to the protocol SNG and CNEV drafted, and further directing SNG to accept GGYC's challenge and draft a protocol with that organization.

2

7.     On November 27, 2007 the Supreme Court, in a memorandum decision, granted Plaintiff- Appellee GGYC's Cross-Motion for Summary Judgment, denied in part Defendant-Appellant SNG's Motion to Dismiss and for Summary Judgment, denied CNEV's Motion for Summary Judgment and to Dismiss GGYC's claims, declared CNEV's challenge to be invalid and CNEV not to be a valid Challenger of Record pursuant to the Deed of Gift, and declared GGYC's challenge to be valid and GGYC to be the Challenger of Record. On March 17, 2008, the Court denied SNG's motion for an order declaring GGYC's Notice of Challenge and Certificate by Golden Gate Yacht Club to be in non-compliance with the Deed of Gift. On May 12, 2008, the Court entered an order setting dates for the next America's Cup. A copy of the May 12, 2008 Order and Decision is attached hereto as Exhibit A.

8.     The grounds for reversal are errors of fact and law.

9.     The following proceedings are related to this action: *Team New Zealand Limited v. Société Nautique de Genève, et al*, Index No. 600662/2008 (N.Y. Sup. Ct.) (Cahn, J.); *Team New Zealand Limited v. Société Nautique de Genève, et al*, No. 08-CV-2228 (S.D.N.Y.). The complaints were filed on March 6, 2008. Defendants have not yet served responsive pleadings. This appeal is also related to an appeal of the trial court's March 17, 2008 Order, Notice of Appeal of which was filed on April 14, 2008.

Dated:  New York, New York
       May 13, 2008

SIMPSON THACHER & BARTLETT LLP

By: *Barry R. Ostrager/klu*

Barry R. Ostrager
Jonathan K. Youngwood
George S. Wang
425 Lexington Avenue
New York, N.Y. 10017-3954
Telephone: (212) 455-2000
Facsimile:  212-455-2502

**Attorneys for Defendant-Appellant
SOCIÉTÉ NAUTIQUE DE GENÈVE**

4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : IAS Part 49

------------------------------------------------------------X

GOLDEN GATE YACHT CLUB,

                                    Plaintiff,

          - against -                                    Index No. 602446/07

SOCIÉTÉ NAUTIQUE DE GENÈVE,

                                    Defendant,

CLUB NÁUTICO ESPAÑOL DE VELA,

                                    Intervenor-Defendant.

------------------------------------------------------------X

HERMAN CAHN, J.:

          This decision addresses a supplemental issue pertaining to the decisions rendered in this

action dated November 27, 2007 and March 17, 2008.

          The essential facts underlying this action have been described at length in those decisions,

including an analysis of the Deed of Gift, dated October 24, 1887, which provides, in relevant

          The Challenging Club *shall give ten months' notice, in writing,
          naming the days for the proposed races* . . . Accompanying the ten
          months' notice of challenge there must be sent the name of the owner
          and a certificate of the name, rig, and following dimensions of the
          challenging vessel, namely, length on load water-line; beam at load
          water-line and extreme beam; and draught of water; which
          dimensions shall not be exceeded; and a custom-house registry of the
          vessel must also be sent as soon as possible

(emphasis added).

          The July 11, 2007 Notice of Challenge, issued by Golden Gate Yacht Club (GGYC), the

Challenger of Record, designated July 4, 2008 as the date of the first race, and July 6, 2008 and

[illegible] 2008 as the respective dates for the second and third races, if necessary, thereby satisfying the ten-month notice requirement provided for in the Deed of Gift. This litigation intervened, however, in that ten-month period, thereby creating an issue as to what effect, if any, this action should have on that ten-month period.

GGYC contends that the ten-month notice period should be deemed to have commenced when the first decision was issued on November 27, 2007. The defending champion, Société Nautique de Genève (SNG), argues that the ten-month notice period should be deemed to have commenced when the second decision was issued, on March 17, 2008.

GGYC commenced the litigation, and the subsequent opposition to GGYC's claim as the Challenger of Record prolonged the uncertainty. Thus, it would be inequitable to deprive SNG of the benefit of a full ten-month period in which to prepare its racing vessel. The ten-month period should commence when the Court's order is final, after the uncertainty created by this litigation has been resolved. Indeed, as this Court noted in its March 17, 2008 decision and order, these legal proceedings "interrupted" the ten-month period, albeit it did not invalidate the Notice of Challenge. And as stated by the Court of Appeals in *Mercury Bay Boating Club v San Diego Yacht Club* (76 NY2d 256, 268 [1990]):

> Because the deed allows a challenge to be mounted upon 10 months' notice, the defender of the Cup is allowed only this short time to construct a defending vessel although the challenger has had unlimited time to mount a challenge and thus may have taken years designing and constructing its challenging vessel.

Because I do not deem this litigation, nor any of the motions made therein, to have been frivolous, the appropriate date for the commencement of the ten-month period should be no earlier than the disposition of the last motion made. Indeed, the latest decision fully addressed

2

the issue of GGYC's status as the official Challenger of Record, and the determination is reflected in the order issued in conjunction with the decision. The ten-month period should commence when a binding decision has been entered. In New York practice that is when an order has been made by the Court. Only such an order triggers finality, for example the right to appeal. Such an order has been simultaneously signed.

Dated: May 12, 2008

ENTER:

_____
J.S.C.

FILED

MAY 1 3 2008

NEW YORK
COUNTY CLERK'S OFFICE

3

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK: IAS Part 49

--------------------------------------------------X

GOLDEN GATE YACHT CLUB,

                                    Plaintiff,

                                                                    Index No. 602446/07

            -against-                                               **ORDER**

SOCIÉTÉ NAUTIQUE DE GENÈVE,

                                    Defendant,

CLUB NÁUTICO ESPAÑOL DE VELA,

                                    Intervenor-Defendant.

--------------------------------------------------X

HERMAN CAHN, J.:

        Plaintiff Golden Gate Yacht Club ("GGYC") in motion sequence number 001 having

moved this Court for a preliminary injunction and expedited discovery and an expedited trial,

and non-parties Reale Yacht Club Canottieri Savoia and Mascalzone Latino (collectively,

"Amici") in motion sequence number 002 having moved this Court for leave to file an amici

curiae brief, and Defendant Société Nautique de Genève ("SNG") in motion sequence number

003 having moved this Court to dismiss and for summary judgment, and GGYC in motion

sequence number 003 having cross-moved this Court for an order pursuant to N.Y. C.P.L.R.

3211(6) and 3212 granting GGYC's cross-motion for summary judgment, together with such

further and other relief as this Court deems just and proper, and Intervenor-Defendant Club

Náutico Español de Vela ("CNEV") in motion sequence number 004 having moved this Court

for summary judgment and an order dismissing Plaintiff's claims;

NOW, upon reading and filing the following papers submitted to the Court: **Motion Sequence number 001**: GGYC's Order to Show Cause, dated August 22, 2007, and the accompanying Memorandum of Law, the Affirmation of Gina M. Petrocelli and the Affidavit of Thomas F. Ehman, including the exhibits attached thereto; SNG's September 5, 2007 Memorandum of Law in Opposition and the September 5, 2007 Affidavits of Hamish Ross and Miquel Terrasa Monasterio, including the exhibits attached thereto; **Motion Sequence number 002**: Amici's October 5, 2007 Order to Show Cause and the Affirmation of Lance J. Gotko, including the exhibits attached thereto; SNG's October 12, 2007 Response to Proposed Amici's Application; **Motion Sequence numbers 003 and 004**: SNG's September 21 Notice of Motion and Memorandum of Law, the Affidavit of Hamish Ross and Affirmation of David G. Hille including the exhibits thereto, and SNG's September 21, 2007 Commercial Division Rule 19-a Statement of Material Facts; CNEV's September 21, 2007 Notice of Motion and the Affidavit of Manuel Jose Chirivella Bonet; GGYC's October 5, 2007 Notice of Cross-Motion, Memorandum of Law, the Affidavit of Thomas F. Ehman, Jr. and Affirmation of James V. Kearney including the exhibits thereto, and GGYC's Commercial Division Rule 19-a Statement of Material Facts, and Response to SNG's Commercial Division Rule 19-a Statement of Material Facts; SNG's October 12, 2007 Memorandum of Law, Response to Plaintiff's Commercial Division Rule 19-a Statement, the Affidavit of Hamish Ross, including the exhibits thereto and CNEV's October 12, 2007 Reply Memorandum of Law and Response to Plaintiff's Commercial Division Rule 19-a Statement and the Affidavit of Manuel Jose Chirivella Bonet and Affirmation of Catherine M. Doll, including the exhibits attached thereto, and GGYC's October 19, 2007 Reply Memorandum of Law and Affirmation of Gina M. Petrocelli, including the exhibits attached thereto;

AND upon reading and filing the following additional papers submitted to the Court:
SNG's December 27, 2007 Notice of Motion and Memorandum of Law in Support of Motion to
Renew and Reargue pursuant to CPLR 2221; the Affidavit of Fred Meyer and the exhibits
attached thereto; GGYC's January 2, 2008 Memorandum of Law in Opposition to SNG's
Memorandum of Law in Support of Motion to Renew and Reargue, the Affirmation of Gina M.
Petrocelli and the exhibits attached thereto; SNG's January 14, 2008 Order to Show Cause, the
Affirmation of Jonathan K. Youngwood and the exhibits attached thereto; the January 23, 2008
Affirmation of Gina M. Petrocelli and the exhibits attached thereto; the January 28, 2008
Affirmation of Barry R. Ostrager and the exhibits attached thereto; GGYC's March 26, 2008
Notice of Filing and the exhibit attached thereto; SNG's March 28, 2008 Notice of Filing and the
exhibit attached thereto; GGYC's April 1, 2008 Notice of Filing and the exhibit attached thereto;
SNG's April 2, 2008 Notice of Filing and the exhibit attached thereto;

AND upon hearing oral argument from counsel for the parties on September 10, 2007,
October 22, 2007, January 14, 2008, January 23, 2008, and April 2, 2008;

AND, upon all prior pleadings and proceedings hereto;

AND, upon the Decision and Order issued by this Court on November 27, 2007 (the
"November 27, 2007 Decision") granting Plaintiff GGYC's cross-motion for summary
judgment dismissing GGYC's breach of fiduciary duty claim against SNG and directing the
parties to "Settle Order", a true copy of which is annexed hereto as Exhibit A;

AND, whereas, on July 11, 2007, GGYC issued a "Notice of Challenge for the America's
Cup" ("Notice of Challenge") that the Court determined to be a valid challenge in its
November 27, 2007 Decision; whereas, at a September 10, 2007 hearing before the Court on
GGYC's motion for preliminary injunction and expedited discovery, the Court inquired whether

the parties would enter into an agreement, pursuant to which the date for the challenge match races prescribed in the Deed of Gift would be extended following a final decision on the merits of this litigation, and counsel for the parties agreed to attempt to negotiate a stipulation tolling the notice period pending a final decision on the merits; it is hereby

ORDERED that the Motion, sequence number 001 for preliminary injunction and expedited discovery and an expedited trial, is denied as moot; and it is further

ORDERED that the Motion, sequence number 002 for leave to file an amici curiae brief, is granted; and it is further

ORDERED that Defendant SNG's Motion to Dismiss and for Summary Judgment in sequence number 003 is granted to the extent it dismisses GGYC's breach of fiduciary duty cause of action, and Plaintiff GGYG's Cross-Motion for Summary Judgment in sequence number 003 is granted; and it is further

ORDERED that the Motion, sequence number 004 by CNEV for Summary Judgment and to Dismiss GCYC's claims, is denied; and it is further

ORDERED and adjudged that CNEV's challenge is invalid, and CNEV is not a valid Challenger of Record pursuant to the Deed of Gift; and it is further

ORDERED and adjudged that GGYC's challenge is valid, and GGYC is the Challenger of Record pursuant to the Deed of Gift; and it is further

ORDERED that the dates for the challenge match races shall be the date ten calendar months from the date of service of a copy of this order, with notice of entry, upon the attorneys who have appeared herein, unless said date is a Sunday or legal holiday, in which case the next day shall be the first date of the challenge match races. The second date shall be two business

4



days thereafter and the third date, if necessary, shall be two business days after the second race.

Notwithstanding the above, the parties may mutually agree in writing to other dates.

ORDERED that the location of the match shall be in Valencia, Spain or any other

location selected by SNG, provided SNG notify GGYC in writing not less than six months in

advance of the date set for the first challenge match race of the location it has selected for the

challenge match races; and it is further

ORDERED that GGYC and SNG may engage in a mutual consent process and make any

arrangement satisfactory to both as to the dates, courses, number of trials, rules and sailing

regulations, and any and all other conditions of the challenge match races in accordance with the

Deed of Gift; and it is further

ORDERED that the Clerk of Court is directed to enter judgment accordingly.

Dated: May 12, 2008

**FILED**

MAY 1 3 2008

ENTER:

NEW YORK
COUNTY CLERK'S OFFICE

J.S.C.

5

**EXHIBIT G**

# Notice of Entry

### 1.    Background

This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33rd America's Cup for application by qualified yacht clubs to become a Challenging Competitor and forms part of the Event Regulations.

Definitions used in the said Protocol shall apply to this Notice of Entry

### 2.    Application

I, Andrew Collins am the Rear Commodore (Sailing) of the Royal Thames Yacht Club, 60 Knightsbridge, London SW1X 7LF and I am duly authorised by such yacht club to submit this Notice of Entry.

**2.1    Yacht Club:** The Royal Thames Yacht Club hereby makes application to AC Management SA to become a Challenging Competitor in the 33rd America's Cup.

**2.2    Deed Of Gift:** The Royal Thames Yacht Club is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular;

(i)    is not domiciled in Switzerland;
(ii)    is an organised yacht club;
(iii)    is incorporated as a private limited company and was registered in England and Wales on the 14 January 2003; and
(iv)    has an annual regatta on the sea or an arm of the sea.

**2.3    Certificate of Incorporation:** A certified copy of the certificate of incorporation, of the Royal Thames Yacht Club is annexed to this Notice of Entry (at annex 1).

**2.4    Annual Regatta:** Details of the Royal Thames Yacht Club's annual regatta on the sea or arm of the sea demonstrating the Challenger meets the obligations in the Deed of Gift are annexed to this Notice of Entry (at annex 2).

**2.5    Organised:** Details demonstrating how the Royal Thames Yacht Club is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry (at annex 3).

**2.6    Representation:** The Royal Thames Yacht Club will be represented by:

TEAMORIGIN LLP (Number OC325168), whose registered office is at 80, Strand, London, WC2R 0NN, United Kingdom.

All communications and notices are to be sent to:

**Representative:**

TEAMORIGIN LLP
80, STRAND,
LONDON, WC2R 0NN
UNITED KINGDOM

| | |
|---|---|
| Attn: | Sir Keith Mills (Team Principal) |
| Fax: | +44 020 7152 4300 |
| email: | keithmills@teamorigin.com |
| Tel: | +44 020 7152 6600 |

**Yacht Club:**

Royal Thames Yacht Club Limited
60 Knightsbridge,
London, SW1X 7LF
UK

| | |
|---|---|
| Attn: | The Secretary, Captain David Freeman, LVO, Royal Navy |
| Facsimile: | +44 (20) 7245 9470 |
| E-mail: | secretary@royalthames.com |
| Tel: | +44(0)20 7235 2121 |

3.    **Bound By Protocol**

The Royal Thames Yacht Club hereby unconditionally agrees and accepts to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

4.    **Arbitration and Dispute Resolution**

The Royal Thames Yacht Club hereby unconditionally agrees and accepts to be bound by the dispute resolution provisions of the Protocol, and in particular, unconditionally submits to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the Arbitration Panel as provided in the said Protocol and shall not resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

5.    **Entry Fee and Performance Bond**

The Royal Thames Yacht Club submits an entry fee of Euro 50,000.00 with this Notice of Entry and agrees a performance bond may be required to be posted by us to AC Management SA of up to Euro 950,000.00 at a later date on at least 30 days prior notice.

6.    **Challenger of Record**

It is acknowledged and agreed the Club Nautico Español de Vela is the Challenger of Record under the terms of the Protocol, but that in the event of the withdrawal or disqualification of Club Nautico Español de Vela, the Royal Thames Yacht Club may become the Challenger of Record, as provided under Article 3.3 of the Protocol.

Signed by The Royal Thames Yacht Club:

Signature:

Andrew Collins
**Name**

Rear Commodore (Sailing)
**Office**

Date:    20th July 2007



ROYAL THAMES YACHT CLUB
60 KNIGHTSBRIDGE
LONDON
SWIX 7LF

The President
Société Nautique de Genève
Port-Noir
CH-1223 Cologny
Switzerland                                              8th January 2008

Dear Sir

**Notice of Challenge for the America's Cup**

The Royal Thames Yacht Club (RTYC) hereby formally challenges Société Nautique de Genève (SNG) to a match for the America's Cup.

This Notice of Challenge is given in accordance with the America's Cup Deed of Gift dated 24th October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17th December 1956 and 5th April 1985.

RTYC hereby confirms that:

(i)     it is an organised yacht club, the oldest Royal club in the United Kingdom, and was formed in 1775. RTYC maintains a club house, a programme of sailing events, a number of moorings on The Solent both at Hamble and Cowes and a membership of more than 1,400 members. RTYC's objects include the encouragement and promotion of yacht sailing, cruising and racing, the pursuit of yachting generally and the occupation, ownership and maintenance of a club house or houses or other assets incidental thereto with a view to the promotion of these activities and social intercourse between those involved. RTYC's powers, organisational structures and procedures are consistent with the carrying out of its objects. RTYC's Memorandum and Articles of Association are a matter of public record;

(ii)    it is incorporated as a private limited company under the Companies Act 1985 and as such was registered in England and Wales at Companies House on the 14th January 2003. RTYC's Certificate of Incorporation is also a matter of public record;

(iii)   it is therefore a yacht club of a foreign country, incorporated by the executive powers of the United Kingdom Government in accordance with applicable English law; and

(iv)    it is an organised yacht club, incorporated as required under the Deed of Gift, having for its annual regatta, the Cumberland Regatta, that among other RTYC regattas, is and has been held annually on an ocean water course on an arm of the sea, namely The Solent.

We hereby give notice of the dates for a match, in accordance with the requirements of the Deed of Gift to give ten months' notice in writing naming the days for the proposed races. We name Monday 4th July 2011 as the date of the first race, Wednesday 6th July 2011 as the date for the second race and Friday 8th July 2011 as the date for the third race if required.

1

We acknowledge that the Deed of Gift contemplates that arrangements as to the dates, courses, number of trials, rules and sailing regulations and any and all other conditions of the match may be made by mutual consent as between the Club challenging for the Cup and the Club holding the same. We confirm our desire to discuss and where possible to agree with SNG some or all of such arrangements and further confirm that nothing in this Notice is intended to prevent such discussions taking place and such arrangements being made by consent.

Accompanying this Notice, as required by the Deed of Gift, is a confirmation of the name of the owner of the challenging vessel and a certificate of the name, rig and the dimensions of the challenging vessel as required by the Deed of Gift.

Yours faithfully

John Stork
Vice Commodore
The Royal Thames Yacht Club

Captain David Freeman, LVO, Royal Navy
The Secretary
The Royal Thames Yacht Club

2

**Confirmation of the name of the owner of the challenging vessel**

The name of the owner of the challenging vessel is:

TEAMORIGIN LLP,
incorporated in England and Wales (No. OC325168),

whose registered office is at

80, Strand,
London,
WC2R 0NN

**CERTIFICATE**

**of the**

**Name, rig and dimensions of the challenging vessel as required by the Deed of Gift**

I, John Stork, Vice Commodore of the Royal Thames Yacht Club, certify the details set out below as to the name, rig and dimensions of the challenging vessel as required by the Deed of Gift, to represent the Royal Thames Yacht Club in a match for the America's Cup to be sailed in accordance with its Notice of Challenge:

1. **Name:**      White Knight AC 90

2. **Owner:**    TEAMORIGIN LLP

3. **Rig:**        Sloop

4. **Dimensions:**

    a.  Length on the load water-line:      90 ft        (27.4 m)

    b.  Beam at load water-line:           14.76 ft      (4.5 m)

    c.  Extreme beam:                    17.39 ft      (5.3 m)

    d.  Draught of water:                21.32 ft      (6.5 m)

For the **Royal Thames Yacht Club**

**John Stork, Vice Commodore**

**Captain David Freeman, LVO, Royal Navy, Secretary**

4



# Notice of Entry



### 1.   Background

This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33rd America's Cup for application by yacht clubs to become a Challenging Competitor.

Definitions used in the said Protocol shall apply to this Notice of Entry.

### 2.   Application

I, Willy Kuhweide am the Commodore of the Deutscher Challenger Yacht Club e.V. and I am duly authorised by such yacht club to submit this Notice of Entry, as confirmed by Notary hereunder.

2.1   **Yacht Club:** Deutscher Challenger Yacht Club e.V. hereby makes application to AC Management SA to become a Challenging Competitor in the 33rd America's Cup.

2.2   **Deed Of Gift:** Deutscher Challenger Yacht Club e.V. is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular;

   (i)    is not domiciled in Switzerland;
   (ii)   is an organised yacht club;
   (iii)  is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and
   (iv)  has or will have an annual regatta on the sea or an arm of the sea.

2.3   **Certificate of Incorporation**: An original notarized certified copy of the Deutscher Challenger Yacht Club's certificate of incorporation as well as of the trade register extract is/are annexed to this Notice of Entry.

2.4   **Annual Regatta**: The Notice of Race of the Deutscher Challenger Yacht Club's annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Entry.

2.5   **Organised**: Details, such as the Deutscher Challenger Yacht Club e.V. existing by-laws and its organization regulations, demonstrating how the Deutscher Challenger Yacht Club e.V. is organised and meets the

obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry.

**2.6    Representation:** Deutscher Challenger Yacht Club e.V. will be represented by

United Internet Team Germany
*Name of representative (syndicate)*

All communications and notices are to be sent to:

*[Provide address (no PO Box address), fax, and email, telephone details of both the yacht club and the representative entity (syndicate) with the name(s) of contact person(s)]*

Yacht club:
DCYC - Deutscher Challenger Yacht Club e.V.
Willy Kuhweide - Commodore
Nepomukweg 4-6
D-82319 Starnberg
Tel.: ++49 (0) 8151-3238
Fax: ++49 (0) 8151-28222
Email: info@dcyc.de

Syndicate:
United Internet Team Germany
Deutsche Challenge S.L.U.
Michael Scheeren - Syndicate Chief
Muelle de Nazaret s/n
Port America's Cup - Base 2
E-46024 Valencia
Tel.: ++49 (0) 171 7875382
Fax: ++34 (0) 96 320 44 71
Email: m.scheeren@ui-team-germany.de

**3.    Bound By Protocol**

The Deutscher Challenger Yacht Club e.V. and the United Internet Team Germany each hereby unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

**Arbitration and Dispute Resolution**

The Deutscher Challenger Yacht Club e.V. and the United Internet Team Germany each hereby unconditionally agree and accept to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. Deutscher Challenger Yacht Club e.V. further unconditionally submit to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

5.    **Entry Fee and Performance Bond**

Deutscher Challenger Yacht Club e.V. submits an entry fee of Euro 50,000.00 with this Notice of Entry and agrees a performance bond will be required to be posted by us to AC Management SA of up to Euro 950,000.00 at a later date on at least 30 days prior notice.

The entry fee shall be transferred on the following bank account:

**BENEFICIARY BANK :**

**UBS SA**
Rue des Noirettes 35
Case Postale 2600
1211 Genève 2

**BANK ACCOUNT :**

IBAN : CH 3000 2402 4048 7696 75T
SWIFT : UBSWCHZH80A

**ACCOUNT BENEFICIARY :**

**AC MANAGEMENT SA**
20, Route de Pré Bois
CP-1852-1215 Geneva 15
Switzerland

6.    **Challenger of Record**

The Deutscher Challenger Yacht Club e.V. and United Internet Team Germany each acknowledge and agree that the Club Nautico Español de Vela ("CNEV") is the Challenger of Record under the terms of the Protocol, but that in the event of the withdrawal or disqualification of CNEV, Deutscher Challenger Yacht Club e.V. may become the Challenger of Record, as provided under Article 3.3 of the Protocol.

The Deutscher Challenger Yacht Club e.V. and United Internet Team Germany also acknowledge that Golden Gate Yacht Club ("GGYC") is claiming that CNEV is not a valid Challenger of Record and has commenced a lawsuit in New York State court seeking to have CNEV removed as Challenger of Record and to have GGYC inserted in its place.

The Deutscher Challenger Yacht Club e.V. and the United Internet Team Germany further acknowledge that Societé Nautique de Genève ("SNG") has commenced an arbitration proceeding before the Arbitration Panel constituted under the Protocol in which it asks the Panel to confirm CNEV's status as Challenger of Record.

The Deutscher Challenger Yacht Club e.V. and the United Internet Team Germany each understand that AC Management and SNG cannot be responsible for any losses incurred by Deutscher Challenger Yacht Club e.V. and/or United Internet Team Germany as a result from GGYC's actions.

**Signatures:**

Deutscher Challenger Yacht Club e.V.

Name: Deutscher Challenger Yacht Club e.V. - Willy Kuhweide - Commodore
Office: Nepomukweg 4-6, D-82319 Starnberg
Date: 10. August 2007

[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]

United Internet Team Germany:

By countersigning this Notice of Entry United Internet Team Germany confirms its agreement with its provisions and in particular unconditionally agrees and accepts to be bound by the terms and conditions of sections 3, 4 and 6 above.

Name: United Internet Team Germany - Michael Scheeren – Syndicate Chief
Office: Deutsche Challenge S.L.U.
        Muelle de Nazaret s/n, Port America's Cup – Base 2, E-46024 Valencia
Date: 9. August 2007

[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]

Amtliche Beglaubigung

Die Echtheit der vor. stehenden, vor uns
gezeichneten bzw. anerkannten Unterschrift/en der
folgenden Person/en wird amtlich bezeugt:
_Wilhelm Kuhweide, geb. do ol 1943,_
_deutschen Staatsangehörigen, in 6403 Küssnacht_

Küssnacht, 13. August 2007

**APOSTILLE**

(Convention de la Haye du 5 octobre 1961)

1. Land: Schweizerische Eidgenossenschaft, Kanton **Schwyz**
   Country: Swiss Confederation, Canton of Schwyz

   Diese öffentliche Urkunde / This public document

2. ist unterschrieben von / has been signed by
   Hensler Ulrich

3. in seiner/ihrer Eigenschaft als / acting in the capacity of
   Notar

4. Sie ist versehen mit dem Stempel/Siegel des/der / bears the stamp/seal of
   Notariat Küssnacht

   Bestätigt / Certified

5. in / to  Schwyz                     6. am / the  13 August 2002

7. durch die Staatskanzlei des Kanton Schwyz
   by Chancery of State of the Canton of Schwyz

8. unter / under Nr.  1340

9. Stempel:                    10. Unterschrift / Signature

                               Der Staatschreiber:



**JUSTIZRAT RICHARD BOCK**
*N O T A R*
**Casinostraße 38, 56068 Koblenz**

Tel. 0261/733960    mail: notariat@notar-bock.de    Fax 0261/1339610

**URNr.**                    3794/2007

Die vorstehende, vor mir anerkannte Namensunterschrift von Herrn Michael **Scheeren**, geboren am 22. Juli 1957, wohnhaft in 56414 Wallmerod, Im grauen Berg 11, von Person bekannt, beglaubige ich hiermit.

Koblenz, den 9. August 2007



Notarassessor Sebastian Miesen
als amtlich bestellter Vertreter von
Justizrat Richard Bock,
Notar in Koblenz

**URNr.**                    3794/2007

The authenticity of the signature of Mr. Michael **Scheeren**, * 22.07.1957, domiciled in 56414 Wallmerod, Im grauen Berg 11, appearing on the foregoing page is hereby certified.

Mr. Scheeren is personally known.

Koblenz, 9th August 2007

Junior Notary Public Sebastian Miesen
acting as officially appointed representative
of Notary Richard Bock, Koblenz

**Kostenberechnung §§ 154 KostO**

Wert: 3.000,-- €
Gebühr §§ 141, 32, 45        10,00 €

Junior Notary Public Sebastian Miesen
acting as officially appointed representative
of Notary Richard Bock, Koblenz

le_07306.doc

**APOSTILLE**

(Convention de La Haye du 5 octobre 1961)

1. Land : Bundesrepublik Deutschland

   Diese öffentliche Urkunde

2. ist unterschrieben von Notarassessor Sebastian Miesen

3. in seiner Eigenschaft als amtlich bestellter Vertreter des Notars JR Richard Bock in Koblenz

4. sie ist Versehen mit dem Siegel des Notars

Bestätigt

5. in Koblenz    6. am 09. August 2007

7. durch den Präsidenten des Landgerichts

8. Unter Nr. 910 a E – 1222/07

9. Siegel

10. Unterschrift

(Hans-Josef Graefen)

Geschäftswert
EUR 3.000,00

Verwaltungsgebühr
Gemäß JVKostO
EUR 10.00

JV 60 Apostille

# Notice of Entry

## 1. Background

This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33rd America's Cup for application by yacht clubs to become a Challenging Competitor.

Definitions used in the said Protocol shall apply to this Notice of Entry.

## 2. Application

I, LORENZO RIZZARDI am the PRESIDENT of the CIRCOLO VELA GARGNANO and I am duly authorised by such yacht club to submit this Notice of Entry, as confirmed by General Secretary of the Comune di Gargnano Dott. Angelo Grassi, hereunder.

2.1 **Yacht Club**: CIRCOLO VELA GARGNANO hereby makes application to AC Management SA to become a Challenging Competitor in the 33rd America's Cup.

2.2 **Deed Of Gift**: CIRCOLO VELA GARGNANO is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular;

   (i)   is not domiciled in Switzerland;
   (ii)  is an organised yacht club;
   (iii) is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and
   (iv)  has or will have an annual regatta on the sea or an arm of the sea.

2.3 **Certificate of Incorporation**: An original notarized certified copy of the CIRCOLO VELA GARGNANO'S certificate of incorporation as well as of the trade register extract is/are annexed to this Notice of Entry.

2.4 **Annual Regatta**: The Notice of Race of the CIRCOLO VELA GARGNANO annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Entry.

2.5 **Organised**: Details, such as the CIRCOLO VELA GARGNANO's existing by-laws and its organization regulations, demonstrating how the CIRCOLO VELA GARGNANO is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry.

notice of entry_33rd_ac.

**2.6    Representation:** CIRCOLO VELA GARGNANO will be represented by

PIU 39 CHALLENGE 2007 S.L.
MUELLE DE L'ADUANA S/N
BASE 10
46024 VALENCIA (SPAIN)

All communications and notices are to be sent to:

Don Lorenzo Rizzardi
MUELLE DE L'ADUANA S/N
BASE 10
46024 VALENCIA (SPAIN)
*TEL. 963 812207*
FAX 963 812206
OFFICIAL@PIU39CHALLENGE.IT

C.FEZZARDI@PIU39CHALLENGE.IT

F.FRATTINI@PIU39CHALLENGE.IT

**3.    Bound By Protocol**

The CIRCOLO VELA GARGNANO and the PIU 39 CHALLENGE 2007 S.L. each hereby unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

**4.    Arbitration and Dispute Resolution**

The CIRCOLO VELA GARGNANO and the PIU 39 CHALLENGE 2007 S.L. each hereby unconditionally agree and accept PIU 39 CHALLENGE 2007 S.L. to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. CIRCOLO VELA GARGNANO further unconditionally submit to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

**5.    Entry Fee and  Performance Bond**

CIRCOLO VELA GARGNANO submits an entry fee of Euro 50,000.00 with this Notice of Entry and agrees a performance bond will be required to be posted by

us to AC Management SA of up to Euro 950,000.00 at a later date on at least 30 days prior notice.

The entry fee shall be transferred on the following bank account:

**BENEFICIARY BANK :**

**UBS SA**
Rue des Noirettes 35
Case Postale 2600
1211 Genève 2

**BANK ACCOUNT :**

IBAN : CH 3000 2402 4048 7696 75T
SWIFT : UBSWCHZH80A

**ACCOUNT BENEFICIARY :**

**AC MANAGEMENT SA**
20, Route de Pré Bois
CP-1852-1215 Geneva 15
Switzerland

6. **Challenger of Record**

The CIRCOLO VELA GARGNANO and PIU 39 CHALLENGE 2007 S.L. each acknowledge and agree that the Club Nautico Español de Vela ("CNEV") is the Challenger of Record under the terms of the Protocol, but that in the event of the withdrawal or disqualification of CNEV, CIRCOLO VELA GARGNANO may become the Challenger of Record, as provided under Article 3.3 of the Protocol.

The CIRCOLO VELA GARGNANO and PIU 39 CHALLENGE 2007 S.L. also acknowledge that Golden Gate Yacht Club ("GGYC") is claiming that CNEV is not a valid Challenger of Record and has commenced a lawsuit in New York State court seeking to have CNEV removed as Challenger of Record and to have GGYC inserted in its place.

The *CIRCOLO VELA GARGNANO* and the PIU 39 CHALLENGE 2007 S.L. further acknowledge that Societé Nautique de Genève ("SNG") has commenced an arbitration proceeding before the Arbitration Panel constituted under the Protocol in which it asks the Panel to confirm CNEV's status as Challenger of Record.

The CIRCOLO VELA GARGNANO and the PIU 39 CHALLENGE 2007 S.L. each understand that AC Management and SNG cannot be responsible for any losses incurred by CIRCOLO VELA GARGNANO and/or [PIU 39 CHALLENGE 2007 S.L. as a result from GGYC's actions.

notice_of_entry_33rd_ac

**Signatures:**

**[Club]:** CIRCOLO VELA GARGNANO

*Reucurafui*

Name: LIBVI LUCIANO (VICEPRESIDANTE)
Office: GARGNANO
Date: 23 OTTOBRE 2007

**[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]**

**[Representative – syndicate]:**

By countersigning this Notice of Entry [representative – syndicate] confirms its agreement with its provisions and in particular unconditionally agrees and accepts to be bound by the terms and conditions of sections 3, 4 and 6 above.

+ 3/5 CHALLENGE

Name: RIZZARDI LORENZO
Office: VALENCIA
Date: 23 OTTOBRE 2007

**[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]**

COMUNE DI GARGNANO *Provincia di Brescia*
Ai sensi dell'art. 21 del D.P.R. 445/2000 si dichiara autentica la firma di ...LIBVI  LUCIANO...
apposta in mia presenza, la cui identità è stata da me accertata mediante ...CONOSCENZA...
...PERSONALE...
nf 3 OTT 2007  SEGRETARIO GENERALE
(Dott. Angelo Grassi)

COMUNE DI GARGNANO *Provincia di Brescia*
Ai sensi dell'art. 21 del D.P.R. 445/2000 si dichiara autentica la firma di ...Rizzardi...
...Lorenzo...
apposta in mia presenza, la cui identità è stata da me accertata mediante ...CONOSCENTA...
...PERSONALE...
B 3 OTT 2007  SEGRETARIO GENERALE
(Dott. Angelo Grassi)

notice_of_entry_33rd_ta

# Notice of Entry

Application by Gamla Stans Yacht Sällskap to become a Challenging Competitor pursuant to the Protocol Governing the 33rd America's Cup

Definitions used in the said Protocol shall apply to this Notice of Entry.

1. **Application**

   I, Johan Stenman am the Managing Director Gamla Stans Yacht Sällskap and I am duly authorized by such yacht club to submit this Notice of Entry.

   1.1 **Yacht Club:** Gamla Stans Yacht Sällskap hereby makes application to AC Management SA to become a Challenging Competitor in the 33rd America's Cup.

   1.2 **Deed Of Gift:** Gamla Stans Yacht Sällskap is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular:

       (i)     is not domiciled in Switzerland;

       (ii)    is an organised yacht club;

       (iii)   is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and

       (iv)   has had and will have an annual regatta on the sea or an arm of the sea.

   1.3 **Certificate of Incorporation:** An certified copy of Gamla Stans Yacht Sällskap certificate of incorporation as well as of the trade register extract is annexed to this Notice of Entry.

   1.4 **Annual Regatta:** The Notice of Race of the annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Entry.

   1.5 **Organised:** Details, such as the existing by-laws and its organization regulations, demonstrating how Gamla Stans Yacht Sällskap is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry.

   1.6 **Representation:** Gamla Stans Yacht Sällskap will be represented by Mr. Johan Stenman

3

1211 Genève 2

**BANK ACCOUNT :**

IBAN : CH 3000 2402 4048 7696 75T
SWIFT : UBSWCHZH80A

**ACCOUNT BENEFICIARY :**

**AC MANAGEMENT SA**
20, Route de Pré Bois
CP-1852-1215 Geneva 15
Switzerland

5.    **Challenger of Record**

Gamla Stans Ycht Sällskap and Mr. Johan Stenman each acknowledge that
the Club Nautico Español de Vela ("CNEV") is the Challenger of Record un-
der the present terms of the Protocol, but that in the event of the with-
drawal or disqualification of CNEV, Gamla Stans Yacht Sällskap may be-
come the Challenger of Record, as provided under Article 3.3 of the Proto-
col.

Gamla Stans Yacht Club and Mr. Johan Stenman also acknowledge that
Golden Gate Yacht Club ("GGYC") is claiming that CNEV is not a valid Chal-
lenger of Record and has commenced a lawsuit in New York State court
seeking to have CNEV removed as Challenger of Record and to have GGYC
inserted in its place.

Gamla Stans Yacht Sällskap further acknowledge that Société Nautique de
Genève ("SNG") has commenced an arbitration proceeding before the Arbi-
tration Panel constituted under the Protocol in which it asks the Panel to
confirm CNEV's status as Challenger of Record.  It is also acknowledged
that the Arbitration Panel has ruled on the issues in question.

Gamla Stans Yacht Sällskap each understand that AC Management and SNG
cannot be responsible for any losses incurred by GSYS and/or Mr. Johan
Stenman as a result from GGYC's actions.

6.    **Confidentiality**

It is agreed between AC Management and SNG, on one side, and Gamla
Stans Yacht Sällskap and Mr. Johan Stenman, on the other side that this
Notice of Challenge shall be kept strictly confidential and shall not be
made public until further notice from Gamla Stans Yacht Sällskap.



2

All communications and notices are to be sent to:

Mr. Johan Stenman, Skeppsbron 18, PO Box 2095, SE-103 13 Stockholm.
Johan.stenman@victorychallenge.com
+46 8 562 00004
+46 8 20 37 74 fax
+46 704 13 05 90 mobile

2. **Bound By Protocol**

Gamla Stans Yacht Sällskap and Mr. Johan Stenman each hereby unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained in the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

3. **Arbitration and Dispute Resolution**

Gamla Stans Yacht Sällskap and Mr. Johan Stenman each hereby unconditionally agree and accept to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. GSYS further unconditionally submit to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of such matter regarding the 33rd America's Cup.

4. **Entry Fee and Performance Bond**

Gamla Stans Yacht Sällskap submits an entry fee of Euro 50,000.00 with this Notice of Entry and agrees that a performance bond will be required to be posted by GSYS to AC Management SA of up to Euro 950,000.00 at a later date on at least 30 days prior notice.

The entry fee shall be transferred to the following bank account:

BENEFICIARY BANK :

UBS SA
Rue des Noirettes 35
Case Postale 2600

4

Signatures:

**Gamla Stans Yacht Sällskap**

**Name:**
**Office:**
**Date:** 2007-11-02

By countersigning this Notice of Entry I Johan Stenman confirms this agreement with its provisions and in particular unconditionally agrees and accepts to be bound by the terms and conditions of sections 3, 4 and 6 above.

**Name:**
**Office:**
**Date:** 2007-11-02

**AC Management**

**Name:**
**Office:**
**Date:**




## Notice of Entry

**Background**

This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33rd America's Cup for application by yacht clubs to become a Challenging Competitor.

Definitions used in the said Protocol shall apply to this Notice of Entry.

2. **Application**

I, Lawyer Raffaele Esposito am the President of the Club Nautico Gaeta and I am duly authorised by such yacht club to submit this Notice of Entry, as confirmed by [*Notary*] hereunder.

2.1    **Yacht Club:** Club Nautico Gaeta hereby makes application to AC Management SA to become a Challenging Competitor in the 33rd America's Cup.

2.2    **Deed Of Gift:** Club Nautico Gaeta is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular;

(i)      is not domiciled in Switzerland;
(ii)     is an organised yacht club;
(iii)    is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and
(iv)    has or will have an annual regatta on the sea or an arm of the sea.

2.3    **Certificate of Incorporation**: An original notarized certified copy of the Club Nautico Gaeta's certificate of incorporation as well as of the trade register extract is/are annexed to this Notice of Entry.

**Annual Regatta**: The Notice of Race of the Club Nautico Gaeta annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Entry.

**Organised**: Details, such as the Club Nautico Gaeta existing by-laws and its organization regulations, demonstrating how the Club Nautico Gaeta

Documento4

is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry.

2.6    **Representation:** Club Nautico Gaeta will be represented by

Paolo Scutellaro (Argo Challenge)



*Name of representative (Syndacate)*

All communications and notices are to be sent to:

Argo Challenge Srl
Via Pietro Micca, 12
10122 Torino, Italy
Ph. +39 011 5067974
Fax +39 011 5624009
Contact person: Mrs. Marcela Senise de Souza

Club Nautico Gaeta
Piazza carlo III
04024, Gaeta ( It ), Italy
Ph. +39 0771460448
Fax +39 0771 452480
Contact person: Dott. Giacomo Bonelli

**3.    Bound By Protocol**

The Club Nautico Gaeta and Paolo Scutellaro - Argo Challenge each hereby unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

**4.    Arbitration and Dispute Resolution**

The Club Nautico Gaeta and Paolo Scutellaro - Argo Challenge each hereby unconditionally agree and accept to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. Club Nautico Gaeta further unconditionally submit to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

Documento4

Page 2 of 5

5.    **Entry Fee and Performance Bond**

Club Nautico Gaeta submits an entry fee of Euro 50,000.00 with this Notice of Entry and agrees a performance bond will be required to be posted by us to AC Management SA of up to Euro 950,000.00 at a later date on at least 30 days prior notice.

Documento4

Page 3 of 5

The entry fee shall be transferred on the following bank account:

**BENEFICIARY BANK :**

**UBS SA**
Rue des Noirettes 35
Case Postale 2600
1211 Genève 2

**BANK ACCOUNT :**

IBAN : CH 3000 2402 4048 7696 75T
SWIFT : UBSWCHZH80A

**ACCOUNT BENEFICIARY :**

**AC MANAGEMENT SA**
20, Route de Pré Bois
CP-1852-1215 Geneva 15
Switzerland

6.     **Challenger of Record**

The Club Nautico Gaeta and Paolo Scutellaro -Argo Challenge each acknowledge and agree that the Club Nautico Español de Vela ("CNEV") is the Challenger of Record under the terms of the Protocol, but that in the event of the withdrawal or disqualification of CNEV, Club Nautico may become the Challenger of Record, as provided under Article 3.3 of the Protocol.

The Club Nautico Gaeta and Paolo Scutellaro – Argo Challenge also acknowledge that Golden Gate Yacht Club ("GGYC") is claiming that CNEV is not a valid Challenger of Record and has commenced a lawsuit in New York State court seeking to have CNEV removed as Challenger of Record and to have GGYC inserted in its place.

The *Club Nautico Gaeta* and Paolo Scutellaro – Argo Challenge further acknowledge that Société Nautique de Genève ("SNG") has commenced an arbitration proceeding before the Arbitration Panel constituted under the Protocol in which it asks the Panel to confirm CNEV's status as Challenger of Record.

The Club Nautico Gaeta and Paolo Scutellaro – Argo Challenge each understand that AC Management and SNG cannot be responsible for any losses incurred by Club Nautico Gaeta  and/or Paolo Scutellaro – Argo Challenge  as a result from GGYC's actions.

Documento4

Page 4 of 5

**Signatures:**

**Club Nautico Gaeta:**

Lawyer Raffaele Esposito

Name:
Office:
Date:

IL CONVENZIONARIO INCARICATO
(DE ANGELIS Franco)

[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]

**Paolo Scutellaro - Argo Challenge**

By countersigning this Notice of Entry Paolo Scutellaro – Argo Challenge confirms its agreement with its provisions and in particular unconditionally agrees and accepts to be bound by the terms and conditions of sections 3, 4 and 6 above.

Name:
Office:
Date:

[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]

NOTAIO
NICOLA CAPUANO
VIA DEPRETIS N° 5    Page 5 of 5
80133 NAPOLI

Documento4

# A P O S T I L L E

## (Convention de la Haye du 5 octobre 1961)

1. Paese: ITALIA

   Il presente atto pubblico

2. è stato sottoscritto da _Nicola Palugano_

3. agente in qualità di _Notaio in Napoli_

4. è segnato dal contrassegno / timbro

   di _Distretto Notarile di Napoli, T. A. Mole_

   Attestato — **6 NOV. 2007**

5. a NAPOLI        6. li

7. da **PROCURA DELLA REPUBBLICA DI NAPOLI**

   **8° REPARTO - 9° SEZ. - AFFARI CIVILI .**

8. sotto il N. _1873/07_

9. Contrassegno / timbro:

10. firma



Il Sost. Procuratore della Repubblica
**Dr.ssa Manuela Mazzi**




## Notice of Entry

### Background

This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33rd America's Cup for application by yacht clubs to become a Challenging Competitor.

Definitions used in the said Protocol shall apply to this Notice of Entry.

### 2.    Application

I, Lawyer Raffaele Esposito am the President of the Club Nautico Gaeta and I am duly authorised by such yacht club to submit this Notice of Entry, as confirmed by [Notary] hereunder.

2.1    **Yacht Club:** Club Nautico Gaeta hereby makes application to AC Management SA to become a Challenging Competitor in the 33rd America's Cup.

2.2    **Deed Of Gift:** Club Nautico Gaeta is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular;

(i)     is not domiciled in Switzerland;
(ii)    is an organised yacht club;
(iii)   is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and
(iv)    has or will have an annual regatta on the sea or an arm of the sea.

2.3    **Certificate of Incorporation:** An original notarized certified copy of the Club Nautico Gaeta's certificate of incorporation as well as of the trade register extract is/are annexed to this Notice of Entry.

**Annual Regatta:** The Notice of Race of the Club Nautico Gaeta annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Entry.

**Organised:** Details, such as the Club Nautico Gaeta existing by-laws and its organization regulations, demonstrating how the Club Nautico Gaeta

Document4

is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry.

**2.6    Representation:** Club Nautico Gaeta will be represented by

Paolo Scutellaro (Argo Challenge)



*Name of representative (Syndacate)*

All communications and notices are to be sent to:

Argo Challenge Srl
Via Pietro Micca, 12
10122 Torino, Italy
Ph. +39 011 5067974
Fax +39 011 5624009
Contact person: Mrs. Marcela Senise de Souza

Club Nautico Gaeta
Piazza carlo III
04024, Gaeta ( It ), Italy
Ph. +39 0771460448
Fax +39 0771 452480
Contact person: Dott. Giacomo Bonelli

**3.    Bound By Protocol**

The Club Nautico Gaeta and Paolo Scutellaro - Argo Challenge each hereby unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

**4.    Arbitration and Dispute Resolution**

The Club Nautico Gaeta and Paolo Scutellaro - Argo Challenge each hereby unconditionally agree and accept to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. Club Nautico Gaeta further unconditionally submit to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

Documented

5.     **Entry Fee and  Performance Bond**

Club Nautico Gaeta submits an entry fee of Euro 50,000.00 with this Notice of Entry and agrees a performance bond will be required to be posted by us to AC Management SA of up to Euro 950,000.00 at a later date on at least 30 days prior notice.

Documento4

Page 3 of 5

The entry fee shall be transferred on the following bank account:

**BENEFICIARY BANK :**

**UBS SA**
Rue des Noirettes 35
Case Postale 2600
1211 Genève 2

**BANK ACCOUNT :**

IBAN : CH 3000 2402 4048 7696 7ST
SWIFT : UBSWCHZH80A

**ACCOUNT BENEFICIARY :**

**AC MANAGEMENT SA**
20, Route de Pré Bois
CP-1852-1215 Geneva 15
Switzerland

**6.    Challenger of Record**

The Club Nautico Gaeta and Paolo Scutellaro -Argo Challenge each acknowledge and agree that the Club Nautico Español de Vela ("CNEV") is the Challenger of Record under the terms of the Protocol, but that in the event of the withdrawal or disqualification of CNEV, Club Nautico may become the Challenger of Record, as provided under Article 3.3 of the Protocol.

The Club Nautico Gaeta and Paolo Scutellaro – Argo Challenge also acknowledge that Golden Gate Yacht Club ("GGYC") is claiming that CNEV is not a valid Challenger of Record and has commenced a lawsuit in New York State court seeking to have CNEV removed as Challenger of Record and to have GGYC inserted in its place.

The *Club Nautico Gaeta* and Paolo Scutellaro – Argo Challenge further acknowledge that Societé Nautique de Genève ("SNG") has commenced an arbitration proceeding before the Arbitration Panel constituted under the Protocol in which it asks the Panel to confirm CNEV's status as Challenger of Record.

The Club Nautico Gaeta and Paolo Scutellaro – Argo Challenge each understand that AC Management and SNG cannot be responsible for any losses incurred by Club Nautico Gaeta  and/or Paolo Scutellaro – Argo Challenge  as a result from GGYC's actions.

Documento4

Page 4 of 5

**Signatures:**

**Club Nautico Gaeta:**

Lawyer Raffaele Esposito

Name:
Office:
Date:

CLUB ... NZIONARIO INCARICATO
(DE ANGELIS Franco)
1 ... 2007

**[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]**

**Paolo Scutellaro – Argo Challenge**

By countersigning this Notice of Entry Paolo Scutellaro – Argo Challenge confirms its agreement with its provisions and in particular unconditionally agrees and accepts to be bound by the terms and conditions of sections 3, 4 and 6 above.

Name:
Office:
Date:

**[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]**

*Tali sono le firme del sig. Paolo Scutellaro nato a Napoli il 6 settembre 1969 e domiciliato in Napoli via Camaldolilli 59. apposte in mia presenza e delle cui identità personale io Notaro sono certo.*

*Napoli li 5 novembre 2007*

NOTARO
**NICOLA CAPUANO**
VIA DEPRETIS N° 5    Page 5 of 5
80133 NAPOLI

Documento4

# APOSTILLE

## (Convention de la Haye du 5 octobre 1961)

1. Paese: ITALIA

   Il presente atto pubblico

2. è stato sottoscritto da _Nicola Pofuano_

3. agente in qualità di _Notaio in Napoli_

4. è segnato dal contrassegno / timbro

   di _Distretto Notarile di Napoli, T.A.Mole_

   Attestato — 6 NOV. 2007

5. a NAPOLI    6. Il

7. da _____ PROCURA DELLA REPUBBLICA DI NAPOLI
   8° REPARTO - 9° SEZ. - AFFARI CIVILI -

8. sotto il N. _1873/07_

9. Contrassegno / timbro:

10. firma





Il Sost. Procuratore della Repubblica
**Dr.ssa Manuela Mazzi**



# Notice of Entry

### 1.  Background

This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33rd America's Cup for application by yacht clubs to become a Challenging Competitor.

Definitions used in the said Protocol shall apply to this Notice of Entry.

### 2.  Application

I am Giuseppe Dalla Vecchia the Commodore of the REALE YACHT CLUB CANOTTIERI SAVOIA (hereinafter the "Club") and I am duly authorized by such yacht club to submit this Notice of Entry, as confirmed by *Notary* hereunder.

2.1    **Yacht Club**: The Club hereby makes application to AC Management SA to become a Challenging Competitor in the 33rd America's Cup.

2.2    **Deed Of Gift**: The Club is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular;

(i)      is not domiciled in Switzerland;
(ii)     is an organised yacht club;
(iii)    is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and
(iv)    has or will have an annual regatta on the sea or an arm of the sea.

2.3    **Certificate of Incorporation**: An original notarized certified copy of the *Club's* certificate of incorporation is annexed to this Notice of Entry.

2.4    **Annual Regatta**: The Notice of Race of the Club's annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Entry.

2.5    **Organised**: Details, such as the Club's existing by-laws and its organization regulations, demonstrating how the Club is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry.

2.6    **Representation**: The Club will be represented by

notice_of_entry_33rd_ac ML Draft sent.doc

Page 1 of 5

MASCALZONE LATINO  (herein after the "Syndicate")

All communications and notices are to be sent to:

For the Club:

**Reale Yacht Club Canottieri Savoia**
Banchina Santa Lucia, 13- 80132 Napoli - Italy

Contact Person: Commodore Giuseppe Dalla Vecchia

Tel. +39 081 764.61.62 - e-mail: ryccsavoia@iol.it

For the Team:

**Mascalzone Latino srl**
Via Toledo 205
80132 Napoli - Italy

and

**Mascalzone Latino sl**
Paseo de la Alameda 35bis
46024 Valencia
Spain

Contact Persons:

Alessandra Pandarese-General Counsel
and Challenger Representative
+39 3356519884 +34 638030685
alessandra.pandarese@mascalzonelatino.it;

Francesco Aversano CEO
+34 638030606 +393357615275
cecchi@mascalzonelatino.it;

3.    **Bound By Protocol**

The Club and the Syndicate each hereby unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

notice_of_entry_33rd_ae ML Draft sent.doc

4.    **Arbitration and Dispute Resolution**

The Club and the Syndicate each hereby unconditionally agree and accept to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. The *Club* further unconditionally submits to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

5.    **Entry Fee and  Performance Bond**

The *Club* submits an entry fee of Euro 50,000.00 with this Notice of Entry and agrees a performance bond will be required to be posted by us to AC Management SA of up to Euro 950,000.00 at a later date but not within 2007:





The entry fee shall be transferred on the following bank account:

**BENEFICIARY BANK :**

**UBS SA**
Rue des Noirettes 35
Case Postale 2600
1211 Genève 2

**BANK ACCOUNT :**

IBAN : CH 3000 2402 4048 7696 75T
SWIFT : UBSWCHZH80A

**ACCOUNT BENEFICIARY :**

**AC MANAGEMENT SA**
20, Route de Pré Bois
CP-1852-1215 Geneva 15
Switzerland

6.    **Challenger of Record**

The Club and the Syndicate each acknowledge and agree that the Club Nautico Español de Vela ("CNEV") is the Challenger of Record under the terms of the Protocol, but that in the event of the withdrawal or disqualification of CNEV, The *Club* may become the Challenger of Record, as provided under Article 3.3 of the Protocol.

The *Club* and the *Syndicate* also acknowledge that Golden Gate Yacht Club ("GGYC") is claiming that CNEV is not a valid Challenger of Record and has commenced a lawsuit in New York State court seeking to have CNEV removed as Challenger of Record and to have GGYC inserted in its place.

The *Club* and the *Syndicate* each understand that AC Management and SNG cannot be responsible for any losses incurred by the *Club* and/or *Syndicate* as a result from GGYC's actions.

Signatures:

**Reale Yacht Club Canottieri Savoia**

**Name: Giuseppe Dalla Vecchia**

notice_of_entry_33rd_ge ML Draft sent.doc

Page 4 of 5

Office: Commodore
Date:

**[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]**

**Mascalzone Latino**

By countersigning this Notice of Entry *Syndicate* confirms its agreement with its provisions and in particular unconditionally agrees and accepts to be bound by the terms and conditions of sections 3, 4 and 6 above.

---

Name: Vincenzo Onorato
Office: Chairman
Date:

---

**[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]**

Certifico io sottoscritto dott. Vittorio FOLINEA, Notaio in Cicciano, iscritto al Collegio Notarile dei Distretti Riuniti di Napoli, Torre Annunziata e Nola, con studio in Cicciano in Via Dante Alighieri n.7, autentiche le antescritte firme apposte in mia presenza in calce e nel margine dei fogli intermedi, dal Dott. Giuseppe DALLA VECCHIA nato a Napoli l'8 giugno 1930 nella qualità di Presidente del "REALE YACHT CLUB CANOTTIERI SAVOIA" e del Dott. Vincenzo ONORATO nato a Napoli il 15 maggio 1957 nella qualità di legale rappresentante della società "MASCALZONE LATINO S.r.l." della cui identità personale io Notaio sono certo.

Napoli 14 novembre 2007.

notice_of_entry_33rd_ae ML Draft sent.doc

Page 5 of 5

# APOSTILLE

(Convention de la Haye du 5 octobre 1961)

1. Paese: ITALIA

   Il presente atto pubblico

2. è stato sottoscritto da _Vittorio Solimeo_

3. agente in qualità di _Notaio in Piccolano_

4. è segnato dal contrassegno / timbro

   di _Distretto Notarile di Napoli, T.A. Mola_

Attestato     **16 NOV. 2007**

5 a NAPOLI     6. Il

7. da   PROCURA DELLA REPUBBLICA DI NAPOLI

8° REPARTO - 9° SEZ. - AFFARI CIVILI -

8. sotto il N. 5035/07

9. Contrassegno / timbro:

10. firma

Il Sost. Procuratore della Repubblica
Dr.ssa Manuela Mazzi



# Notice of Entry



**REAL CLUB**
**NAUTICO**
**DENIA**







1.    **Background**

This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33ʳᵈ America's Cup for application by yacht clubs to become a Challenging Competitor.

Definitions used in the said Protocol shall apply to this Notice of Entry.

2.    **Application**

I, **Manuel Gonzalez Devesa** am the Chairman of the Real Club Nautico Denia and I am duly authorised by such yacht club to submit this Notice of Entry, as confirmed by Notary hereunder.

2.1    **Real Club Nautico Denia** hereby makes application to AC Management SA to become a Challenging Competitor in the 33ʳᵈ America's Cup.

2.2    **Deed Of Gift: The Real Club Nautico Denia** is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22ⁿᵈ day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular;



(i)    is not domiciled in Switzerland;
(ii)    is an organised yacht club;
(iii)    is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and
(iv)    has or will have an annual regatta on the sea or an arm of the sea.

2.3    **Certificate of Incorporation**: An original notarized certified copy of the **Real Club Nautico Denia** certificate of incorporation as well as of the trade register extract is/are annexed to this Notice of Entry.

**Annual Regatta**: The Notice of Race of the **Real Club Nautico Denia** annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Entry.

AYRE notice_of_entry_33rd ac.doc

**Organised**: Details, such as the **Real Club Nautico Denia** existing by-laws and its organization regulations, demonstrating how the **Real Club Nautico Denia** is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry.

2.6 **Representation:** The **Real Club Nautico Denia** will be represented by

Pedro Juan Perello Canal

All communications and notices are to be sent to:

**Real Club Nautico Denia**



Carretera Denia-Javea nº 1. 03700 Denia (Alicante), España
Email.       ayrechallenge@cndenia.es
Tel.         +34 965780989
Fax          +34 965780850
Mobil        +34 636484897
Contact      Luis Nogueroles Peiro

**AYRE Challenge**

C/ Parelladas, nº 12, 3º pta. 15, de Palma de Mallorca (07003), España,
Email.       juridico@ayrechallenge.com
Tel          +34 971214507
Fax          +34 971213 283
Mobil        +34 666553245
Contact      Jose Juan Parets

3. **Bound By Protocol**

The Real Club Nautico Denia and AYRE Challenge each hereby unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

4. **Arbitration and Dispute Resolution**

The Real Club Nautico Denia and AYRE Challenge each hereby unconditionally agree and accept to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. Real Club Nautico Denia further unconditionally submit to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the

AYRE notice_of_entry_33rd_ac.doc



Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

### 5. Entry Fee and Performance Bond

The Real Club Nautico Denia submits an entry fee of Euro 50,000.00 with this Notice of Entry and agrees a performance bond will be required to be posted by us to AC Management SA of up to Euro 950,000.00 at a later date on at least 30 days prior notice.

The entry fee shall be transferred on the following bank account:



**BENEFICIARY BANK :**

**UBS SA**
Rue des Noirettes 35
Case Postale 2600
1211 Genève 2

**BANK ACCOUNT :**

IBAN : CH 3000 2402 4048 7696 75T
SWIFT : UBSWCHZH80A

**ACCOUNT BENEFICIARY :**

**AC MANAGEMENT SA**
20, Route de Pré Bois
CP-1852-1215 Geneva 15
Switzerland

### 6. Challenger of Record

The Real Club Nautico Denia and AYRE Challenge each acknowledge and agree that the Club Nautico Español de Vela ("CNEV") is the Challenger of Record under the terms of the Protocol, but that in the event of the withdrawal or disqualification of CNEV, The Real Club Nautico Denia may become the Challenger of Record, as provided under Article 3.3 of the Protocol.

The Real Club Nautico Denia and AYRE Challenge also acknowledge that Golden Gate Yacht Club ("GGYC") is claiming that CNEV is not a valid Challenger of Record and has commenced a lawsuit in New York State court seeking to have CNEV removed as Challenger of Record and to have GGYC inserted in its place.

The Real Club Nautico Denia and AYRE Challenge each understand that AC Management and SNG cannot be responsible for any losses incurred by Real Club Nautico Denia and AYRE Challenge as a result from GGYC's actions.

AYRE notice_of_entry_33rd ac.doc

Signatures:

*Real Club Nautico de Denia:*





Name: Manuel Gonzalez Devesa
Office: Presidente del Real Club Nautico de Denia
Date: 19 de noviembre de 2007

AYRE Challenge:d

By countersigning this Notice of Entry confirms its agreement with its provisions and in particular unconditionally agrees and accepts to be bound by the terms and conditions of sections 3, 4 and 6 above.



Name: Pedro Juan Perello Canal
Office: Director General AYRE Challenge
Date: 19 de noviembre de 2007

AYRE notice of entry_33rd_ac doc

**DILIGENCIA DE LEGITIMACIÓN:**

Yo, **ANGEL C. VICEDO GARCIA,** Notario del Ilustre Colegio de Valencia con residencia en Denia conforme al artículo 207 del Reglamento Notarial DOY FE:

Que la firma que antecede de **DON MANUEL GONZALEZ DEVESA con D.N.I./N.I.F 22448763G** estampada en el anverso del presente folio que forma parte de un documento extendido en cuatro folios numerados del 1 al 4, ambos inclusive, de papel común redactado en el idioma inglés, ha sido puesta en mi presencia, quedando constancia en acta autorizada por mi, en el día de hoy, con el número 2438 de mi protocolo en orden.

En Denia(Alicante), a diecinueve de noviembre de dos mil siete.



YO, **ALFONSO PASCUAL DE MIGUEL,** Notario del Ilustre Colegio de Valencia, con residencia en esta Capital, ----------------------------------

DOY FE: Que considero legítima la firma que antecede de **DON PEDRO JUAN PERELLÓ CANAL (D.N.I. 42.989.081-B),** estampada en el anverso del presente folio que forma parte de un documento extendido en cuatro folios numerados del 1 al 4, ambos inclusive, de papel común redactado en el idioma inglés cuyo contenido conozco conforme a lo preceptuado en los artículos 252 y 262 del Reglamento Notarial español, por haber sido reconocida en mi presencia por el firmante, quedando constancia en acta autorizada por mi, en el día de hoy, con el ...... 352 de mi protocolo en orden. --------------------------------------
............ Valencia, a diecinueve de noviembre de dos mil siete. ----------

# Notice of Entry

1.    **Background**

This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33rd America's Cup for application by yacht clubs to become a Challenger.

Definitions used in the said Protocol shall apply to this Notice of Entry.

2.    **Application**

I, Mrs Sophie NORET am the Commodore of the Yacht Club de Saint-Tropez ( YCST ) and I am duly authorised by such yacht club to submit this Notice of Entry, as confirmed by Me BORTOLOTTI hereunder.

2.1    **Yacht Club:** Yacht Club de Saint-Tropez ( YCST ) hereby makes application to AC Management SA to become a Challenger in the 33rd America's Cup.

2.2    **Deed Of Gift:** Yacht Club de Saint-Tropez ( YCST ) is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular;

(i)    is not domiciled in Switzerland;
(ii)   is an organised yacht club;
(iii)  is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and
(iv)   has or will have an annual regatta on the sea or an arm of the sea.

2.3    **Certificate of Incorporation:** An original notarized certified copy of the Yacht Club de Saint-Tropez's certificate of incorporation as well as of the trade register extract are annexed to this Notice of Entry.

2.4    **Annual Regatta:** The Notice of Race of the Yacht Club de Saint-Tropez ( YCST ) annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Entry.

2.5 **Organised**: Details, such as the Yacht Club de Saint-Tropez's existing by-laws and its organization regulations, demonstrating how the Yacht Club de Saint-Tropez is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry.

2.6 **Representation**: Yacht Club de Saint-Tropez will be represented by

**French Sprit 33ème America's Cup SA**

All communications and notices are to be sent to:

French Spririt 33ème America's Cup SA :
    16, rue du Cepoun Sanmartin – F 83990 Saint Tropez
    Tel . : 00.33.678.90.92.16
    Fax : 00.33.498.12.68.20
    Email: americascup33@frenchspirit.net
    Contact : Marc PAJOT

Yacht Club de Saint-Tropez :
    Tour Saint Elme – F 83995 Saint Tropez Cdx
    Tel. : 00.33.679.68.38.41
    Email: info@yachtclubdesainttropez.com
    Contact : Christian CHALMIN

## 3.    Bound By Protocol

The Yacht Club de Saint-Tropez ( YCST ) and the French Spirit 33ème America's Cup SA each hereby unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

## 4.    Arbitration and Dispute Resolution

The Yacht Club de Saint-Tropez ( YCST ) and the French Spirit 33ème America's Cup SA each hereby unconditionally agree and accept to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. Yacht Club de Saint-Tropez further unconditionally submit to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

5.    **Entry Fee and  Performance Bond**

Yacht Club de Saint-Tropez ( YCST ) submits an entry fee of Euro 50,000.00 with this Notice of Entry and a performance bond of Euro 950,000.00 by 15 January 2008, as per the provisions of Clauses 3.3 and 3.4 of the Event Regulations.

The entry fee shall be transferred on the following bank account:

**BENEFICIARY BANK :**
**UBS SA**
Rue des Noirettes 35
Case Postale 2600
1211 Genève 2

**BANK ACCOUNT :**

IBAN : CH 3000 2402 4048 7696 75T
SWIFT : UBSWCHZH80A

**ACCOUNT BENEFICIARY :**

**AC MANAGEMENT SA**
20, Route de Pré Bois
CP-1852-1215 Geneva 15
Switzerland

6.    **Challenger of Record**

The Yacht Club de Saint-Tropez ( YCST ) and French Spirit 33ème America's Cup SA each acknowledge and agree that the Club Náutico Español de Vela ("CNEV") is the Challenger of Record under the terms of the Protocol, but that in the event of the withdrawal or disqualification of CNEV, Yacht Club de Saint-Tropez may also become the Challenger of Record, as provided under Article 3.3 of the Protocol.

The Yacht Club de Saint-Tropez ( YCST ) and French Spirit 33ème America's Cup SA also acknowledge that Golden Gate Yacht Club ("GGYC") is claiming that CNEV is not a valid Challenger of Record and has commenced a lawsuit in New York State court seeking to have CNEV removed as Challenger of Record and to have GGYC inserted in its place.

The Yacht Club de Saint-Tropez ( YCST ) and the French Spirit 33ème America's Cup SA each understand that AC Management and SNG cannot be responsible for any losses incurred by Yacht Club de Saint-Tropez ( YCST ) and/or French Spirit 33ème America's Cup SA as a result from GGYC's actions.

Vu pour certification matérielle
de la Signature, apposée en ma présence,
de Mme......Sophie NORET..........................
..........................................................
Fait à ST TROPEZ le 13.12.2007

Signatures:

Yacht Club de Saint-Tropez :

| | |
|---|---|
| **Name:** | **NORET Sophie - Président** |
| **Office:** | **Tour St Elme – 83990 Saint-Tropez - FRANCE** |
| **Date:** | 13 / 12 / 2007 |

**[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]**

**French Spirit 33ème America's Cup SA:**

By countersigning this Notice of Entry, Marc PAJOT confirms its agreement with its provisions and in particular unconditionally agrees and accepts to be bound by the terms and conditions of sections 3, 4 and 6 above.

| | |
|---|---|
| **Name:** | **PAJOT Marc - Président** |
| **Office:** | **French Spirit 33ème America's Cup SA** |
| | **16, rue du Cépoun Sanmartin - 83990 Saint-tropez - FRANCE** |
| **Date:** | 13 décembre 2007 |

**[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY CONFIRMED BY THE HAGUE APOSTILLE]**

Vu pour certification matérielle
de la Signature, apposée en ma présence,
de M.: ....Marc PAJOT..........................
..........................................................
Fait à ST TROPEZ le 13.12.2007

# Notice of Entry

### 1.    Background

This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33rd America's Cup for application by yacht clubs to become a Challenger.

Definitions used in the said Protocol shall apply to this Notice of Entry.

### 2.    Application

I, Andre Annicq, am the Commodore of the *Royal Belgian Sailing Club (RBSC)* and I am duly authorised by such yacht club to submit this Notice of Entry, as confirmed by Notary Christophe Beyer hereunder. *AND MAURICE BEKE, Secretary*

2.1    Yacht Club: RBSC hereby makes application to AC Management SA to become a Challenger in the 33rd America's Cup.

2.2    Deed Of Gift: RBSC is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular:

(i)     is not domiciled in Switzerland;

(ii)    is an organised yacht club;

(iii)   is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and

(iv)    has or will have an annual regatta on the sea or an arm of the sea.

Notice of Entry 33rd AC

2.3    **Certificate of Incorporation:** An original notarized certified copy of the RBSC certificate of incorporation as well as of the trade register extract is/are annexed to this Notice of Entry.

2.4    **Annual Regatta:** The Notice of Race of the RBSC's annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Entry.

2.5    **Organised:** Details, such as the RBSC's existing by-laws and its organization regulations, demonstrating how the [*club*] is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Entry.

2.6    **Representation:** RBSC will be represented by Carbon Challenge Holding GmbH

All communications and notices are to be sent to:

1. Royal Belgian Sailing Club, Attn. Commodore Andre Annicq <u>as private and confidential</u>
   i.   **Phone:**    +32-475-49 66 58
   ii.  **Fax:**      +32-9 - 257 02 31
   iii. **Email:**    Andre@Annicq.com
   iv.  **Street:**   Eilanderskaai 7,
   v.   **City:**     9000 Gent – Belgium

2. Carbon Challenge Holding GmbH, c/o Norton Rose LLP, Attn. Florian Breitreiner
   i.   **Phone:**    +49-89-21 21 48-0
   ii.  **Fax:**      +49-89-21 21 48-500
   iii. **Email:**    Florian.Breitreiner@nortonrose.com
   iv.  **Street:**   Theatinerstrasse 11
   v.   **City:**     D - 80333 Munich, Germany.

Notice of Entry 33rd AC

3.    **Bound By Protocol**

The RBSC and the *Carbon Challenge Holding GmbH* each hereby unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

4.    **Arbitration and Dispute Resolution**

The RBSC and the *Carbon Challenge Holding GmbH* each hereby unconditionally agree and accept to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. RBSC further unconditionally submit to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and the Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

5.    **Entry Fee and Performance Bond**

RBSC submits an entry fee of Euro 50,000.00 with this Notice of Entry and a performance bond of Euro 950,000.00 by 15 January 2008, as per the provisions of Clauses 3.3 and 3.4 of the Event Regulations.

The entry fee shall be transferred on the following bank account:

BENEFICIARY BANK :
UBS SA
Rue des Noirettes 35
Case Postale 2600
1211 Genève 2

Notice of Entry 33rd AC                    Page 3 of 5

BANK ACCOUNT :

IBAN : CH 3000 2402 4048 7696 75T
SWIFT : UBSWCHZH80A

ACCOUNT BENEFICIARY :

AC MANAGEMENT SA
20, Route de Pré Bois
CP-1852-1215 Geneva 15
Switzerland

6.    Challenger of Record

The *RBSC* and *Carbon Challenge Holding GmbH* each acknowledge and agree
that the Club Náutico Español de Vela ("CNEV") is the Challenger of Record under
the terms of the Protocol, but that in the event of the withdrawal or
disqualification of CNEV, RBSC may become the Challenger of Record, as
provided under Article 3.3 of the Protocol.

The RBSC and Carbon Challenge Holding GmbH  also acknowledge that Golden
Gate Yacht Club ("GGYC") is claiming that CNEV is not a valid Challenger of
Record and has commenced a lawsuit in New York State court seeking to have
CNEV removed as Challenger of Record and to have GGYC inserted in its place.

The RBSC and the Carbon Challenge Holding GmbH each understand that AC
Management and SNG cannot be responsible for any losses incurred by the RBSC
and/or the Carbon Challenge Holding GmbH as a result from GGYC's actions.

Notice of Entry 33rd AC

Page 4 of 5

Mr Maurice Beke

Signatures:

Royal Belgian Sailing Club (RBSC):    Mr André Annicq

*Andre Annicq, Commodore*

I, notary E.Chr.Beyer, confirm and attest the above signature is of mr
André Annicq, identity card n° 590 3329505 1949
and of mr Maurice Beke identity card n°590
4360227 06

Name: Notary E.Chr.Beyer

Office: with Office in Ghent/Wondelgem(Belgium)St.Markoenstr.
Date:    n° 45
    Ghent, the 13th of december 2007

[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY
CONFIRMED BY THE HAGUE APOSTILLE]

Carbon Challenge Holding GmbH:

*Giovanni Aufder Mauer, Geschäftsführer/CEO*

By countersigning this Notice of Entry, the Carbon Challenge Holding GmbH confirms
its agreement with its provisions and in particular unconditionally agrees and accepts
to be bound by the terms and conditions of sections 3, 4 and 6 above.

Name:

Office:

Date:

[NOTARY'S LEGALISATION + CONFIRMATION OF SIGNATORY'S AUTHORITY, POSSIBLY
CONFIRMED BY THE HAGUE APOSTILLE]

Notice of Entry 33rd AC

Page 5 of 5

Official Certification see reverse side

## Official Certification

Seen for authentication of the reverse side signature, affixed in our presence by

**Mr. Hans-Rudolf Aufdermauer-Conrad,** born 19.09.1950, Swiss citizen of Kerns OW, according to his information residing at Ottikerstrasse 27, 8006 Zürich, Switzerland,
who has identified himself by identity card.

Zurich 8, 14.12.2007/ec

B No. 7596/7
Fee: Fr. 20.–

NOTARIAT RIESBACH-ZÜRICH

Max Bodmer, certifying officer



# Royal Cape Yacht Club

With which is incorporated the
TABLE BAY YACHT CLUB

## Notice of Entry

**1.    Background**

This Notice of Entry is issued by AC Management SA pursuant to Article 4 of the Protocol Governing the 33rd America's Cup for application by qualified yacht clubs to become a Challenging Competitor and forms part of the Event Regulations.

Definitions used in the said Protocol shall apply to this Notice of Entry

**2.    Application**

I, ~~Raymond Craig Hiddleton~~ am the Commodore of the ROYAL CAPE YACHT CLUB and I am duly authorised by such yacht club to submit this Notice of Entry.

**2.1    Yacht Club:** ROYAL CAPE YACHT CLUB hereby makes application to AC Management SA to become a Challenging Competitor in the 33rd America's Cup.

**2.2    Deed Of Gift:** ROYAL CAPE YACHT CLUB is qualified to challenge for the America's Cup under the terms of the Deed of Gift dated 24 October 1887 between George L. Schuyler and the New York Yacht Club regarding a silver cup won by the schooner yacht *America* at Cowes, England on the 22nd day of August 1851, as amended by orders of the Supreme Court of the State of New York on 17 December 1956 and 5 April 1985, and in particular;

    (i)     is not domiciled in Switzerland;
    (ii)    is an organised yacht club;
    (iii)   is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled on the 1905; and
    (iv)   has or will have an annual regatta on the sea or an arm of the sea.

**2.3    Certificate of Incorporation:** A certified copy of the certificate of incorporation, patent or license or other document evidencing the incorporation, patent or license of the ROYAL CAPE YACHT CLUB is annexed to this Notice of Challenge.

**TEAM
SHOSHOLOZA**
◆◆◆◆◆

2.4    **Annual Regatta**: Details of the ROYAL CAPE YACHT CLUB annual regatta on the sea or arm of the sea demonstrating the Challenger meets or will meet the obligations in the Deed of Gift are annexed to this Notice of Challenge.

2.5    **Organised**: Details demonstrating how the ROYAL CAPE YACHT CLUB is organised and meets the obligations in the Deed of Gift regarding being an organised yacht club are annexed to this Notice of Challenge

2.6    **Representation**: ROYAL CAPE YACHT CLUB will be represented by

RAYMOND CRAIG MIDDLETON
*Name of representative*

All communications and notices are to be sent to:

ROYAL CAPE YACHT CLUB
P O BOX 772
CAPE TOWN
8000
REPUBLIC OF SOUTH AFRICA

TEL: +27 021 4211354
FAX: +27 021 4216028
E-MAIL: info@rcyc.co.za

RAYMOND CRAIG MIDDLETON
C/O ROYAL CAPE YACHT CLUB
P O BOX 772
CAPE TOWN
8000
REP OF SOUTH AFRICA

TEL:  +27 021 5931620
FAX:  +27 021 5931714
E-MAIL:  craig@quantumsails.co.za

3.    **Bound By Protocol**

ROYAL CAPE YACHT CLUB hereby unconditionally agrees and accepts to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.

4.    **Arbitration and Dispute Resolution**

ROYAL CAPE YACHT CLUB hereby unconditionally agrees and accepts to be bound by the dispute resolution provisions of the Protocol, and in particular, unconditionally submits to the exclusive jurisdictions of the Measurement Committee, Sailing Jury and

the Arbitration Panel as provided in the said Protocol and shall not resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup.

5.    **Performance Bond**

ROYAL CAPE YACHT CLUB agrees a performance bond may be required to be posted by us to AC Management SA of up to Euro 950,000.00 at a later date on at least 30 days prior notice.

Signed by ROYAL CAPE YACHT CLUB :

Signature:  _Wmdll_

RAYMOND CRAIG MIDDLETON
Name

CONMODORE - ROYAL CAPE YACHT CLUB.
Office

**EXHIBIT H**



# 33rd America's Cup

## AMERICA'S CUP ARBITRATION PANEL

**ACAP 33 / 01**

**Decision**

**September 7, 2007**

**APPLICANT:**

- Société Nautique de Genève ("**SNG**" or the "**Applicant**")

**IN THE MATTER** of the Protocol governing the 33rd America's Cup (the "**Protocol**").

**AND**

**IN THE MATTER** of an application filed by SNG on July 20, 2007 in respect of the validity of the challenge of Club Nautico Español de Vela ("**CNEV**") for the 33rd America's Cup.

# TABLE OF CONTENTS

**THE PROCEEDINGS**

**THE PARTIES' POSITION**

**1.** IN FAVOR OF SNG'S SUBMISSION
**2.** AGAINST SNG'S SUBMISSION

**THE ISSUES AT STAKE**

**THE FACTS**

**1.** SNG
**2.** CNEV
**3.** THE PROTOCOL
**4.** OTHER CHALLENGERS
**5.** GGYC'S CHALLENGE
**6.** THE NEW YORK LAWSUIT

**DISCUSSION OF THE ISSUES**

**1.** JURISDICTION OF THE PANEL

    *1.1. Issues*
    *1.2. Applicable rules and discussion*
        1.2.1. The competence of the Panel to rule on its own jurisdiction
        1.2.2. The Panel's jurisdiction to rule on the present matter
    *1.3. Conclusion*

**2.** ELIGIBILITY TO CHALLENGE

*2.1. Issue*

*2.2. Applicable rules*

*2.3. Discussion of the submissions*

    2.3.1. Preliminary comment

    2.3.2. What constitutes "an organized yacht club"?

    2.3.3. What constitutes "incorporated, patented or licensed"?

    2.3.4. What constitutes an "annual regatta"?

    2.3.5. Trustee duties

*2.4. Conclusion*

**3. COMPLIANCE OF THE PROTOCOL WITH THE DEED OF GIFT**

*3.1. Issue*

*3.2. Applicable rule*

*3.3. Discussion*

    3.3.1. Does the Protocol comply with the Deed of Gift?

    3.3.2. Should some specific clauses be reconsidered by the Defender and the Challenger of Record?

*3.4. Conclusion*

**SUMMARY OF THE DECISION**

**PUBLICATION OF THE DECISION**

**COSTS**

**THE PROCEEDINGS**

[1]    On July 20, 2007 at 19.42 Central European Time ("**CET**"), corresponding to 13.42 New York time, the 33rd America's Cup Arbitration Panel ("**ACAP 33**" or the "**Panel**") received an application from SNG (acting through Team Alinghi) (the "**Application**") in respect of the validity of the challenge made by CNEV on July 3, 2007 for the 33rd America's Cup.

[2]    The Application read:

> "*There has been issued raised by prospective competitors in the 33rd America's Cup, including the Golden Gate Yacht Club, as to the validity of the challenge of Club Nautico Espanol de Vela. SNG as Trustee of the America's Cup makes an application to the Panel for a declaration that the challenge received from Club Nautico Espanol de Vela on 3rd July 2007 and accepted by SNG on the same date, is a valid challenge under the terms of the Deed of Gift of 24th October 1887, and that SNG is obliged to meet that challenge under the terms of the Deed of Gift.*
>
> *SNG understands the Challenger of Record is intending to make a substantially similar application on Monday, if they do so SNG would withdraw this application unless there is good reason to continue with it.*
>
> *We look forward to the Panel's directions and timetable for party submissions in due course*".

[3]    On July 23, 2007 at 9.33 CET, the Panel received an email from SNG supplementing the Application, which read as follows:

> "*I confirm SNG would like to proceed with it's application in light of reports of an apparently subsequent filing in the New York Supreme Court by Golden Gate Yacht Club on substantially the same issues, rather than withdraw the*

*application. It would like the matter to be determined as soon as possible but recognising the need to allow for all interested parties to have an opportunity to make submissions.*

*SNG can file its submissions on 24 hours notice.*

*It is appropriate that sporting issues are resolved by the dispute resolution bodies established by the sport rather than in the courts, a concept which is strongly endorsed, in relation to the America's Cup, in the Mercury Bay opinion of the New York Court of Appeals the highest appellate court with jurisdiction to rule on matters arising under the Deed of Gift.*

*Finally, there is a small typographical in the application , the word "issued" in the first line should have read " issues" which needs to be corrected."*

[4]    On July 23, 2007, the Panel issued **Directions no 1** which stated:

*"APPLICATION*

*1    The 33rd America's Cup Panel (ACAP 33) has received an application from SNG (acting through Team Alinghi, SNG) on Friday, July 20, 2007 at 7.42 p.m. (Swiss time) (the Application).*

*2    The Application read as follows:*

*"Dear Professor Peter,*

*There has been issued raised by prospective competitors in the 33rd America's Cup, including the Golden Gate Yacht Club, as to the validity of the challenge of Club Nautico Espanol de Vela. SNG as Trustee of the America's Cup makes an application to the Panel for a declaration that the challenge received from Club Nautico Espanol de Vela on 3rd July 2007*

5

*and accepted by SNG on the same date, is a valid challenge under the terms of the Deed of Gift of 24th October 1887, and that SNG is obliged to meet that challenge under the terms of the Deed of Gift.*

*SNG understands that Challenger of Record is intending to make a substantially similar application on Monday. If they do so SNG would withdraw this application unless there is good reason to continue with it.*

*We look forward to the Panel's directions and timetable for party submissions in due course."*

3    *The Application was supplemented by mail received from SNG on July 23, 2007 at 9.33 a.m. which read as follows:*

*"Dear Professor Peter*

*Thank you for your email.*

*I confirm SNG would like to proceed with it's application in light of reports of an apparently subsequent filing in the New York Supreme Court by Golden Gate Yacht Club on substantially the same issues, rather than withdraw the application. It would like the matter to be determined as soon as possible but recognising the need to allow for all interested parties to have an opportunity ti make submissions.*

*SNG can file its submissions on 24 hours notice.*

*It is appropriate that sporting issues are resolved by the dispute resolution bodies established by the sport rather than in the courts, a concept which is strongly endorsed, in relation to the America's Cup, in the Mercury Bay opinion of the New York Court of Appeals the highest appellate court with jurisdiction to rule on matters arising under the Deed of Gift.*

*Finally, there is a small typographical in the application , the word "issued" in the first line should have read " issues" which needs to be corrected.".*

### **Directions and Timetable**

4    *SNG to inform ACAP 33 by **July 24, 2007 at 5.00 p.m.** whether any Challenges have been made, and if so what Challengers have already formally declared that they accept the terms of the Protocol, and that SNG has accepted them as Challengers to the 33rd America's Cup, so that they can be advised of and be given the opportunity to participate in the present proceedings. The persons to whom such advice is to be provided are to be advised to ACAP 33, including contact details of the applicable representatives of GGYC.*

5    *SNG shall, by **Wednesday July 25, 2007 at 5.00 p.m.** provide in writing their full case.*

6    *CNEV shall, by **Friday July 27, 2007 at 12.00 a.m.**, submit in writing their full case.*

7    *GGYC is invited, by not later **than Friday, July 27, 2007 at 5.00 p.m.**, to inform ACAP 33, SNG and CNEV whether they are willing to take part to these proceedings and, if so, (i) as a party, submitting to the jurisdiction of ACAP 33, or (ii) by presenting their case, without prejudice to the existence and/or jurisdiction of ACAP 33 including the basis and reasons therefore.*

8    *Should GGYC decide to participate in the present proceedings whether under 7 (i) or (ii) above, GGYC is invited to present its response to the Application by not later than **Tuesday August 14 2007 at 12.00 a.m**.*

7

9    *Should any party consider they are not able to meet any part of this timetable they may request an extension of time which request should include the reasons for such extension and requested extended date(s).*

10   *Pursuant to clause 34 (b) of the Protocol:*

*"The Arbitration Panel shall only proceed upon payment of an application fee by the applicant which the Arbitration Panel shall fix being its estimate of total costs to resolve an arbitration. Such application fee shall be paid to the Arbitration Panel.".*

*ACAP 33 considers that it is difficult for it to estimate the total costs of these proceedings at this stage. An advance on costs of EURO 25'000 shall however be required from SNG, to be transferred on the following account: [...]*

11   *Any reference made herein to date or time shall be deemed to be Spanish time (which is equal to Swiss time).*

12   *Any communication shall be made by e-mail to all three members of ACAP 33 with a copy to all participants in these proceedings, currently SNG, CNEV GGYC (subject to their confirming that they will participate in the present proceedings) and possible other participants (see 1 above), unless expressly directed otherwise.*

13   *Further directions will be issued as may be appropriate.*

14   *An opportunity will be given by further directions for any party who chooses to participate in this case to respond to other parties submissions".*

[5]    On July 24, 2007 at 16.52 CET, the Panel received a notice from AC Management
       ("**ACM**") which read:

> "*1. REPRESENTATION*
>
> *This notice is made by AC Management SA ("ACM") in the frame of ACAP 33
> / 01 dated 23RD July 2007 in which the Arbitration Panel invited SNG to inform
> ACAP 33 whether any Challenges have been made, and if so what
> Challengers have already formally declared that they accept the terms of the
> Protocol, and were accepted as Challengers to the 33rd America's Cup, so that
> they can be advised of and given the opportunity to participate in the
> proceedings.*
>
> *2. GENERAL CONSIDERATIONS*
>
> *This notice is respectfully made by ACM and not by SNG, to the extent the
> Protocol governing the 33rd America's Cup provides that yacht clubs wishing to
> become a Challenging Competitor shall apply by completing and submitting a
> Notice of Entry in a form to be issued by ACM, and that ACM may accept or
> reject any entry received at its sole and entire discretion (article 4).*
>
> *3. NOTICE*
>
> *As per its request, ACM hereby informs ACAP 33 that, in addition to CNEV,
> two Challenges have been made to date, who each formally declared that it
> "unconditionally agrees and accepts to be bound by the terms of the Deed of
> Gift, the Protocol and all applicable rules and obligations referred to in such
> Protocol, including but not limited to those which will be contained in the
> documents listed in article 2.5 of the said Protocol, and any amendment to
> such Protocol or such rules and obligations that may be issued from time to
> time".*
>
> *These Challenges are the following:*
>
> *1. <u>Yacht Club:</u>*
>
> *ROYAL CAPE YACHT CLUB ["**RCYC**"]*
>
> *PO BOX 772*

*CAPE TOWN*

*8000*

*REPUBLIC OF SOUTH AFRICA*

*Tel.: +27 021 4211354*

*Fax: + 27 021 4216028*

*e-mail: info@rcyc.co.za*

*Representative:*

*RAYMOND CRAIG MIDDLETON*

*C/O ROYAL CAPE YACHT CLUB*

*PO BOX 772*

*CAPE TOWN*

*8000*

*REPUBLIC OF SOUTH AFRICA*

*Tel.: +27 021 5931620*

*Fax: +27 021 5931714*

*e-mail: craig@quantumsails.co.za*

*2. Yacht Club:*

*ROYAL THAMES YACHT CLUB LIMITED ["**RTYCL**"]*

*60, KNIGHTSBRIDGE*

*LONDON, SW1X 7LF*

*UNITED KINGDOM*

*Attn.: The Secretary, Captain David Freeman, LVO, Royal Navy*

*Fax.: + 44 0(20) 7245 9470*

*e-mail: secretary@royalthames.com*

*Tel.: + 44 0(20) 7235 2121*

*Representative:*

*TEAMORIGIN LLP*

*80, STRAND,*

*LONDON, WC2R 0NN*

10

*UNITED KINGDOM*

*Attn: Sir Keith Mills (Team Principal)*

*Fax: + 44 020 7152 4300*

*Email: keithmills@teamorigin.com*

*Tel.: + 44 020 7152 6600"*

[6]    On July 25, 2007, the Panel issued **Directions no 2** which stated:

> *"**1**    ACAP 33 has issued first directions in this case on July 23, 2007 (copy enclosed; Directions no 1).*
>
> ***2**    In point 4 of Directions no 1, SNG was invited to advice ACAP 33 as to what Challengers, in addition to the Challenger of Record, had declared that they accept the terms the Protocol and were accepted as Challengers of the XXXIII America's Cup.*
>
> ***3**    Within the deadline set by ACAP 33 an answer was given by ACM, not by SNG. Pursuant to the Protocol, ACM is in fact competent in that respect. ACM's reply dated July 24, 2007 is enclosed.*
>
> ***4**    Pursuant to ACM's e-mail, two Challengers have now accepted the terms of the Protocol and been accepted as Challengers, namely Royal Cape Yacht Club, Cape Town, Republic of South Africa (RCYC), acting through Raymond Craig Middleton, Cape Town, Republic of South Africa, and Royal Thames Yacht Club Limited, London, United Kingdom (RTYCL), acting through Teamorigin LLP, London, United Kingdom.*

> ### *Directions and Timetable*
>
> ***5**    Both RCYC and RTYCL, as well as ACM, are entitled to take part in the present proceedings and, in addition to the all three ACAP 33 members and to the parties already mentioned under point 12 of Directions no 1,*

11

*shall directly receive all and any submissions, responses or communication, by e-mail.*

*6    RCYC and RTYCL may by **Tuesday August 14, 2007** at 12.00 a.m. (Swiss time), provide their respective submissions in respect of the case.*

*7    Further directions will be issued as may be appropriate including an opportunity to respond to any submissions received."*

[7]    On July 25, 2007 at 13.44 CET, the Panel received an email from SNG which read:

*"Owing to the imminent venue announcement and other related announcements this afternoon, I have been requested to seek from the Panel an extension of time until 1700hrs Friday 25th July 2007. I appreciate this may cause the rescheduling of other submission for which SNG apologises."*

[8]    On July 25, 2007 at 13.47 CET, the Panel received an email from CNEV which read:

*"The Challenger of Record does not oppose to Alinghi's petition, on the contrary, we fully understand their reasons for requesting an extension of the period.*

*We would like to have two or three days after SNG application for the submission of our, so we kindly ask that if SNG petition is accepted, CNEV is given a new term for submission until August 1, 2007."*

[9]    On July 25, 2007, the Panel issued **Directions no 3** which stated:

*"1    ACAP 33 has received from SNG today at 13.44 p.m. the following application:*

*"Dear Professor Peter*

12

*Owing to the imminent venue announcement and other related announcements this afternoon, I have been requested to seek from the Panel an extension of time until 1700hrs Friday 25th July 2007. I appreciate this may cause the rescheduling of other submission for which SNG apologises."*

*2    ACAP 33 has thereafter received from CNEV at 13.47 p.m. the following application:*

*"Dear Professor Peter,*

*The Challenger of Record does not oppose to Alinghi's petition, on the contrary, we fully understand their reasons for requesting an extension of the period.*

*We would like to have two or three days after SNG application for the submission of our, so we kindly ask that if SNG petition is accepted, CNEV is given a new term for submission until August 1, 2007."*

*<u>**Directions and Timetable**</u>*

*3    Both applications are accepted by ACAP 33 and the respective deadlines are extended accordingly."*

[10]  On July 27, 2007 at 13.06 CET, the Panel received a notice from ACM which read:

*"1. REPRESENTATION*
*This notice is made by AC Management SA ("ACM") in the frame of ACAP 33 / 01 dated 23rd July 2007 in which the Arbitration Panel invited SNG to inform ACAP 33 whether any Challenges have been made, and if so what Challengers have already formally declared that they accept the terms of the*

13

*Protocol, and were accepted as Challengers to the 33rd America's Cup, so that they can be advised of and given the opportunity to participate in the proceedings.*

*A first notice was made by ACM on 24th July 2007, informing the Arbitration Panel of the entry of ROYAL CAPE YACHT CLUB and ROYAL THAMES YACHT CLUB LIMITED. The present notice is to inform the Arbitration Panel of an additional entry.*

## 2. GENERAL CONSIDERATIONS

*This notice is respectfully made by ACM and not by SNG, to the extent the Protocol governing the 33rd America's Cup provides that yacht clubs wishing to become a Challenging Competitor shall apply by completing and submitting a Notice of Entry in a form to be issued by ACM, and that ACM may accept or reject any entry received at its sole and entire discretion (article 4).*

## 3. NOTICE

*As per its request, ACM hereby informs ACAP 33 that, in addition to CNEV, ROYAL CAPE YACHT CLUB and ROYAL THAMES YACHT CLUB LIMITED, an additional Notice of Entry was received on 25th July 2007 and accepted on 26th July 2007. This new Challenge is namely:*

*Yacht Club:*
*ROYAL NEW ZEALAND YACHT SQUADRON*
*101 Curran Street*
*Westhaven*
*Auckland 1147*
*New Zealand*
*Attn: Mr J.C. Crawford*
*Tel.: + 64 93 60 68 09*
*Fax: + 64 93 60 68 02*
*e-mail: n/a*

*Representative:*

*TEAM NEW ZEALAND*

*c/o ROYAL NEW ZEALAND YACHT SQUADRON*

*101 Curran Street*

*Westhaven*

*Auckland 1147*

*New Zealand*

*Attn: Mr Grant Dalton*

*Tel.: + 64 21 923 023*

*Fax: + 64 93 606 802*

*e-mail: grant.dalton@emiratesteamnz.com*

*ACM confirms that this additional Challenge formally declared that it "unconditionally agrees and accepts to be bound by the terms of the Deed of Gift, the Protocol and all applicable rules and obligations referred to in such Protocol, including but not limited to those which will be contained in the documents listed in article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time". "*

[11]  On July 27, 2007, the Panel issued **Directions no 4** which stated:

*"1  In point 4 of Directions no 1, SNG was invited to advise ACAP 33 as to which Challenger(s), in addition to the Challenger of Record, had declared that it (they) accept(s) the terms of the Protocol and was (were) accepted as Challenger(s) in respect of the XXXIII America's Cup.*

*2  Pursuant to an e-mail received by ACAP 33 from ACM on July 27, 2007 (copy enclosed), another Challenger has now accepted the terms of the Protocol and been accepted as Challenger, namely Royal New Zealand Yacht Squadron (RNZYS) of Auckland, New Zealand, acting through Team New Zealand, Auckland, New Zealand.*

15

### *Directions and Timetable*

**3**   *RNZYS is entitled to take part in the present proceedings and, in addition to the three ACAP 33 members and to the parties already mentioned under point 12 of Directions no 1 and under point 5 of Directions no 2, shall directly receive all and any submissions, responses or communications, by e-mail.*

**4**   *RNZYS as well as, for the avoidance of doubt, all parties hereto and GGYC receive herewith copy of Directions no 1 through no 3.*

**5**   *RNZYS may, by **Tuesday August 14, 2007 at 12.00 a.m.** (Swiss time), provide its submission in respect of the case."*

[12]   On July 27, 2007 at 15.50 CET, the Panel received an email (enclosing a submission) from SNG which read:

### *"Submissions*

*I attach submissions made on behalf of SNG. Due to the size of the attachments, I will send these by separate emails so that there is a good chance of them being received without problems.*

*I have sent a copy to the representative CNEV, and will await the Panel's directions as regards other parties.*

### *Confidentiality*

*As regards any party who is not an entered competitor in the 33rd America's Cup, SNG strongly believes they should not be given access to submissions made to the Panel unless they have agreed to become a party to the arbitration. The reason for this that at least one party, GGYC, has filed an application in the Supreme Court of New York, it is believed access to SNG's application to the Panel and it will result in a considerable advantage to GGYC*

*in those proceedings if it does not commit to participate in the arbitration, but receives the submissions. As a consequence, SNG requests that all submissions to the Panel remain confidential to the Panel and to parties who have agreed entered the 33rd America's Cup, or have agreed to become parties to the arbitration. This should include periods after the Panel has delivered its decision.*

*Notwithstanding this, SNG fully supports and endorses GGYC being given every opportunity to become a party and to make submissions to the Panel. Any additional time given to SNG or another party should in fairness be extended to GGYC and other parties.*

*SNG also recommends if this has not already occurred that copies of the Panel's invitation to become a party to the proceedings be faxed and couriered to other interested parties, including GGYC."*

[13]    Pursuant to its submission attached to its aforesaid email dated July 27, 2007, SNG asked the Panel to confirm that:

*"[...] 13.1 The challenge of Club Nautico Español de Vela is a valid challenge under the terms of the Deed of Gift. SNG is obliged to meet the challenge of Club Nautico Español de Vela.*

*13.2 Société Nautique de Genève is under a legal obligation as holder of the America's Cup and Trustee of the America's Cup to accept the challenge of Club Nautico Español de Vela both by virtue of the terms of the Deed of Gift, the past decisions of the New York State courts, and the history and tradition of the America's Cup. It is also under an express legal obligation not to consider another challenge until the challenge of Club Nautico Español de Vela has been decided.*

*13.3 Société Nautique de Genève as trustee of the America's Cup determined that the challenge of Club Nautico Español de Vela complied with the terms of the Deed of Gift in a manner consistent with similar decisions made by past*

*trustees, and with the decisions of the New York State courts. SNG was mindful that in addition to complying with the terms of the Deed of Gift, the club, albeit newly formed, was the Real Federacion Española de Vela, a challenger in the 32nd America's Cup and would be represented by Desafio Español a strong and credible competitor.*

*13.4 Société Nautique de Genève and Club Nautico Español de Vela reached terms satisfactory to them by mutual consent as to the conduct of the 33rd America's Cup. No other party is entitled to disturb those arrangements. It remains open for prospective challengers to review those terms and decide whether or not to apply to participate in the competition."*

[14] On July 27, 2007 at 17.12 CET, the Panel received a letter from Golden Gate Yacht Club's ("**GGYC**") lawyers Latham & Watkins LLP, New York (James V. Kearney), challenging the Panel's jurisdiction and the validity of CNEV's challenge and some Articles of the Protocol, which read:

*"The Golden Gate Yacht Club ("GGYC") has received notice that Societe Nautique de Geneve ("SNG") and Club Nautico Espanol de Vela ("CNEV") plan to submit to arbitration the validity of the challenge of CNEV.[1]*

*The format and process set up for this arbitration in The Protocol Governing the Thirty Third America's Cup ("Protocol") violate the most basic principles of justice and independence common to illegitimate adjudicatory bodies and are an affront to the most basic sensibilities common to all law abiding people. A dispute resolution proceeding in which the parties to the proceeding are in agreement (in this case CNEV and SNG), and in which the judges may be removed, and the rules of procedure may be changed, at any time and for any reason by the parties to the arbitration, will be viewed by the public and the sailing community as nothing more than a kangaroo court.*

---

[1] *Unsigned letter from Henry Peter, Chairman of the arbitration panel, captioned "ACAP 33 / 01: Application filed by SNG on July 20, 2007, in respect of the validity of the challenge of Club Nautico Espanol de Vela (CNEV) for the 33rd Americas Cup," dated July 23, 2007.*

*The arbitration process will further damage the sport of yachting as it will be viewed with no more validity, and no less frivolity, than CNEV's attempt to meet the annual regatta requirement for the Challenger of Record by holding a sailing school.[2] Its continuation day to day will provide compelling on-going proof that SNG's Protocol for the 33rd America's Cup was designed by SNG to put the fox in charge of the henhouse.*

*The question presented to the arbitration panel by SNG is whether it violated the terms of the Deed of Gift and its legal duty to comply with and enforce those terms under New York law by accepting CNEV's challenge. In a transparent attempt to lend legitimacy to the arbitration panel, SNG in its letter to the arbitration panel dated July 23, 2007, ironically refers to a New York Court of Appeals decision captioned Mercury Bay Boating Club v. San Diego Yacht Club and argues that it "is appropriate that sporting issues are resolved by the dispute resolution bodies established by the sport rather than in the courts."*

*In fact, as the arbitration panel must be aware, the Mercury Bay opinion held that the New York courts have the authority to interpret the trust instrument, the Deed of Gift, and determine whether a successor trustee, in this case SNG, has complied with its terms. Indeed, the Mercury Bay opinion refers to amicus briefs submitted jointly on behalf of "renowned yachtsmen from the United States, Great Britain and Australia and yacht clubs of undisputed standing" for the proposition that the court has jurisdiction over the*

---

[2] *The Deed of Gift requires that a bona fide yacht club challenge for the Cup. Pursuant to the Deed of Gift, "[a]ny organized Yacht Club of a foreign country, incorporated, patented, or licensed by the legislature, admiralty, or other executive department, having for its annual regatta an ocean water course on the sea, or on an arm of the sea, or one which combines both, shall always be entitled to the right of sailing a match of this Cup." Demonstrating its failure to comply with the terms of the Deed of Gift regarding an annual regatta, CNEV sought to hold a sham regatta after its purported challenge for the America's Cup which was announced by the Spanish Sailing Federation on July 13, 2007, the very same day that the regatta was supposed to take place. Reports have indicated that the sham regatta was actually a sailing training session.*

*administration of the Deed of Gift. Mercury Bay Boating Club, Inc. v. San Diego Yacht Club, 76 N.Y.2d 256, 278 (N.Y. 1990).*

*GGYC is disappointed that Henry Peter, appointed chairman of the arbitration panel, would even consider SNG' s application to arbitrate knowing the panel lacks jurisdiction over this issue. Mr. Peter, in his book entitled, "Arbitration in The America's Cup," concedes that "the New York State Supreme Court . . . has jurisdiction over the Deed of Gift" to decide upon the "interpretation of the deed of gift" and whether a "challenge was valid." Henry Peter, Arbitration in the America 's Cup, (2003), p.4.*

*Indeed, the panel's willingness to engage in this arbitration in the face of this legal precedent suggests its members are beholden to the parties who appointed them in a secret document and who retain the power to remove them. The Protocol, published only two days after SNG won the 32nd America's Cup, states that SNG and CNEV "have agreed in a separate document on the names of the Arbitration Panel members." See Protocol ¶ 24.2. The letter has never been publicly disclosed, to our knowledge, nor has the identity of the arbitrators; and until we received notification from Mr. Peter, we did not even know he was the panel's chairman. Nor have we yet been advised of the names of the other members.*

*Not only does this arbitration panel lack jurisdiction, the clubs opposed to SNG and CNEV on the issue presented are frozen out from the adjudication since they will not and cannot have standing before the arbitration panel. Under the Protocol only a yacht club accepted as a Challenger has standing before the panel; but to become a Challenger, a yacht club must submit to the terms of the Protocol which includes granting SNG the power to disqualify any Challenger who disputes the binding effect of the Protocol. An adjudicatory proceeding over the validity of the Protocol in which a yacht club must accept the Protocol before they can challenge its validity, while SNG retains the right*

*to terminate their standing if they challenge any provision of the Protocol, is a fatally flawed proceeding.*

*It offends basic notions of justice that one side to a dispute, SNG and CNEV collectively, would retain hegemonic control over an adjudicatory panel and its proceedings while the other side remains powerless.[3] Moreover, any real adversary can be disqualified from the competition just far disputing a provision of the Protocol. See Protocol ¶ 2.7(d).*

*Moreover, SNG and CNEV retain the sole power to modify anything they desire regarding the arbitration, including but not limited to the powers of the arbitration panel, the jurisdiction of the arbitration panel, procedures of the arbitration panel, and even the official language of the arbitration panel. See Protocol ¶ 36.1. The issue of whether CNEV is a legitimate challenger is not contested by CNEV or SNG and their masquerading as adversaries while the real adversaries are rendered impotent is not a legitimate legal proceeding but rather a mockery of justice. Civilized countries have long done away with such tribunals and no legitimate arbitration panel would agree to operate under these conditions. This may explain the striking omission from the 33rd Protocol of the requirement in the 32nd Protocol that arbitration panel members be "fair minded and possess good judgment."*

*It is subterfuge to have SNG and CNEV's hand picked arbitrators, replaceable at the their whim, sitting in a forum and under rules wholly controlled by SNG and CNEV, and judging an issue that the parties to the arbitration do not dispute. The disgrace and shame brought upon the America's Cup by this charade threatens to inflict a crippling blow to the sport. This arbitration, if it chooses to proceed, will not and cannot have any involvement from GGYC, and will be viewed with the same disdain by the public and sailing community as CNEV's sham regatta."*

---

[3] *SNG's letter to the Panel of July 20, 2007 expects that CNEV would make an application to the Panel on July 23, 2007 but did not disclose how SNG knew this information.*

[15]  On July 28, 2007, the Panel issued **Directions no 5** which stated:

"*1   Within the deadline set in Directions no 1, i.e. Friday July 27, 2007 at 5.00
p.m., GGYC have submitted their reply and reasons thereof to ACAP 33
through a letter dated July 27, 2007 from their lawyers Latham & Watkins
LLP, New York (James V. Kearney).*

**<u>Directions and Timetable</u>**

*2   GGYC submission is enclosed hereto for parties to this case's
consideration.*

*3   For all parties' information, the members of ACAP 33 are:
- Chairman: Professor Henry Peter, Lugano, Switzerland. Henry Peter is a
lawyer. He was member of the Arbitration Panel of the 31st America's Cup
and member of the Jury of the 32nd America's Cup;
- Members:
    .Graham McKenzie, Auckland, New Zealand. Graham McKenzie is
    a lawyer. He was member of the Jury of the 32nd America's Cup.
    .Dr. Luis Cazorla Prieto, Madrid, Spain. Luis Cazorla Prieto is a
    lawyer.*
**ACM** *will issue full particulars of all three members of ACAP 33 by* **August
2, 2007**. *A copy will be directly sent by ACM to all addressees hereof.*

*4   To the best of ACAP 33's understanding, GGYC's letter means that they
have decided not to take part to the present proceedings any further.*
**GGYC** *is however invited to confirm this expressly by* **Tuesday August 7,
2007 at 6 p.m.**, *Swiss time., or, alternatively, to take part to this case as
provided in Directions no 1. GGYC's letter dated July 27, 2007 and the*

*detailed reasons contained therein shall in any event remain part of the present proceedings and be duly considered by ACAP 33.*

**5**    *Alinghi, acting on behalf of SNG, in providing its submission on July 27, 2007 requested that it be kept confidential and confined only to the parties taking part in this case. ACAP 33 considers that it is important for its proceedings to be transparent as a matter of principle and that there must be a substantive reason for granting any confidentiality order. It does not appear to ACAP 33 that any such reason exists in this case, at least at this stage. ACAP 33 however recognises that where a prospective party to a case is not an accepted Challenger for the 33rd America's Cup and where they have expressly chosen not to participate in a given case there is no proper basis for them to receive from any party copies of any further submission, document or, generally, communication. In any event, when this case will have been decided, the full written decision will be made publicly available.*

**6**    *Accordingly, unless GGYC advises that it wishes to take part in this case as aforesaid, no further communication or document regarding these proceedings will be sent to GGYC.*

**7**    *Subject to the aforesaid, the timetable set in ACAP 33's previous Directions remains unchanged.*

**8**    *Further directions will be issued in due course."*

[16]  On July 31, 2007, ACM published a press release on its website (www.americascup.com) publically announcing the nomination of the Panel members and providing Panel members profiles.

[17]  On August 1, 2007 at 17.01 CET, the Panel received a submission from CNEV in support of the SNG Application and submission.

[18]  On August 2, 2007 at 19.28 CET, the Panel received an email from ACM which read:

> "ACM is hereby respectfully asking for some clarification as to whether it may provide a submission in respect of the case.
>
> Indeed, point 5 of the Directions no 2 dated 25th July 2007 provides that "both RCYC and RTYCL, as well as ACM, are entitled to take part in the present proceedings and [...] shall directly receive all and any submissions, responses or communication, by e-mail" whereas point 6 thereof sets forth that "RCYC and RTYCL may by Tuesday August 14, 2007 at 12:00 a.m. (Swiss time), provide their respective submissions in respect of the case" without referring to ACM.
>
> I would therefore be thankful if you could clarify the situation, it being specified that ACM would normally use the possibility of providing such a submission."

[19]  On August 6, 2007, the Panel issued **Directions no 6** which stated:

> "*1*   *With its submission filed on August 1, 2007 at 17.01 CNEV requested:*
>
> > "6.2 We would also want to offer the testimony of relevant officers of the Royal Spanish Sailing Federation and Club Nautico Espagnol de Vela to support our statements in this submission. Either this testimony may take place in writing through afidavits or by means of oral in a testimony hearing, or both, as the Arbitration Panel deems more convenient.".
>
> *2*   *On August 2, 2007, at 19.28, ACM pointed out that Directions no 2 dated 25th July 2007 provides that*

24

*"both RCYC and RTYCL, as well as ACM, are entitled to take part in the present proceedings and [...] shall directly receive all and any submissions, responses or communication, by e-mail"*

*whereas point 6 thereof sets forth that*

*"RCYC and RTYCL may by Tuesday August 14, 2007 at 12:00 a.m. (Swiss time), provide their respective submissions in respect of the case"*

*without referring to ACM.*

### **Directions and Timetable**

**3**  *CNEV is instructed to submit all testimonies in writing in the form of affidavits to be filed with ACAP 33 and sent to all parties hereto by **Thursday August 14, 2007 at 12.00 a.m.** (Swiss time).*

**4**  *ACAP 33 reserves the right to hear the witnesses and the parties on the occasion of a hearing, if any.*

**5**  ***ACM** is entitled to file a submission by **Thursday August 14, 2007 at 12.00 a.m.** Copy thereof shall simultaneously be sent to all three members of ACAP 33 as well as to all parties hereto within such deadline.*

**6**  *Further directions, if appropriate, will be issued in due course."*

[20]  On August 8, 2007 at 12.54 CET, the Panel received a submission from ACM which read:

"*1. REPRESENTATION*

*This submission in the frame of ACAP 33 / 01 is filed by AC Management SA ("ACM") based on the Arbitration Panel's Directions no 6 dated 6th August 2007 whereby the Arbitration Panel entitled ACM to file a submission by 14th August 2007.*

*2. SUBMISSION*

*The Protocol governing the 33rd America's Cup (the "Protocol") gives ACM the competence to accept or reject entries at its discretion (art. 4.4), except however for what concerns the acceptance of the Challenger of Record which remains within the competence of the America's Cup Trustee, SNG (art 3.1).*

*The Protocol further gives ACM the competence to define the content of the Notice of Entry and the documents that will be presented with the Notice of Entry (art. 4.3). A copy of the Notice of Entry issued by ACM is attached hereto as <u>Schedule 1</u>. This Notice of Entry is also posted on AC33 entry section of ACM's website (<u>http://www.americascup.com</u>).*

*This Notice of Entry sets forth the requirements to challenge, based on the Deed of Gift which terms are reminded under points 2.2 to 2.5 of said Notice. Basically, the requirements to qualify are that the yacht club:*

> *(i)     is not domiciled in Switzerland;*
> *(ii)    is an organised yacht club;*
> *(iii)   is incorporated, patented or; licensed by the legislature, admiralty or other executive department of the state in which it is domiciled; and*

26

> (iv)    has or will have an annual regatta on the sea or an arm of the sea.

*ACM carefully reviewed the documents which were provided by CNEV, i.e. the Notice of Challenge of 29th June, SNG's acceptance and the relating Notarial Deed of 3rd July, as well as the Notarial Deed of CNEV's incorporation and initial statutes of 19th June 2007, CNEV's internal rules of 19th June 2007, the Notarial Deed relating to the revised statutes of 27th June 2007, as well as CNEV registration with the competent "Registro de Entidades Deportivas de la Comunitat Valenciana" (Registry of Sportive Entities of the Valencian Community) on 28 June 2007.*

*In addition, CNEV provided documents evidencing that it organizes several regattas on the sea, in particular the information relating to the Optimist Regatta which took place on 13th and 14th July 2007 as well as the Notice of Regatta for the "Vuelta España a Vela 2007" which are attached to CNEV's submission of 1st August.*

*In their respective Submissions of 27th July and 1st August, SNG and CNEV further explained and demonstrated that CNEV meets the qualifications to challenge required in the Deed of Gift.*

*As mentioned above, these qualifications are also applied to Challenging Competitors and compliance therewith is systematically examined by ACM when receiving an application to become a Challenging Competitor from a yacht club.*

*In this respect, should CNEV's challenge have been an application subject to ACM's assessment and approval, ACM would have accepted it without restriction.*

27

*Moreover, CNEV's application being the first challenge received by the trustee of the 33rd America's Cup, ACM believes that SNG had the obligation to accept it, as per the provisions of the Deed of Gift.*

*ACM is therefore fully supporting SNG's acceptance of CNEV as Challenger of Record and believes there is no doubt as to its validity.*

*One could even argue that the question raised by some prospective competitors with respect to the validity of CNEV's challenge is in reality nothing but an attempt to ultimately modify the arrangements made by the Defender and the Challenger of Record, as reflected in the Protocol they have mutually agreed in accordance with the terms of the Deed of Gift.*

*ACM respectfully underlines the gravity of any such attempt which could seriously affect the stakeholders, protagonists and all participants of the 33rd America's Cup and have severe consequences on the Event, including as concerns the commitments made by the hosts of the Event: Valencia, the Comunidad Valenciana and Spain.*

**3. SUBMISSION**

*In view of the above, ACM respectfully submits that CNEV's challenge as Challenger of Record is valid and that any attempt to question its validity should be disregarded."*

[21] On August 13, 2007 at 16.06 CET, the Panel received a submission from RTYCL which included *inter alia*:

> *"[...]*
>
> **5. Impact of uncertainty**
>
> *5.1 Until the application before this Panel in this matter is decided and until the matters raised in the Complaint are resolved or settled, there is uncertainty as to the terms upon which RTYC may compete in the 33rd America's Cup and indeed uncertainty as to whether or not RTYC will be permitted to compete in the 33rd America's Cup.*
>
> *5.2 This uncertainty damages RTYC's ability to raise funds from sponsors (which understandably wish to know whether the party they wish to sponsor will indeed take part in the event), to employ staff, to plan, to know whether and to what extent to expend further funds on all matters relevant to becoming an effective challenger and ultimately jeopardises RTYC's ability to become a viable competitor.*
>
> *5.3 A quick decision from this Panel declaring CNEV's challenge and the Protocol valid will provide the certainty RTYC needs, will save RTYC and its representative TEAMORIGIN from potentially wasting substantial sums of money and will ultimately make for a more competitive event."*

[22] On August 14, 2007 at 11.53 CET, the Panel received two affidavits from CNEV in support of its submission, one by Mr. Manuel Chirivella, Chairman of CNEV and Vice-Chairman of the Spanish Royal Sailing Federation ("**SRSF**") (dated August 13, 2007), and one by Mr. Gerardo Pombo García, Chairman of SRSF (dated August 10, 2007) (see below point [55] to [57]).

[23]  On August 16, 2007, the Panel issued **Directions no 7** which stated:

"*1  Following ACAP 33's Directions no 1 through 6, the following has been received:*

- *on July 27, 2007, a submission by SNG;*
- *on July 27, 2007, a letter from GGYC;*
- *on August 1, 2007, a submission by CNEV;*
- *on August 8, 2007, a submission by ACM;*
- *on August 13, 2007, a submission by RTYCL;*
- *on August 14, 2007, from CNEV, affidavits by Mr. Manuel Chirivella (Chairman of CNEV and Vice-Chairman of the Spanish Royal Sailing Federation) and Mr. Gerardo Pombo Garcia (Chairman of the Spanish Royal Sailing Federation).*

*2  In its previous Directions, ACAP 33 has reserved further directions with regard to additional submissions and/or to hearing witnesses and/or the parties.*

*3  No party has requested to file further submissions and/or documents and/or affidavits and/or to be heard and/or that witnesses or experts be heard.*

*4  In its submission, RTYCL, page 5, has insisted on the urgency of the matter since:*

*"5.1 Until the application before this Panel in this matter is decided and until the matters raised in the Complaint are resolved or settled, there is uncertainty as to the terms upon which RTYC may compete in the 33rd America's Cup and indeed uncertainty as to whether or not RTYC will be permitted to compete in the 33rd America's Cup.*

5.2 *This uncertainty damages RTYC's ability to raise funds from sponsors (which understandably wish to know whether the party they wish to sponsor will indeed take part in the event), to employ staff, to plan, to know whether and to what extent to expend further funds on all matters relevant to becoming an effective challenger and ultimately jeopardises RTYC's ability to become a viable competitor.*

5.3 *A quick decision from this Panel declaring CNEV's challenge and the Protocol valid will provide the certainty RTYC needs, will save RTYC and its representative TEAMORIGIN from potentially wasting substantial sums of money and will ultimately make for a more competitive event.".*

## **Directions and Timetable**

5    *It is believed that each party has received all of the aforesaid submissions, letter and affidavits. Should this not be the case, such party is invited to inform ACAP 33's Chairman by* **Monday August 20, 2007 at 5.00 p.m.** *(Swiss time). The relevant document will be forwarded forthwith to such party.*

6    *Should any party, having or not filed a submission so far, desire to file a (further) submission in view of the aforesaid submissions, letter and affidavits, it is invited to do so by* **Thursday August 23, 2007 at 5.00 p.m.** *(Swiss time).*

7    *Should any party desire to express itself or submit the testimony of witnesses or experts on the occasion of a hearing, it is invited to state so by* **Tuesday August 21, 2007 at 5.00 p.m.** *(Swiss time).*

8    *Further directions will be issued in due course."*

[24]  On August 17, 2007 at 04.15 CET, the Panel received an email from SNG which read:

> "In response to the Jury's Directions No. 7, SNG responds as follows:
>
> 1. It confirms receipt of the documents listed.
>
> 2. It does not seek to make further submissions in response.
>
> 3. It does not seek a hearing in the matter because it believes the relevant issues and evidence is sufficiently clear and are uncontested.
>
> 4. SNG supports the statements made by RTYC regarding the desirability for an early determination.
>
> One matter in SNG's submission which has been kindly brought to SNG's attention by Counsel for CNEV. It concerns paragraph 11.4 and comments made about Don Gerardo Pombo Garcia. He was not a member of the America's Cup Arbitration Panel during 2000 - 2003, his brother was hence the confusion. The words "He was a member of the America's Cup Arbitration Panel during the 31st America's Cup" should be deleted from Paragraph 11.4 of SNG's submission."

[25]  On August 24, 2007, the Panel issued **Directions no 8** which stated:

> "1  In points 5, 6 and 7 of its Directions no 7, ACAP 33 has stated:
>
>> "5  It is believed that each party has received all of the aforesaid submissions, letter and affidavits. Should this not be the case, such party is invited to inform ACAP 33's Chairman by Monday August 20, 2007 at 5.00 p.m. (Swiss time). The relevant document will be forwarded forthwith to such party.
>>
>> 6  Should any party, having or not filed a submission so far, desire to file a (further) submission in view of the aforesaid submissions, letter and affidavits, it is invited to do so by Thursday August 23, 2007 at 5.00 p.m. (Swiss time).

7   *Should any party desire to express itself or submit the testimony of witnesses or experts on the occasion of a hearing, it is invited to state so by Tuesday August 21, 2007 at 5.00 p.m. (Swiss time)."*

**2**   *Within the deadlines set in Directions no 7, SNG has submitted a reply to ACAP 33 on August 17, 2007 at 04:15am as follows:*

*"In response to the Jury's Directions No. 7, SNG responds as follows:*

*1.   It confirms receipt of the documents listed.*

*2.   It does not seek to make further submissions in response.*

*3.   It does not seek a hearing in the matter because it believes the relevant issues and evidence is sufficiently clear and are uncontested.*

*4.   SNG supports the statements made by RTYC regarding the desirability for an early determination.*

*One matter in SNG's submission which has been kindly brought to SNG's attention by Counsel for CNEV. It concerns paragraph 11.4 and comments made about Don Gerardo Pombo Garcia. He was not a member of the America's Cup Arbitration Panel during 2000 - 2003, his brother was hence the confusion. The words "He was a member of the America's Cup Arbitration Panel during the 31st America's Cup" should be deleted from Paragraph 11.4 of SNG's submission."*

**3**   *Within the deadlines set in Directions no 7, no party has informed ACAP 33 that it had not received all of the submissions mentioned under point 1 of Directions no 7, no party other than SNG has filed or requested to file a further submission, letter or affidavit, and no party has expressed its desire to be heard or submit the testimony of witnesses or experts on the occasion of a hearing.*

*Directions and Timetable*

**4**  *Subject to yet unforeseen developments, ACAP 33 considers that it now disposes of all necessary elements in order to render its decision.*

**5**  *Should any other Challenger accept the terms of the Protocol and be accepted as Challenger of the XXXIII America's Cup before ACAP 33's decision is rendered, ACAP 33 reserves the right to grant said Challenger the opportunity to file a submission.*

**6**  *Further directions, if appropriate, will be issued in due course."*

[26]  On August 30, 2007 at 13.45 CET, the Panel received a notice from ACM which read:

*"1. REPRESENTATION*

*This notice is made by AC Management SA ("ACM") in the frame of the Arbitration Panel's Directions 23rd July and 24th August 2007 in which the Arbitration Panel invited SNG to inform ACAP 33 of new entries of Challengers having accepted the terms of the Protocol, whose challenge was accepted as Challenging Competitor.*

*Two notices were made by ACM on respectively 24th and 27th July 2007, informing the Arbitration Panel of the entry of ROYAL CAPE YACHT CLUB, ROYAL THAMES YACHT CLUB LIMITED and ROYAL NEW ZEALAND YACHT SQUADRON. The present notice is to inform the Arbitration Panel of an additional entry.*

*2. NOTICE*

*ACM hereby informs the Arbitration Panel that, in addition to CLUB NAUTICO ESPANOL DE VELA, ROYAL CAPE YACHT CLUB, ROYAL THAMES*

*YACHT CLUB LIMITED and ROYAL NEW ZEALAND YACHT SQUADRON, an additional Notice of Entry dated 10th August 2007 was accepted by ACM on 30th August 2007.*

*This new Challenging Competitor is namely:*
*Yacht Club:*
*DCYC – DEUTSCHER CHALLENGER YACHT CLUB e.V. ["DCYC"]*
*Nepomukweg 4-6*
*D- 82319 STARNBERG*
*Attn.: Mr Willy Kuhweide – Commodore*
*Tel.:  +49 (0) 8151 3238*
*Fax.: +49 (0) 8151 28222*
*e-mail: info@dcyc.de*

*Representative:*
*UNITED INTERNET TEAM GERMANY*
*Deutsche Challenge S.L.U.*
*Muelle de Nazaret s/n*
*Port America's Cup – Base 2*
*46024 VALENCIA*
*Spain*
*Attn.: Mr Michael Scheeren – Syndicate Chief*
*Tel.:  +49 (0) 171 7875382*
*Fax.: +34 (0) 96 320 4471*
*e-mail: m.scheeren@ui-team-germany.de*

*ACM confirms that this additional Challenging Competitor formally declared that it "unconditionally agrees and accepts to be bound by the terms of the Deed of Gift, the Protocol and all applicable rules and obligations referred to in such Protocol, including but not limited to those which will be contained in the documents listed in article 2.5 of the said Protocol, and any amendment to*

*such Protocol or such rules and obligations that may be issued from time to time"."*

[27]  On August 30, 2007, the Panel issued **Directions no 9** which stated:

*"1    In point 5 of its Directions no 8, ACAP 33 has stated:*

*"Should any other Challenger accept the terms of the Protocol and be accepted as Challenger of the XXXIII America's Cup before ACAP 33's decision is rendered, ACAP 33 reserves the right to grant said Challenger the opportunity to file a submission."*

*2    Pursuant to an e-mail received by ACAP 33 from ACM on Thursday, August 30, 2007 at 1.45 p.m. (CET) (copy enclosed), another Challenger has now accepted the terms of the Protocol and been accepted as Challenger, namely Deutscher Challenger Yacht Club ("DCYC") of Starnberg, Germany, acting through United Internet Team Germany, Valencia, Spain.*

*<u>**Directions and Timetable**</u>*

*3    DCYC is entitled to take part in the present proceedings and, in addition to the three ACAP 33 members and to the parties already mentioned under point 12 of Directions no 1, under point 5 of Directions no 2 and under point 3 of Directions no 4, shall directly receive all and any submissions, responses or communications, by e-mail.*

*4    To that effect, DCYC receives herewith copy of the following documents:*
   - *SNG's Application dated July 20, 2007;*
   - *The submissions received by ACAP 33 from SNG (on July 27, 2007), GGYC (through a letter received on July 27, 2007 from their counsel Latham & Watkins LLP (James V. Kearney)), CNEV (on*

> *August 1, 2007), ACM (on August 8, 2007) and RTYCL (on August 13);*
>
> - *Two affidavits received by ACAP 33 from CNEV on August 14, 2007, one by Mr. Manuel Chirivella, Chairman of CNEV and Vice-Chairman of the Spanish Royal Sailing Federation (dated August 13, 2007), and one by Mr. Gerardo Pombo García, Chairman of SRSF (dated August 10, 2007); and*
> - *ACAP 33's Directions no 1 through no 8.*
>
> **5**  *DCYC may, by **Tuesday, September 4, 2007 at 5 p.m. (CET)**, produce a submission in respect of the case.*
>
> **6**  *Further directions will be issued as appropriate."*

[28]  On August 31, 2007 at 20.58 CET, the Panel received an email from SNG which read:

> *"The Members of the Jury are likely to be aware from media reports of additional ex-parte proceedings instituted by GGYC last week, which resulted in a procedural order of the Supreme Court. Copies of the order and the documents filed have now been posted by GGYC on its home page and can be accessed at http://www.ggyc.com/.*
>
> *In short, the order accelerates by nine days the time by which SNG must file its first response GGYC's filings, but is restricted to the ex-parte application for an expedited trial, for SNG to provide the location of the match sought by GGYC, and provide the rules and regulations of such match. The date for filing the response is 1500hrs 5th September 2007 and a hearing has been setdown for 1400hrs 10th September 2007 (all NY time) to address these issues.*
>
> *The order does not affect SNG's application to the Panel or the work of the Panel.*

*SNG is will make available to the Panel the documents it files with the Court in response."*

[29]  On September 4, 2007 at 11.42 CET, the Panel's Chairman received an email from DCYC which read:

*"Please see the mail I sent to the Challenger and Michel."*

The email mentioned by DCYC was sent to all other Challengers and ACM on September 4, 2007 at 11.28 CET, and read:

*"We have read the documents about the arbitration panel and we don't wish to delay the process with details.*

*So we concur in and agree to the submission made by SNG and we respond to your invitation CNEV as being valid and binding."*

[30]  On September 5, 2007 at 20.48 CET, the Panel received an email from CNEV which read:

*"CNEV would like to update certain aspects of its submission:*

*a)  **Regatta organised by CNEV called Vuelta España a Vela.** As advanced in our submission dated August 1, this regatta has started on September 3 . It is organised by CNEV, RFEV and the company Deportevents. This competition is sailed in boats RO 340 of 34 feet and there are 10 boats competing. The regatta is divided in 7 races starting September 3 in Ceuta (Spanish territory in North Africa) and finalising September 22 in Badalona (near Barcelona). The first race, Ceuta-Cadiz, has been completed. Full information is available in Spanish on www.vueltavela.com.*

*In the last paragraph of the first screen, it can be read "the Vuelta España a Vela is organised by the Real Federación Española de Vela, Deportevents and Club Nautico Español...". The fact that the CNEV is one of the organising bodies it can also be read in the notice of race attached to our first submission.*

*We attach herewith the translation of the news appearing on the RFEV webpage www.rfev.es in which they refer to this regatta. We also attach several news that are available on internet about this regatta, this last in Spanish.*

b) *Certifications from RFEV and Federacion de Vela de la Comunidad Valenciana. in these certificates is certified that CNEV is a licenced club at both state and local autonomous community level. These certifications have been obtained due to GGYC suggestion that the CNEV was not properly licenced in the New York litigation case.*

c) *Incorporation documents. We also attach the Incorporation Public Deed and by-laws of CNEV and the translation of this first deed, the second in which there are certain amendments (not relevant to this case) is being translated and will be filed next week.*

*We believe that these documents do not affect other parties' arguments or submissions and simply update the situation. Therefore in our opinion should be accepted by the ACAP without further requirements.*

*We are sending the documents mentioned above in subsequent e-mails."*

[31]    On September 6, 2007 at 09.53 CET, the Panel received an email from CNEV enclosing CNEV's Incorporation Deed dated June 19, 2007 (and its translation in English), CNEV's Articles of Incorporation (and its translation in English), a report from the "Conselleria de Cultura, Educacio i Esport" dated June 20, 2007 requiring

some amendments to be made to the CNEV's Articles of Incorporation, and an official certificate dated June 28, 2007 issued by the "Conselleria de Cultura, Educacio i Esport" of the Community of Valencia confirming that CNEV had been registered in the Register of Sport Entities of the Community of Valencia.

[32]    On September 6 and 7, 2007, all members of the Panel met in Lugano, Switzerland for its final deliberation.


## THE PARTIES' POSITION

[33]    Out of the five submissions received by the Panel, four (from CNEV, ACM, RTYCL and DCYC) support SNG's submission. GGYC, in the letter from its lawyers dated July 27, 2007, strongly opposed SNG's position.


## 1.  IN FAVOR OF SNG'S SUBMISSION

[34]    CNEV, ACM, RTYCL and DCYC submitted that they agree with SNG's position. They provided additional comments in their respective submissions.

[35]    CNEV, in its submission dated August 1, 2007, quoted the decision of the New York Court of Appeals of April 25, 1990 (the Mercury Case):

> "[...] Ultimately [...] it must be the contestants, not the courts, who define the traditions and ideals of the sport."

[36]    ACM pointed out in its submission dated August 8, 2007 that:

> "One could even argue that the question raised by some prospective competitors with respect to the validity of CNEV's challenge is in reality nothing but an attempt to ultimately modify the arrangements made by the

*Defender and the Challenger of Record, as reflected in the Protocol they have mutually agreed in accordance with the terms of the Deed of Gift.*

*ACM respectfully underlines the gravity of any such attempt which could seriously affect the stakeholders, protagonists and all participants of the 33rd America's Cup and have severe consequences on the Event, including as concerns the commitments made by the hosts of the Event: Valencia, the Comunidad Valenciana and Spain."*

[37]    In its submission dated August 13, 2007, RTYCL stated:

*"[...]*

*3.1 [...] in submitting its Challenge, it [RTYCL] accepted CNEV's challenge as a valid challenge under the terms of the Deed of Gift and has accepted CNEV as Challenger of Record.*

*3.2 Further, RTYC has, in submitting its Challenge, accepted the Protocol as an arrangement made by mutual consent between SNG and CNEV satisfactory to both, in accordance with the terms of the Deed of Gift.*

*3.3 By accepting the Protocol unequivocally on its terms, RTYC accepts (amongst other things) the procedures and authorities under which the Protocol may be amended and pursuant to which further America's Cup rules may be created, communicated and challenged. RTYC voluntarily submitted to take part in the 33rd America's Cup  on these terms and is now bound contractually to continue to accept these terms."*

[38]    In this respect, ACM also underlined in its submission that it systematically examines these qualifications *"when receiving an application to become a Challenging Competitor from a yacht club."*

[39]    RTYCL's submission also read:

> "[...] 3.6 RTYC would be aggrieved if a third party, in this instance GGYC, which has not challenged as required under the Protocol and does not have the necessary locus to influence the amendment of the Protocol or the creation or amendment of the rules envisaged by the Protocol is able effectively, by submitting a complaint to the New York or any other court and/or succeeding in its claim, to subvert the contractual jurisdiction of this Panel and thereby circumvent the right of legitimate challengers under the Deed of Gift and the Protocol to have their case heard on all matters regarding the 33rd America's Cup by this Panel."

[40]    Moreover, RTYCL claimed that:

> "Until the application before this Panel in this matter is decided and until the matters raised in the Complaint are resolved or settled, there is uncertainty as to the terms upon which RTYC may compete in the 33rd America's Cup and indeed uncertainty as to whether or not RTYC will be permitted to compete in the 33rd America's Cup
>
> This uncertainty damage RTYC's ability to raise funds from sponsors (which understandably wish to know whether the party they wish to sponsor will indeed take part in the event), to employ staff, to plan, to know whether and to what extent to expend further funds on all matters relevant to becoming an effective challenger and ultimately jeopardises RTYC's ability to become a viable competitor.
>
> A quick decision from this Panel declaring CNEV's challenge and the Protocol valid will provide the certainty RTYC needs, will save RTYC and its representative TEAMORIGIN from potentially wasting substantial sums of money and will ultimately make for a more competitive event."

## 2. AGAINST SNG'S SUBMISSION

[41]    GGYC strongly opposed SNG's position in its letter sent to the Panel's Chairman on July 27, 2007.

[42]    On more than one occasion, namely on July 23, 2007 (Directions no 1) and on July 28, 2007 (Directions no 5), GGYC was formally invited to take part in the proceedings, including on a without prejudice basis. However, GGYC chose only to file their attorneys' letter dated July 27, 2007, which is part of the formal case record (see point [14]). Nevertheless, in reaching its decision, the Panel has considered GGYC attorneys' letter dated July 27, 2007 and also considered the contents of all of the material placed on GGYC's website up to the date of this Decision, including the documents filed with the Supreme Court for the State of New York.

[43]    In the said letter (see point [14]) and a press release of August 22, 2007 included on the GGYC website, GGYC claimed that "*the Protocol violates the most basic principles of justice and independence common to all legitimate adjudicatory bodies*" and that the Panel lacks jurisdiction over the Application.

[44]    Regarding the validity of CNEV and its challenge, GGYC's concerns were stated to include that:

- *"It is not a bona fide yacht club.*
- *It was created and is controlled by Real Federación Española de Vela (RFEV), which is itself not a yacht club.*
- *It was formed for the sole purpose of making a challenge only days before its challenge was made and accepted.*
- *Contrary to the Deed it has never held an annual regatta anywhere, and*
- *It appears to have accepted the loss of Challenger rights in the new Protocol in a way that no genuine Challenger who was seeking a fair contest would.*"

[45]    Moreover, GGYC also stated that:

*"We believe that the protocol must be rejected in order to protect the status of the America's Cup as a genuine sporting contest.*

*We do not believe this protocol is valid, fair, or in the spirit of racing that the Cup stands for. It is clearly not the result of the mutual consent process between a defender and a legitimate challenger that is prescribed in the Deed of Gift.*

*Our chief concerns about the Protocol are:*

- *It is invalid because SNG entered into it with an invalid Challenger, CNEV.*
- *The defender, through the company it has formed to manage the event, America's Cup Management (ACM) can reject any entry – even if it complies with all requirements. Once disqualified, there is no provision for the challenger to contest this ruling. See AC 33 Protocol clauses 2.7 (d), 4.4*
- *ACM have the power to appoint the event authority, and all officials. (The Challenger of Record (see below) can only object on grounds of neutrality of judgment. See Protocol clause 5.4*
- *ACM can impose any rule on any team. See Protocol clause 5.4 (b)(d)*
- *The new Protocol does away with the independent Challenger Commission which represented well all challengers in AC 32. See Protocol clause 10.1*
- *The defender will unilaterally create a new design rule governing the boats to be raced, with seemingly only very minor input from the COR; and can develop this rule well in advance of advising challengers so that they have a much shorter window to develop a rival boat. See Protocol clause 14.1*

- *The Defender gains the right to gain valuable information and advantage by participating in the Challenger selection series, but Challengers will not be permitted to participate in any Defender series. See Protocol clause 13.5"*

[46]    In respect of the Panel as such and its Rules of Procedure, GGYC stated *inter alia* that:

> *"[...]*
>
> *The format and process set up for this arbitration in The Protocol Governing the Thirty Third America's Cup ("Protocol") violate the most basic principles of justice and independence common to illegitimate adjudicatory bodies and are an affront to the most basic sensibilities common to all law abiding people. A dispute resolution proceeding in which the parties to the proceeding are in agreement (in this case CNEV and SNG), and in which the judges may be removed, and the rules of procedure may be changed, at any time and for any reason by the parties to the arbitration, will be viewed by the public and the sailing community as nothing more than a kangaroo court.*
>
> *[...]*
>
> *[...] the panel's willingness to engage in this arbitration in the face of this legal precedent suggests its members are beholden to the parties who appointed them in a secret document and who retain the power to remove them.*
>
> *[...]*
>
> *Moreover, SNG and CNEV retain the sole power to modify anything they desire regarding the arbitration, including but not limited to the powers of the arbitration panel, the jurisdiction of the arbitration panel, procedures of the arbitration panel, and even the official language of the arbitration panel. See Protocol ¶ 36.1. The issue of whether CNEV is a legitimate challenger is not*

*contested by CNEV or SNG and their masquerading as adversaries while the real adversaries are rendered impotent is not a legitimate legal proceeding but rather a mockery of justice. Civilized countries have long done away with such tribunals and no legitimate arbitration panel would agree to operate under these conditions. This may explain the striking omission from the 33rd Protocol of the requirement in the 32nd Protocol that arbitration panel members be "fair minded and possess good judgment."*

*It is subterfuge to have SNG and CNEV's hand picked arbitrators, replaceable at the their whim, sitting in a forum and under rules wholly controlled by SNG and CNEV, and judging an issue that the parties to the arbitration do not dispute."*

## THE ISSUES AT STAKE

[47]    The following three different issues arise in the present case:

1.   Jurisdiction of the Panel

2.   Eligibility to challenge

3.   Compliance of the Protocol with the Deed of Gift

## THE FACTS

## 1.  SNG

[48]    On July 3, 2007, SNG, a yacht club organized under the laws of Switzerland, defended its title in the 32nd America's Cup sailing match with RNZYS, and won the 32nd America's Cup match in Valencia. SNG is therefore currently the holder and

trustee of the America's Cup in accordance with the terms of the Deed of Gift dated 24 October 1887 (the "**Deed of Gift**").

## 2. CNEV

[49]    CNEV has filed with the Panel documents which record the following:

1.  On June 19, 2007, a Deed of Incorporation of CNEV was executed in front of a Public Notary in Madrid;

2.  On June 20, 2007, the legal department of the local authority, namely the "*Conselleria de Cultura, Educacio i Esport*", required some amendments to be made to CNEV's Articles of Incorporation;

3.  On June 27, 2007, CNEV's Articles of Incorporation were amended by Notarial Deed executed in Valencia in order to comply with the aforesaid June 20, 2007 requirements;

4.  On June 28, 2007, an official certificate was issued by the "*Conselleria de Cultura, Educacio i Esport*" of the Community of Valencia confirming that CNEV had been registered in the Register of Sport Entities of the Community of Valencia as a corporation in compliance with the laws of Spain.

[50]    In its email to the Panel dated September 5, 2007 and in the documents attached to the same, CNEV submitted certificates declaring that CNEV "*is a sport corporation legally constituted within the Government of the Comunidad Valenciana*" and that "*it holds the Club license from June 20, 2007*" (Certificates by D. Manuel Cabrera Aynat, Secretary of the Sailing Federation of the Valencian Community, and D. Gerardo Pombo Garcia).

[51]    CNEV's Deed of Incorporation dated June 19, 2007, submitted by CNEV on September 6, 2007, provides that:

"*[...]*

*FIRST*

*[...] the following resolutions have been adopted by unanimous vote:*

1) *To incorporate a sports company denominated "[CNEV]" which corporate domicile for the purpose of the notices shall be [...], which will be subject to Law 4 of December 20th, 1993 concerning Sports Activities of the Generalitat of Valencia.*

2) *The corporate purpose of the Club shall be that detailed under Article Number 1 of the Articles of Incorporation, this is to say, the promotion of water sports activities, and in particular, the promotion of sailing practices through the organization of national as well as international regattas with in the national territory.*

3) *To approve the Articles of Incorporation that shall rule the sports company, which are attached [...].*

4) *To designate the first Board of Directors that will be made up by the following persons*

> *Chairman: Mr. Manual José Chirivella Bonet*
>
> *Vice-Chairman: Mr. José María Martín Puertas*
>
> *Treasurer-Secretary: Mr. José Angel Rodríguez Santos*
>
> *Board Member: Mr. Luis Francisco Merino Bayona*

*[...]*

*SECOND*

*This deed shall be registered with the Registry of Sports Companies of the Autonomous Community of Valencia.*

*[...]*

*In agreement with the provisions of Article 17 bis of Notary Publics, this document enjoys the condition of public instrument, and its contents are presumed complete and truthful."*

[52]    On July 3, 2007, upon conclusion of the 32nd America's Cup Match, SNG received a written challenge for the America's Cup from CNEV. With the challenge, CNEV submitted documents regarding its incorporation and organization, as well as its

other qualifications to serve as Challenger of Record under the Deed of Gift. This challenge was accepted and signed by SNG on the same day.

[53]    On July 14, 2007, CNEV organized a regatta of the Optimist Class in Santander[4].

[54]    CNEV also organized with RFEV and the company Deportevents the Regatta "*Vuelta a España a Vela*" that started on September 3, 2007 and is scheduled to finish on September 22, 2007. This regatta is sailed on boats RO 340 of 34 feet and is divided into seven races starting on September 3 in Ceuto (Spanish territory in North Africa) and finishing on September 22 in Badalona (near Barcelona). The regatta is 776 nautical miles long and stops in several cities on the south coast of Spain, namely Cadiz, Malaga, Cartagena, Alicante, Valencia and Castellon. Ten boats are competing in this regatta[5].

[55]    The two affidavits submitted by CNEV on August 14, 2007 support these facts.

[56]    The affidavit by Mr. Manuel Chirivella dated August 13, 2007 reads:

> "*1.    I am the Chairman of the Club Nàutico Español de Vela (CNEV) and the Vice-Chairman of the Spanish Royal Sailing Federation (RFEV}, Challenger of the XXXII America's Cup.*
>
> *2.    The project headed by RFEV in the XXXII America's Cup was a success and the Sponsors assure their intention to maintain or increase their budgets for the XXXIII America's Cup before the termination of the XXXII. Given that we have for a new resources campaign it was decided by the RFEV to be a Challenger in the next Cup. It also considered the possibility of being Challenger of Record in order to help the next venue to be Valencia.*

---

[4] See the affidavit by Mr. Manuel Chirivella, infra point [56] and CNEV's submission dated August 1, 2007.
[5] See the documents attached to the email received by the Panel from CNEV on September 5, 2007, supra point [30].

3.  *Our lawyers consider that the possibility of being a Royal Federation Challenger may be disputed, and advised the incorporation of a Club in order to formalize the Challenge. RFEV resolved, to incorporate a Club for this purpose, with certain conditions to be met*

    *(i)Continuity of the same philosophy as in the XXXII America's Cup.*
    *(ii) The Club should represent the entire Spanish Sailing Community.*
    *(iii)The Club should have real content.*
    *(Iv)The Club has to fulfill all the requirements of the Deed of Gift.*

4.  *On June 19, 2007 the Club was incorporated and included the following people:*

    *(a)  Manuel Chirivella, Vice-Chairman of the Royal Spanish Sailing Federation. He won the "Copa del Rey" in 1999 in IMS. He has won also in IMS "Copa de la Reina" in 1993, 1995 and 1999.*
    *(b)  José Maria Martin, second Vice-Chairman of the Royal Spanish Sailing Federation and chairman of the Madrid Federation.*
    *(c)  José Angel Rodriguez, third Vice-Chairman of the Royal Spanish Sailing Federation. He is also Chairman of the Galician Federation. He is an International Umpire.*
    *(d)  Luis Merino, Vice-Chairman of the Royal Spanish Sailing Federation. He is Chairman of the Royal Yacht Club of Malaga*
    *(e)  Gerardo Pombo, the Chairman of the Royal Spanish Sailing Federation, and previously the technical secretary during 20 years. He was the captain on the Spanish Olympic sailing team of Barcelona 92. He is a member of the Spanish Olympic Committee.*

    *All of them are members of the RFEV, so RFEV controls the decisions to be taken by the new incorporated Club.*

5.  *The main activities that the Club has been carrying out are:*

(a) *Negotiating a collaboration agreement with the CAR (Center of Sailing Training in Santander where the Spanish Sailing Olympic Team is trained). As a first activity we organized a Regatta the 14fh of July of the Optimist Class. The promotion of sailing among young people is a priority for the CNEV.*

(b) *Organizing Several Regattas. Due to the short time since the incorporation there is, in the short term, only one that will take place during the month of September: la "Vuelta España a Vela". There are other Regattas under consideration. The organization of Regattas is the main activity of the Club and all the members of the board have huge experience in this field, on top of that the RFEV will give full support to this end.*

(c) *We will organize the "Club Nautico Español de Vela Annual Regatta", "Trofeo Desafio Español". We want to do that in Valencia, open to several classes specially RN.*

(d) *I hereby formally undertake on behalf of CNEV to maintain the above referred Regatta Annually for all the time that the XXXIII America's Cup will last.*

6. *I have read the submission of SNG and I found it correct in relation to the facts related to CNEV with only a minor error where Getardo Pombo is confused with his brother Fernando who was for a short period of time Chairman of the Arbitration Panel in the XXXI America's Cup."*

[57]    The affidavit by Mr. Gerardo Pombo García dated August 10, 2007 reads:

*"1. I am the Chairman of the Spanish Royal Sailing Federation (Real Federacion Espanola de Vela). This Federation is incorporated under the law 10/1990 of 15th of October and is at body who has as purpose the supervision, control, organization, etc of all activities related with Sailing in all the territory of Spain. Is the only Federation of Sailing that exists in*

*Spain and represent Spain in front of the International Federation and any other Sportive Organism. The Federation is affiliated to the International Sailing Federation (ISAF), the European Sailing Federation (EUROSAF) and Off Shore Racing Congress (ORC). Is also member of the Olympic Spanish Committee. In the XXXII America's Cup the Royal Spanish Federation was a Challenger. The reason why we acted as Challenger was in order to try to solve the problem that existed because of the dispute among different Yacht Clubs which were difficulting to obtain the necessary recourses for having an Spanish Team in the XXXII America's Cup.*

2.  *I have read the Afidavit signed by Manuel Chirivella and I agree with the content of the same.*

3.  *It is one of the activities of the Royal Spanish Federation the organization and promotion of national and international Regattas inside the Spanish territory and the Federation count with enough recourses far organizing Regattas in Spain.*

4.  *The RFEV fully support CNEV and announce that it will give enough support for organizing Regattas in a regular basis.*

5.  *RFEV is the responsible of CAR (Center of High Rendiment of Santander), and we are currently negotiating with the CNEV a close relationship in order to promote the America's Cup in the young Spanish Sailors we plan to establish regular Regattas which would be promoted and organized by CNEV the winners of such Regattas will be invited by CNEV to the headquarters of the Team Desafio Espanol.*

6.  *The 14th of July it took place a regatta of Optimist Class organized in Santander by CNEV.*

      7.    *CNEV together with RFEV organized la "Vuelta a Espana a Vela" that will take place between the 1st and 24th of September in Class RO 34."*

## 3. THE PROTOCOL

[58]    On July 3, 2007, CNEV and SNG signed the Protocol. The Protocol states in its "Background" section, that "*B. Société Nautique de Genève has received and accepted a notice of challenge from the Challenger of Record in accordance with the Deed of Gift.*"

[59]    On July 5, 2007, the signed Protocol was publicly released.

## 4. OTHER CHALLENGERS

[60]    The following other Challengers have been accepted by the Defender, through ACM: RCYC, RTYCL, RNZYS and DCYC[6].

[61]    Upon applying to take part to the 33rd America's Cup, all Challengers have formally declared in their respective Notice of Entry (paragraph 3. "Bound by the Protocol") that they "*unconditionally agree and accept to be bound by the terms of the said Deed of Gift, the Protocol, and all applicable rules and obligations referred to in such Protocol including but not limited to those which will be contained the documents listed in Article 2.5 of the said Protocol, and any amendment to such Protocol or such rules and obligations that may be issued from time to time.* "

[62]    In the same Notice of Entry (paragraph 4. "Arbitration and Dispute Resolution"), all Challengers have stated that they "*unconditionally agree and accept to be bound by the dispute resolution provisions of the Protocol and by the decisions rendered by the Measurement Committee, Sailing Jury and the Arbitration Panel in accordance with such provisions of the Protocol. [ The relevant Challenger ] further unconditionally submit to the exclusive jurisdictions of the Measurement Committee,*

---

[6] As seen in the description of the Proceedings (see supra [1] to [32]).

*Sailing Jury and the Arbitration Panel as provided in the said Protocol and agree and undertake not to resort to any other court, or tribunal in respect of any matter regarding the 33rd America's Cup."*

## 5. GGYC'S CHALLENGE

[63]    On July 11, 2007, GGYC's representatives delivered a letter to the President of SNG which disputed the validity of CNEV's challenge, claiming that CNEV *"was not a bona fide yacht club"* and that it had *"not performed any of the duties of the Challenger as contemplated by the Deed of Gift"*. GGYC *"demand[ed] recognition as the legitimate Challenger of Record of the 33rd America's Cup"*, as its challenge was *"a bona fide challenge"* and as it is *"fully prepared to meet all of the obligations of the Challenger"*. Accordingly, on July 11, 2007, GGYC's representatives hand-delivered to SNG's Secretary-General at the SNG clubhouse in Geneva a challenge to sail the 33rd America's Cup.

## 6. THE NEW YORK LAWSUIT

[64]    On July 20, 2007, GGYC filed a suit against SNG in the Supreme Court for the State of New York[7] (which was served on SNG on August 17, 2007[8]) seeking a Court ruling on the legitimacy of the Protocol, and in particular seeking *"(i) a declaration that CNEV's challenge and the Protocol are void; (ii) a declaration that GGYC's challenge is valid; (iii) that judgment be entered in favor of GGYC and against SNG enjoining SNG from promulgating rules and regulations pursuant to the Protocol and directing SNG to reject CNEV's challenge; (iv) that judgment be entered in favor of GGYC and against SNG enjoining SNG to accept GGYC's notice and implement the terms of the Deed of Gift by participating with GGYC in the establishment of a protocol through a consensual process and failing that to proceed with the match under the rules expressly set forth in the Deed of Gift; and*

---

[7] Copies of the such Supreme Court proceedings were obtained from GGYC's website (www.ggyc.com).
[8] See the press release published on August 28, 2007 on the 33rd America's Cup website "Golden Gate Yacht Club v. Société Nautique de Genève: Arbitration/Litigation status (as of 24 August 2007)".

*(v) that GGYC shall have all such further and other relief as is just and proper in this case".*

[65]   On August 22, 2007, GGYC applied to the same Court to seek an expedited schedule for the case commenced by GGYC's complaint under which discovery (the exchange of information between the parties) would be completed in September and trial would be held in October, and a preliminary injunction requiring that SNG (i) provide GGYC with SNG's club sailing rules and (ii) identify where a two-team match between SNG and GGYC in July 2008 would be held[9].

[66]   On August 22, 2007, the Court granted an order sought by GGYC requiring SNG to promptly answer a request to speed up the legal process for resolving its proposed new rules for defending the next America's Cup[10]. The order only set a schedule for the parties' submissions on GGYC's application and did not address the substance or the merits of the Application[11]. SNG's written response to the motion was due to be filed 5 September and a hearing on the motion before the New York Court is scheduled for 10 September[12].

---

[9] Ibid.
[10] See the press release published on August 22, 2007 on GGYC's website "Golden Gate granted court order to advance America's Cup resolution".
[11] See the press release published on August 28, 2007 on the 33rd America's Cup website "Golden Gate Yacht Club v. Société Nautique de Genève: Arbitration/Litigation status (as of 24 August 2007)".
[12] Ibid.

[67]    In its email to the Panel dated August 31, 2007, SNG stated:

> "*In short, the order accelerates by nine days the time by which SNG must file its first response GGYC's filings, but is restricted to the ex-parte application for an expedited trial, for SNG to provide the location of the match sought by GGYC, and provide the rules and regulations of such match. The date for filing the response is 1500hrs 5th September 2007 and a hearing has been setdown for 1400hrs 10th September 2007 (all NY time) to address these issues.*
> *The order does not affect SNG's application to the Panel or the work of the Panel.*"

## DISCUSSION OF THE ISSUES

### 1.  JURISDICTION OF THE PANEL

[68]    In its letter dated July 27, 2007, GGYC has questioned the validity of the Protocol. GGYC has not, however, alleged that, as such, the arbitration clause contained in the Protocol is invalid.

[69]    It is a well known principle of international arbitration that the validity of an agreement, on the one hand, and the validity of the arbitration clause contained therein, on the other, are two separate and autonomous issues. This is sometimes referred to as the principle of "autonomy of the arbitration clause" or as the doctrine of "separability".

[70]    This has been explained by leading authors as follows:

> "*Most arbitration agreements are, however, contained in an arbitration clause inserted in the main contract. It is primarily in these cases where the autonomy of the arbitration clause is an issue, i.e. the interaction between*

56

*the status of the main contract and the jurisdiction of the arbitrator, What happens if the main contract is deemed to be void or illegal ?, What is the effect of the arbitration clause after the termination of the main contract ? This is the realm of the "doctrine of separability", Further, the autonomy of the arbitration agreement has a bearing on the question of whether the law governing the rest of the contract also extends to the arbitration agreement.*

*The doctrine of separability recognises the arbitration clause in a main contract as a separate contract independent and distinct from the main contract. The essence of the doctrine is that the validity of an arbitration clause is not bound to that of the main contract and vice versa.. Therefore the illegality or termination of the main contract does not affect the jurisdiction of an arbitration tribunal based on an arbitration clause contained in that contract. The obligation to resolve all disputes by arbitration continues even if the main obligation or indeed the contract expires or is vitiated.*

*Separability protects the integrity of the agreement to arbitrate and plays an important role in ensuring that the parties intention to submit disputes is not easily defeated, In this way it also protects the jurisdiction of the arbitration tribunal. While the doctrine of competence-competence empowers the tribunal to decide on its own jurisdiction, the doctrine of separability ensures that it can decide on the merits."*[13]

[71]    No party to this case nor GGYC have challenged the validity of the arbitration clause as such. It therefore does not appear necessary to address the issue. Because, however, third parties may be affected by the present decision and/or by decisions which this Panel could be taking in the future, it has nonetheless appeared appropriate for this Panel to also discuss whether it has jurisdiction to rule on its own jurisdiction, before reviewing whether it has jurisdiction in this particular case.

### *1.1. Issues*

[72]    Accordingly, two different issues are to be decided:

- First, the competence of the Panel to rule on its own jurisdiction;
- Second, if so, the Panel's jurisdiction to rule on the present matter.

### *1.2. Applicable rules and discussion*

#### 1.2.1.  The competence of the Panel to rule on its own jurisdiction

##### 1.2.1.1.    The Protocol

###### 1.2.1.1.1. The provision of the Protocol

[73]    The Panel acquires competence to rule on its own jurisdiction from the Protocol itself. Indeed, Article 23 of the Protocol provides that "*The Sailing Jury and the Arbitration Panel shall have the power to determine their respective jurisdiction upon receiving an application. In case of doubt on whose jurisdiction shall prevail, the Arbitration Panel shall determine jurisdiction. Its decision shall be final and binding*".

###### 1.2.1.1.2. New York arbitration law

[74]    The Protocol provides in Article 26(a) (Rules of Procedure) that:

> "*Both the Arbitration Panel and the Sailing Jury shall act in accordance with New York arbitration law.*"

---

[13] See J. Lew, L. Mistelis and S. Kröll, *Comparative International Commercial Arbitration*, The Hague / London / New York (Kluwer Law International) 2003, Chapter 6, 6-8 to 6-10, pg. 102.

The Panel therefore considers it appropriate to assess whether "*New York arbitration law*" contains any provision which could prevail on the aforesaid Article 23 of the Protocol.

[75]    "*New York arbitration law*" is codified in article 75 of the New York Civil Practice Law and Rules ("**CPLR**").[14]

[76]    It does not appear to this Panel that article 75 of CPLR contains any provision regarding the issue at stake.

### 1.2.1.1.3. U.S. arbitration law in general

[77]    In respect of the issue in the United States in general, Gary Born has said: "*In the absence of a detailed guidance from the FAA [Federal Arbitration Act], U.S. Courts were historically divided over the extent to which an arbitrator had the authority to rule on his own jurisdiction under the FAA. [...] this uncertainty was largely resolved in the United States by the Supreme Court's decision in* First Options of Chicago, Inc. v. Kaplan"[15].

[78]    In *First Options of Chicago, Inc. v. Kaplan*[16], a decision delivered in 1995, the US Supreme Court addressed, *inter alia*, what it defined as the "*who*" question.  The issue in that respect is whether the primary power to decide on the arbitrability of the dispute lies with the arbitrators or with a Court of law.  The US Supreme Court ruled that the answer to the "who" question (i.e. what the US Supreme Court also refers to "*the standard of review question*") depends on whether the parties agreed to arbitrate that particular issue, in other words did the parties agree to submit the arbitrability question itself to arbitration.

---

[14] See A. Sim, *To waive or not to waive : New York and federal law on waiver of the right to compel arbitration*, 43 N.Y.L Sch. L. Review 609.
[15] G. Born, *International Commercial Arbitration: Commentary and Materials,* page 84 (2000).
[16] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995). See also W. Park, *The Arbitrability Dicta in First Options v. Kaplan: What Sort of Kompetenz-Kompetenz Has Crossed the Atlantic?*, 12 Arb. Int'l 137 (1996).

[79]    The US Supreme Court then went on to address the question as to the criteria that should be applied by a Court when deciding whether the parties had agreed to submit the arbitrability question to arbitration (i.e what the US Supreme Court refers to as "*how*" a Court should decide).   Although the US Supreme Court stated that, generally, the Courts should apply ordinary state law principles that govern the formation of contracts, it added an important qualification with respect to the context where a court is called upon to decide whether a party had agreed that arbitrators should decide arbitrability. In that respect, the US Supreme Court stated that courts should not assume that the parties agreed to arbitrate unless there is clear and unmistakable evidence that they did so.

[80]    As already mentioned in point [73] of this decision, Article 23 of the Protocol provides that "*The Sailing Jury and the Arbitration Panel shall have the power to determine their respective jurisdiction ...*".   Accordingly, the parties to the Protocol have clearly, expressly and unmistakably agreed that the arbitrators, i.e. the Panel, would have the power to decide on the question of arbitrability. Consequently, applying the First Option v. Kaplan test, the Panel considers that it has the power to rule on its own jurisdiction.

### 1.2.1.2.    The principle of competence-competence

[81]    Third parties, which are not a Party to the Protocol, might be affected by the present decision. It therefore appears appropriate to note that, since the Panel is technically an arbitral tribunal, the general principle known as "*competence-competence*" applies.

[82]    Pursuant to the competence-competence principle, the Panel has competence to rule on its own jurisdiction.

### 1.2.1.2.1. Meaning of the principle of competence-competence

[83]    The principle of competence-competence "*recognises the competence of the arbitral tribunal to rule on its own jurisdiction [...]*"[17]. Craig, Park and Paulsson have stated that "*In its simplest formulation, competence-competence means no more than that arbitrators can look into their own jurisdiction without waiting for a court to do so. In other words, when one side says the arbitration clause is invalid, there is no need to halt the proceedings and refer the question to a judge*"[18]. This rule is seen by Fouchard Gaillard and Goldman as "*among the most important [...] rules of international arbitration*"[19].

### 1.2.1.2.2. Justification of the principle

[84]    Poudret and Besson have written that the principle of competence-competence is "*essentially based on a practical rationale, namely to avoid that a party which disputes the jurisdiction of the arbitral tribunal prematurely seizes the courts, or obstructs the arbitral process*"[20]. The rule is thus "*intended to ensure that a party does not succeed in delaying the arbitral proceedings by alleging that the arbitration agreement is invalid or non-existent*"[21] and that, above all, "*[...] the most solid justification for the principle [...] lies in the presumed will of the parties to confer on the arbitrators the power to decide all aspects of their dispute, including jurisdiction, while the courts retain the power to control their decision but not to take their place*"[22].

---

[17] J.-F. Poudret, S. Besson, *Comparative Law of International Arbitration*, para. 457 et seq (2007).
[18] L. Craig, W. Park, J. Paulsson, *International Chamber of Commerce Arbitration*, para. 28.07 (1998).
[19] P. Fouchard, E. Gaillard, B. Goldman on *International Commercial Arbitration*, para. 650 (1999).

[20] J.-F. Poudret, S. Besson, *Comparative Law of International Arbitration*, para. 457 (2007).
[21] P. Fouchard, E. Gaillard, B. Goldman on *International Commercial Arbitration*, para. 660 (1999). See also E. Gaillard, *Les Manoeuvres Dilatoires des Parties et des Arbitres dans l'Arbitrage Commercial International*, 1990 Rev. Arb. 759.
[22] J.-F. Poudret, S. Besson, *Comparative Law of International Arbitration*, para. 457 (2007).

### 1.2.1.2.3. A widely recognized principle

[85]    Fouchard, Gaillard and Goldman have underlined that "*The competence-competence principle is now recognized by the main international conventions on arbitration, by most modern arbitration statutes and by the majority of institutional arbitration rules*"[23]. As a consequence, the basic position that an international arbitral tribunal has jurisdiction to consider and decide on its own jurisdiction must be regarded as a generally accepted principle of international arbitration law, which is, absent contrary indication by the parties, incorporated into international commercial arbitration agreements[24].

[86]    The principle is recognized by leading international arbitration conventions. As an example, Article 41(1) of the ICSID Convention provides that "*The Tribunal shall be the judge of its own competence*" (see also Article V para. 3 of the 1961 European Convention).

[87]    The 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, known as the New York Convention, deals with the conditions for recognition and enforcement of foreign arbitral awards. According to van den Berg, although the Convention is silent on the issue of competence-competence (for the reason that it "*only deals with the conditions for recognition and enforcement of awards*"[25]), pursuant to such Convention "*it would make sense that an arbitrator be permitted to rule provisionally on issues pertaining to his competence, subject to subsequent judicial control*"[26].

---

[23] P. Fouchard, E. Gaillard, B. Goldman on *International Commercial Arbitration*, para. 653 (1999).

[24] *See* International Law Commission, *Model Rules on Arbitral Procedure With a General Commentary*, Arts. 1(3), 9 (1958), II Y.B. I.L.C. 83 (1958) (Art. 1(3): "If the arbitral tribunal has already been constituted, any dispute concerning arbitrability shall be referred to it."; Art. 9: "The arbitral tribunal, which is the judge of its own competence, has the power to interpret the compromis and the other instruments on which that competence is based."); ILC, *Memorandum on Arbitral Procedure, Prepared by the Secretariat*, Doc. A/CN.4/35, II Y.B. I.L.C. 157, 165 (1950) ("it seems well-established that the tribunal has the right to judge as to its own powers (competence de la competence)"); *Award in Case of the Betsey (Lord Chancellor Loughborough)*, in J. Moore, *International Arbitrations* 326-27 ("the doubt respecting the authority of the commissioners to settle their own jurisdiction was absurd; and that they must necessarily decide upon cases being within or without, their competency").

[25] P. Fouchard, E. Gaillard, B. Goldman on *International Commercial Arbitration*, para. 654 (1999).

[26] A. J. van den Berg, *Court Decision on the New York Convention*, in *The New York Convention of 1958*, ASA Special Series No. 9, para. 222 (August 1996).

[88]    Competence-competence is also recognized in most of the main international arbitration rules (see Article 6.2 of the ICC Rules, Article 23.1 of the LCIA Rules, Article 21 of the ICSID Rules, Article 21.1 of the Swiss Rules).

[89]    The doctrine of competence-competence has been affirmed by international arbitral tribunals regardless of the applicable law of the seat. The vast majority of arbitration tribunals' conclusions lends support to the doctrine's status as a general principle of international law. This is confirmed by the virtually complete absence of any contemporary arbitral award, under any legal system, denying the existence of the competence-competence principle. In that respect, the *TOPCO v. Libya* preliminary award on jurisdiction, is very widely and frequently mentioned and can thus be considered a leading precedent. In such case, the arbitration tribunal declared that "*International case law has continuously confirmed that arbitrators are necessarily the judges of their own jurisdiction...*" and based its decision primarily on "*... a customary rule, which has the character of necessity, derived from the jurisdictional nature of the arbitration, confirmed by case law more than 100 years old and recognized unanimously by the writings of legal scholars*"[27]. In another frequently mentioned award rendered pursuant to the ICC Rules, the arbitral tribunal explained that "*[t]he principle of 'competence-competence' is widely recognized by doctrine and jurisprudence*"[28].

[90]    There is broad acceptance of the competence-competence doctrine by the UNCITRAL Model Law (art. 16(1)), and by "*most recent laws on arbitration*"[29], notably in Europe (for example, English[30], German[31], French[32], Belgian[33], Dutch[34],

---

[27] *Texas Overseas Petroleum Co v. Government of the Libyan Arab Republic*, Nov. 27, 1975 Preliminary Ad-hoc Award, 17 I.L.M. 1 (1978), IV Y.B. Comm. Arb. 177 (1980).
[28] *Final Award in ICC Case No. 8938*,XX IVa Y.B. Comm. Arb. 174, 176 (1999).
[29] P. Fouchard, E. Gaillard, B. Goldman on *International Commercial Arbitration*, para. 655 (1999).
[30] See Arbitration Act 1996, s. 30.
[31] See ZPO, Art. 1040(1).
[32] See NCPC, Art. 1466. See also, as an example, the *Zanzi* decision (the French *Cour de cassation* ruled in a very general manner that it "is for the arbitrator to determine his own jurisdiction"), 1999 Rev. Arb. 260.
[33] See Belgian Judicial Code, Art. 1697(1).
[34] See Code of Civil Procedure, Art. 1052(1).

Italian[35] and Swiss[36] law have adopted it). Also, "*Recent decisions have confirmed the principle, giving it a very broad scope*"[37].

[91]    In England, the arbitrability of a dispute as to whether an agreement to arbitrate exists (and therefore the recognition of the competence-competence principle) is now beyond doubt: Pursuant to Section 7 of the English Arbitration Act 1996 ("*separability*") "*Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement*"[38]. Competence-competence is enshrined in the English Arbitration Act 1996 at Section 30: "*Unless otherwise agreed by the parties, the arbitral tribunal may rule on its own substantive jurisdiction, that is, as to - (a) whether there is a valid arbitration agreement; (b) whether the tribunal is properly constituted; and (c) what matters have been submitted to arbitration in accordance with the arbitration agreement*".

### 1.2.1.2.4. Effects of the Competence-competence Doctrine

[92]    It is generally considered that the principle has "both positive and negative effects"[39]. Fouchard, Gaillard and Goldman assert that "*The positive effect of the competence-competence principle is to enable the arbitrators to rule on their own jurisdiction, [...]. However, the negative effect is equally important. It is to allow the arbitrators to be [...] the first judges of their jurisdiction. In other words, it is to allow them to come to a decision on their jurisdiction prior to any court or other judicial authority, and thereby to limit the role of the courts to the review of the award. The principle of competence-competence thus obliges any court hearing a claim*

---

[35] See ICCP 2006, Art. 817(1).
[36] See PILS, Art. 186(1).
[37] P. Fouchard, E. Gaillard, B. Goldman on *International Commercial Arbitration*, para. 655 (1999).
[38] See also Harbour v. Kansa [1992] 1 Lloyd's Rep 81; 1993 1 Lloyd's Rep 455.
[39] P. Fouchard, E. Gaillard, B. Goldman on *International Commercial Arbitration*, para. 660 (1999).

concerning the jurisdiction of an arbitral tribunal [...] to refrain from hearing substantive argument as to the arbitrators' jurisdiction until such time as the arbitrators themselves have had the opportunity to do so"[40].

[93]    The Panel therefore determines it has jurisdiction to rule on its own jurisdiction.

### 1.2.2. The Panel's jurisdiction to rule on the present matter

[94]    Article 21 of the Protocol provides that "*Any dispute, protest or claim arising out of or in relation to this Protocol and/or the Applicable Documents, the interpretation or breach thereof, shall be resolved by arbitration in accordance with the provisions of this Protocol, except if and where otherwise expressly set forth in this Protocol. Such arbitration shall be final and binding*".

[95]    Pursuant to Article 1.1(d) of the Protocol, an "*Applicable Document means any document made under authority of this Protocol and includes the documents referred to in Article 2.5*". The documents referred in Article 2.5 include "*(a) the Deed of Gift*" and "*(b) this Protocol*".

[96]    Consequently, such as in the present case, the disputes, protests or claims in relation to the Protocol and/or the Deed of Gift shall be resolved by arbitration.

[97]    Moreover, Article 22 of the Protocol provides that "*There shall be two dispute resolution bodies: a Sailing Jury, which shall interpret provisions or resolve disputes of a sporting or technical nature arising under the Competition Regulations, the Notices of Race, the Sailing Instructions and the Racing Rules, and an Arbitration Panel, which shall interpret all other provisions of this Protocol or resolve other disputes. The Sailing Jury and the Arbitration Panel shall in making any determination give effect to all provisions of this Protocol*".

---

[40] Ibid.

[98]    SNG's Application regards the compliance of the Protocol with the Deed of Gift. It therefore is a "*other disputes*" as referred to in Article 22 of the Protocol. As a consequence, the Panel has jurisdiction to rule on the present case.

### 1.3. Conclusion

[99]    The Panel determines that (i) it has the competence to rule on its own jurisdiction and that (ii) it has jurisdiction to rule on the present matter. The other issues are therefore properly able to be considered by the Panel.

## 2. ELIGIBILITY TO CHALLENGE

### 2.1. Issue

[100]    The Panel has been asked whether the challenge for the 33rd America's Cup made by CNEV on June 29, 2007 is a valid challenge pursuant to the Deed of Gift.

### 2.2. Applicable rules

[101]    The Deed of Gift dated 24 October 1887 contains the following provision relating to eligibility to challenge for the 33rd America's Cup:

> "*Any organized Yacht Club of a foreign country, incorporated, patented, or licensed by the legislature, admiralty, or other executive department, having for its annual regatta an ocean water course on the sea, or on an arm of the sea, or one which combines both, shall always be entitled to the right of sailing a match of this Cup, with a yacht or vessel propelled by sails only and constructed in the country to which the Challenging Club belongs, against any one yacht or vessel constructed in the country of the Club holding the Cup*".

[102]    The qualifications that a challenging yacht club has to meet are in summary:

(a) The yacht club must be "an organized yacht club";

(b) It must be "foreign";

(c) It must be "incorporated, patented or licensed"; and

(d) Have an "annual regatta" on an "ocean course on the sea, or on an arm of the sea, or one that combines both".

[103] The Deed of Gift provides that a yacht club meeting these criteria *"shall always be entitled to the right to sailing a match for this Cup"*. This means that a club holding the Cup cannot, if the criteria set forth in the Deed of Gift are met, deny a yacht club a match for the Cup.

[104] It is not challenged that CNEV is a Spanish yacht club. Accordingly, it is of a foreign country in respect of SNG.

[105] The issues in the present Application are therefore the following:

(a) Is CNEV an organized yacht club?

(b) Is CNEV incorporated, patented or licensed?

(c) Does CNEV have an annual regatta on an ocean course on the sea, or on an arm of the sea, or one that combines both?

(d) Did therefore SNG as trustee have an obligation to accept CNEV's challenge?

### 2.3. Discussion of the submissions

### 2.3.1. Preliminary comment

[106] The Panel accepts SNG's submission that historically one of the traditions of the America's Cup is a broad and liberal interpretation of the requirements of the Deed of Gift as regards the qualifications of challenging yacht clubs and receiving of challenges. The concept has been to permit rather than deny entry to Challengers.

It would appear that this liberal approach is consistent with the terms of the Deed of Gift and with New York law as applied by New York courts with regard to the America's Cup.

[107]   The Panel notes that SNG stated that in 1984 the then Trustee of the America's Cup, the Royal Perth Yacht Cub of Western Australia Inc, petitioned the Supreme Court of the State of New York as to whether the Chicago Yacht Club was entitled to challenge. The issue was whether the Chicago Yacht Club, which held regattas on Lake Michigan, met the obligation in the Deed of Gift to have an annual regatta on "ocean water course on a sea, or an arm of the sea, or one that combines both". Despite Lake Michigan being more than 1500 kilometers from the sea, the Court declared that "…*the Deed of Gift entitles the Chicago Yacht Club, a club of a foreign (i.e. competing) country as contemplated on the Deed of Gift, to enroll and compete as a contestant for the "America's Cup"* "[41].

[108]   RNZYS challenged for the America's Cup for the 26th Match held in 1987, the 28th Match held in 1992, and the 29th Match in 1995. Its challenges were accepted by the then Trustee, Royal Perth Yacht Club of Western Australia Inc. and for 1992 and 1995 by the San Diego Yacht Club. Following RNZYS victory in the 29th Match, it became the Trustee of the America's Cup from 13th May 1995 until its defeat in the 31st Match on March 2, 2003. SNG's submission that throughout such periods RNZYS was neither incorporated, patented nor licensed by any authority has not been disputed, including by RNZYS.

[109]   A letter dated November 30, 2000 from the New York Yacht Club[42] (the first trustee of the America's Cup from 1857 until 1983) to RNZYS, in which it expressed its views on challenger entries, after recommending that a challenger should be capable of becoming a trustee should it win, states "*The New York Yacht Club also believes that it is in the best interests of the America's Cup and within the spirit and*

---

[41] The Royal Perth Yacht Club of Western Australia (N.Y. Sup. Ct.) Order dated 20th September 1984, Index no. 18436/84.
[42] Attached as Annexure 7 to SNG's submission.

*the intent of the Deed of Gift, that as many eligible yacht clubs as possible should be permitted to compete*".

### 2.3.2. What constitutes "an organized yacht club"?

[110] There is no specific guidance in the Deed of Gift as to what constitutes an "organized yacht club".

[111] CNEV provided SNG with evidence that it is organized under the laws of Spain pursuant to the requirements of Spanish law for a club of its nature, and that it has board of directors, rules, and a head office and other facilities. It was incorporated, adopted Articles of Incorporation, made arrangements for sailing events including its annual regatta and appointed officers. The Articles of Incorporation of CNEV include provisions on respect of:

1. "*CNEV is a private sports club endowed with its own legal personality and with the capacity to act in order to achieve its goals and purposes [...] and in particular the promotion of sailing practices through the organization of national as well as international regattas within the national territory [of Spain]*" (Article 1 of CNEV's Articles of Incorporation);
2. "*The duration of [CNEV] shall be unlimited*" (Article 5 of CNEV's Articles of Incorporation);
3. Chapter II provides for "*Types of Members, Admission, Rights and Obligations*";
4. Chapter III concerns "*About loosing the condition of Member*";
5. Chapter IV provides for "*Temporary leave of Members and their return*";
6. Chapter V provides for "*Responsibilities of the Club*";
7. Chapter VI provides for "*Correspondence with other water sports clubs*";
8. Chapter VII provides for "*Representation and Management*";

9. Chapter VIII provides for "*Documents*";

10. Chapter IX concerns "*About the Company's economy*";

11. Chapter X concerns "*Modification of the Articles of Incorporation and dissolution of the Club*".

[112]  Also, in its submission in the present case and in the two affidavits which it filed (see supra point [55] to [57]), CNEV added information as to the composition of its Board of Directors, which is formed by a Chairman and four Vice Chairmen.

**Decision**

[113]  The Panel considers that the CNEV submissions and evidence establish that CNEV is an organized yacht club under the laws of Spain and meets the terms of the Deed of Gift.

### 2.3.3.  What constitutes "incorporated, patented or licensed"?

[114]  A yacht club must be incorporated, or have some other official governmental registration or recognition. There is no requirement in the Deed of Gift as to when or for how long the yacht club must be incorporated. In the Panel's view, under New York law there is no basis for inserting terms or requirements into the Deed of Gift that do not otherwise appear in the text.

[115]  Pursuant to the applicable Spanish law ("Ley del  Deporte de la Comunidad Venciana" nb 4 of December 20, 1993, Clause 42 paragraph 3), a sporting club must file for registration in the Register of Sport Entities of the Community of Valencia. CNEV's Articles of Incorporation were executed by Notarial Deed on, respectively June 19 and 27, 2007 (see above point [49]). CNEV was entered in the Public Register of Sport Entities of the Community of Valencia on June 28, 2007. Accordingly, CNEV has been properly incorporated  and this occurred before July 3, 2007.

[116]  In its submission, SNG identified the officers of CNEV (see supra point [56]) being persons well-known in the international sailing community, who have been associated with prior America's Cups and who are fully familiar with what is needed in order to be a Challenger for the America's Cup.

[117]  SNG also submitted by way of further background:

   (a)  On 17 December 2004, SNG accepted a challenge for the 32nd America's Cup from the Real Federacion Española de Vela because SNG considered that it complied with the requirements of the Deed of Gift.

   (b)  During 2005 SNG received correspondence from the New York Yacht Club and the RNZYS expressing concern at the acceptance of a challenge from Real Federacion Española de Vela, the Royal Spanish Sailing Federation, claiming that the challenge should have been through a yacht club, not a federation of yacht clubs.

   (c)  The letters received were a result of intensive lobbying by BMW Oracle's Mr. Tom Ehman who was at the time Chairman of the Challengers Commission. The members of the Challengers Commission at their subsequent meeting on 4th February 2005 refused to become involved in the issue, and the issue was not raised or protested during the 32nd America's Cup by any competitor, including GGYC.

   (d)  Partly in response to the concerns raised, and to endeavour to avoid doubts for the 33rd America's Cup, the Spanish Sailing Federation challenged through a yacht club representing all of Spain, rather than itself or through a local yacht club that may not attract support from all of Spain.

   (e)  CNEV will be represented by Desafio Español. This is an established and credible competitor in the America's Cup.

[118]  The Panel accepts SNG's submission that there are several historical examples of recently formed yacht clubs to challenge for the America's Cup whose challenge has been accepted by past trustees including the New York Yacht Club, the San Diego Yacht Club and the RNZYS. The examples submitted by SNG are:

(a)  Secret Cove Yacht Club was incorporated on 29th December 1980, three months after the conclusion of the 1980 Cup. It had only been in existence for three months when it made its challenge on 30th March 1981, which was eventually accepted by the New York Yacht Club. Secret Cove had been formed for the sole purpose of challenging for the America's Cup. A recently published authoritative and comprehensive history of the America's Cup noted: *"The challenge came from the Secret Cove Yacht Club of Calgary, an organisation that, for a considerable time, had difficulty in gaining acceptance for its challenge by the New York Yacht Club. Initially, the Canadians were refused entry, but, after six months, the NYYC agreed it was a genuine organisation and not a commercial venture. It had, however, been formed solely for the purpose of challenging, as Marvin McDill, the syndicate head, wished to avoid provincialism within this frequently divided country. He wanted to challenge through a club that had no ties, as he wanted to be able to work with all Canadian sailing clubs without being attached to one of the elitist organisations of the Canadian yachting establishments"[43].*

The purpose and intent in forming the Secret Cove Yacht Club was similar to the purpose and intent of the Royal Spanish Sailing Federation in forming CNEV.

(b)  The Mercury Bay Yacht Club which challenged on 15th July 1987 was incorporated on 30th September 1986, less than 9 months before, and operated out of a derelict car on a beach, which was well publicized and photographed at the time.

(c)  An Australian challenger for 1995, Southern Cross Yacht Club, was incorporated on 19th April 1993, immediately prior to challenging, and was accepted by San Diego Yacht Club. The aforesaid author wrote *"oneAustralia's challenge was through the Southern Cross Yacht Club. This Club was created especially for the challenge, whose spiritual headquarters*

---

[43] Page 70, Volume 2, "An Absorbing Interest: The America's Cup 1851-2003 – A History", by Bob Fisher, John Wiley & Sons Ltd, Chicester, England 2007.

were at Red Rocks Point, a headland in Victoria, south east of Melbourne"[44].

(d) A second Australian challenge for 1995, the Australian Yacht Club, was similarly formed and incorporated for the purpose of challenge and whose challenge was accepted by the San Diego Yacht Club. The author of the above history wrote of this challenge "...Syd Fisher's Australian challenge which was lodged by the Australian Yacht Club, another organisation created especially for an America's Cup Challenge"[45].

(e) In 2000, Dennis Connor challenged through the Cortez Sailing Association. The challenge was accepted by RNZYS. Searches of public records in California show that it does not appear to have been incorporated until 12th August 2002, more than 2 years after it competed in the 2000 America's Cup.

[119] In the Panel's view, the Deed of Gift does not require a yacht club to have been incorporated or otherwise in existence for any particular period prior to acceptance of its challenge. The Deed of Gift also does not require that a challenging club be incorporated for any purpose other than challenging for the America's Cup. Accordingly, there would be no basis under the Deed of Gift for the Trustee to reject a challenge from a yacht club just because that club is new.

[120] CNEV was incorporated for the purpose to challenge in the 33rd America's Cup in order to avoid further controversies about the capacity of the Royal Sailing Federation to become Challenger under the Deed of Gift and, which is more relevant, the availability of such federation to become trustee under the Deed of Gift. As CNEV claims in its submission, it is "not a 'ghost' club but is simply a new Club with the firm intention of being a normal Club and eager to organize Regattas at the Sea".

---

[44] Ibid Page 180, Volume 2.
[45] Ibid Page 180, Volume 2.

[121]   The Panel deems it appropriate to comment in that respect about the statements made by GGYC[46] that SNG only has "*masquerading as adversaries*"[47] and that clubs opposed to SNG and CNEV "*are frozen out from the adjudication*"[48]. GGYC chose not to fully participate in this arbitration which it was invited to do, including on a without prejudice basis. Four other clubs, all of which are of substance, namely RCYC, RTYC, RNZYS and DCYC, have had their challenges accepted and have been a formal part throughout this case. None of such challenging clubs have submitted that they support the GGYC views.

**Decision**

[122]   The Panel considers that the submissions and evidence from CNEV and SNG establish that CNEV meets the requirements of being "*incorporated, patented or licensed*" in terms of the Deed of Gift.

### 2.3.4. What constitutes an "annual regatta"?

**SNG's submission**

[123]   SNG submitted that there is no requirement in the Deed of Gift that an annual regatta be held before a challenge is made by a yacht club.

---

[46] See GGYC's letter to the Panel's Chairman dated July 27, 2007 (point [14]).
[47] Ibid., page 3, paragraph 2.
[48] Ibid., page 2, last paragraph.

[124] SNG further submitted that, as a matter of practice among America's Cup participants, it is recognized that a regatta need not be held before a challenge is made. This concept was affirmed by the then America's Cup Arbitration Panel appointed under the Protocol Governing the 31st America's Cup in a decision delivered on 17 December 2000 in respect of SNG's then challenge for the America's Cup. The Panel ruled at paragraph 16:

> "[16] Neither the Deed of Gift nor the Protocol have any provision requiring the annual regatta to have been held prior to the lodging of a challenge, nor that the annual regatta must have been held more than once. The only requirement is that the challenging club must be a yacht club "having for its annual regatta an ocean water course on the sea [...]" If it has such a regatta, it is eligible".

[125] Such 31st America's Cup Arbitration Panel decision and the lack of SNG holding an annual regatta prior to challenging was never contested by GGYC whilst a competitor in the 31st America's Cup. SNG submitted that under the provisions of the then applicable Protocol, if SNG would have been ineligible to proceed to the Match for the America's Cup against the then defender, GGYC's representative would have proceeded to that Match to compete for the America's Cup.

[126] As another example, Secret Cove Yacht Club of Canada, which challenged for the 1983 Cup, was a newly formed club when it challenged and had never held an annual regatta at the time of its challenge. Its first annual regatta was at the time of acceptance scheduled for many months later, on 10th October 1981. Notwithstanding that Secret Cove had never before held a regatta, the New York Yacht Club ultimately accepted its challenge.

**Decision**

[127] The Panel determines that CNEV was not required to hold an annual regatta prior to acceptance of its challenge.

[128]  The Panel further determines that CNEV fulfills the "annual regatta" requirement of the Deed of Gift[49]. On July 13 and 14, 2007, CNEV held an Optimist Regatta in Santander[50]. It confirmed, before acceptance of its challenge, that it will hold annual regattas on the sea throughout the duration of the 33rd America's Cup. It has now organized the "Vuelta a España" Regatta, that is currently taking place from September 2 to September 24, 2007[51].

### 2.3.5. Trustee duties

[129]  Under the terms of the Deed of Gift, SNG submitted that it is obliged to accept the first valid challenge it receives.

[130]  The Deed of Gift provides in the last sentence of its 11th paragraph "*And when a challenge from a club fulfilling all the conditions required by this instrument has been received, no other challenge can be considered until the pending event has been decided*".

[131]  The Deed uses the word "event" in this passage rather than the word "match" or "races" which are frequently used elsewhere. This indicates an intention to cover a wider potential time period than just the match itself.

[132]  The New York Supreme Court described the limited options available to the trustee when it receives a valid challenge in its ruling regarding the Mercury Bay case when it considered the validity of the Mercury Bay Boating Club's challenge:

> "*Therefore, in the face of a properly tended challenge, San Diego Yacht Club, having accepted the cup pursuant to the terms of the Deed may either accept the challenge, forfeit the cup, or negotiate agreeable terms with the*

---

[49] See CNEV's submission and the affidavit by Mr. Manuel Chirivella.
[50] See affidavits by Mr. Manuel Chirivella and Mr Gerardo Pombo García, and Annex A to the submission of CNEV.
[51] See affidavit of Mr. Gerardo Pombo García, Annex B to the submission of CNEV and documents filed by CNEV on September 5, 2007.

*challenger....Accordingly, the relief requested by the parties is granted solely to the extent of declaring that Mercury Bay Boating Club has tended a valid challenge and that San Diego yacht club must treat it as such in accordance with the terms of the Deed".*[52]

This particular decision in the Mercury Bay case was not appealed, and remains good law on how SNG should act when presented with a challenge which on its face is valid.

[133]  SNG as trustee of the America's Cup submitted that it determined that the challenge of CNEV complied with the terms of the Deed of Gift in a manner consistent with similar decisions made by past trustees, and with the decisions of the New York State Courts.

**Decision**

[134]  As soon as a challenge *"has been received from a club"*, the Deed of Gift, by stating that *"no other challenge can be considered"*, does not permit any consideration to another challenger. The Deed thus does not permit to negotiate with several potential challengers of record.

[135]  Nothing in the Deed of Gift leaves it open to a third party to question those terms agreed as acceptable by the trustee and the Challenger of Record. If invited to participate, a challenger has the freedom to enter the competition or not at the agreed terms.

[136]  No one is obligated to compete. If it wants to compete, this has to be under the rules agreed by SNG and CNEV. This has been the position of America's Cup Challengers for a long period of time.

---

[52] Mercury Bay Boating Club Inc. v. San Diego Yacht Club and Royal Perth Yacht Club of Western Australia Inc (N.Y. Sup. Ct.) (Judgment dated 25th November 1987, Index No. 21299/87 and 21809/87).

[137]  The first challenge received by SNG, as trustee, was from CNEV and, as such, SNG was obliged to accept CNEV's challenge.

### 2.4. Conclusion

[138]  The Panel determines that CNEV's challenge meets the requirements of the Deed of Gift.

[139]  The challenge for the 33rd America's Cup made by CNEV on July 3, 2007 entitles CNEV to challenge for the America's Cup as Challenger of Record, and SNG is obligated to accept (as it was the first valid challenge it received).

## 3.  COMPLIANCE OF THE PROTOCOL WITH THE DEED OF GIFT

### 3.1. Issue

[140]  The Panel now turns to the issue whether the Protocol signed by SNG and CNEV meets the requirements of the Deed of Gift.

[141]  The Panel considers that this issue can be usefully subdivided in 2 sub-issues, namely:

(i)   Does the Protocol comply with the Deed of Gift?

(ii)  Should some specific clauses be reconsidered by the Defender and the Challenger of Record?

### 3.2. Applicable rule

[142]  Pursuant to the Deed of Gift, "*the Club challenging for the Cup and the Club holding the same may, by mutual consent, make any arrangement satisfactory to both as to the dates, courses, number of trials, rules and sailing regulations, and any and all*

*other conditions of the match, in which case also the ten months' notice may be waived."*

### 3.3. Discussion

#### 3.3.1. Does the Protocol comply with the Deed of Gift?

[143]   SNG submitted that the Deed of Gift contemplates that the club challenging for the Cup and the Club holding the Cup should make reasonable efforts to make satisfactory arrangements regarding the Match to be held. They submitted it is recognized by the New York State Court of Appeals in the Mercury Bay opinion that there is no duty on either party when arriving at mutual consent.

[144]   Pursuant to the Deed of Gift, "*any arrangement*" can be made "*by mutual consent*" provided these requirements are "*...satisfactory to both* ['the Defender and the Challenger of Record']". Here, SNG and CNEV have so agreed in the Protocol, and that agreement should be recognized under the Deed of Gift.

[145]   If they fail to agree, the Deed of Gift specifies in detail how the match is to take place. If there is no mutual consent, one of those default terms is that the match is to be "*sailed subject to its* [the Defender's] *rules and regulations so far as the same do not conflict with the provisions of this Deed of Gift"*. Subject only to a few provisions which are expressly stated in the Deed of Gift, the donor thus intended for the Defender to establish the rules where there is no agreement.

[146]   There is, in particular, no obligation on the Defender and the Challenger of Record to hold a challenger selection series. This is confirmed by the judgment of the Supreme Court of the State of New York[53] delivered in the *Mercury Bay* case:

---

[53] Mercury Bay Boating Club Inc. v. San Diego Yacht Club and Royal Perth Yacht Club of Western Australia Inc (N.Y. S. Ct) (Judgment dated 6th April 1988, Index No. 01569/88).

*"Under the terms of the deed, unless the parties can agree to another format, the parties must sail a 1-on-1 match race for the cup. Significantly, nowhere in the deed is the possibility of a challenger elimination series mentioned and in fact, throughout much of its history, the America's Cup has been held as a match race. The multinational format was introduced relatively late in the events history, in the* 1950s [sic – the first multinational series was held in 1970]*".*

*"Examination of the deed and the America's Cup traditions make it clear that the multi-nation elimination format is permissible under the mutual consent clause, but absent mutual agreement a multi-nation series may not be forced upon the competitors".*

This judgment was not appealed and remains good law.

[147]   Under the Deed of Gift, the right of competing is for the first club to challenge. The competition among challengers, the so-called Challenger Selection Series, may – but does not have to – be created by mutual agreement of Defender and Challenger of Record, who are free to do it or not. Therefore, if potential challengers have no right to compete, they have no right to object the Protocol.

[148]   If there is no obligation to hold a Challenger Selection Series, there can be no duties owed to other actual or potential challengers regarding how that series is structured. In any event, there can be no duty owed to potential challengers who may or may not enter the next competition.

[149]   SNG and CNEV reached terms satisfactory to them by mutual consent as to the conduct of the 33rd America's Cup. No other party is entitled to disturb those arrangements, although it remains open for prospective challengers to review those terms and decide whether or not to apply to participate in the competition. As CNEV stated in its submission, *"No one is obligated to compete but if it wants to compete it has to be under the rules agreed by [SNG] and [CNEV]."*

### 3.3.2. Should some specific clauses be reconsidered by the Defender and the Challenger of Record?

[150]  The Panel does not have the power to amend the Protocol. It however has the power to state that one or more provisions of the Protocol do not comply with the Deed of Gift. Without stating absolutely that specific clauses of the Protocol are not complying with the Deed of Gift, the Panel deems that it is accordingly also entitled to state that it would be preferable to reconsider some clauses of the Protocol and to invite the parties thereto to do so.  This was for instance suggested by the 32nd America's Cup Jury in its decision April 6, 2007 (Case ACJ025, point [59] (iii) *"... the Jury recommends that a Protocol change is made which could be limited to this particular case."*).

[151]  GGYC, in its letter to the Chairman of this Panel dated July 27, 2007 (see supra point [14]), has raised doubts about a number of matters including the following:

- Right of the Defender and Challenger of Record to dismiss and replace the Panel members;
- Right of the Defender and Challenger of Record to change the language of the proceedings;
- Right of the Defender and Challenger of Record to change the Panel Rules of Procedure;
- Right of the Defender and Challenger of Record to modify the powers of the Panel;
- Right of the Defender and Challenger of Record to modify the jurisdiction of the Panel;
- Right of the Defender and Challenger of Record to cancel a team which has been accepted as Challenger by the Defender.

[152]  A general principle governing international arbitration is that the parties are free to agree on the modalities of appointment or substitution of the members of the

arbitration tribunal, about its seat and about all other issues which shall govern the procedure of the arbitral process.

[153] Since the clauses which are criticized by GGYC are the result of an agreement reached by the parties to the Protocol (both the initial parties as well as the four yacht clubs which adhered thereto at a later stage without any reservation), this Panel considers that the aforesaid clauses of the Protocol are valid.

[154] The Panel however recognizes that some of the concerns raised by GGYC should be considered. It is in fact quite seldom for a party to appoint an arbitration panel the members of which can be revoked at any time. This might not be disturbing in an isolated matter considering that, in such case, it is a generally accepted principle in international arbitration that the parties to the litigation fully control the arbitration process[54]. As a consequence, if all parties to such specific case jointly agree, they have the right to modify the procedure or even to terminate the case, which includes the right to revoke the arbitrators' assignment.

[155] The question at stake here is however different. It is in fact not about two specific parties which are litigating about a specific case in front of a specific arbitration tribunal. It is about the rules governing the functioning of an arbitration panel which is set up with an almost institutional function, for an unknown but in any event a plurality of forthcoming cases, involving a plurality and not yet known number of parties. Also, only two of these parties (the Defender and the Challenger of Record) do, under the current wording of the Protocol, enjoy the rights which are criticized by GGYC. This creates or might create an inequality of treatment amongst all parties which accept to submit to the jurisdiction of the Panel.

---

[54] P. Fouchard, E. Gaillard and B. Goldman on *International Commercial Arbitration*, para. 752 et seq (1999) ("The primacy of the parties' agreement").

[156] For these reasons, the Panel is of the opinion that it would be appropriate for the Protocol to be reconsidered by SNG and CNEV in respect of the following points:

- Right to dismiss and replace the Panel members (Article 24.3 of the Protocol);
- Right to change the arbitration seat (Article 25 of the Protocol);
- Right to change the language of the proceedings (Article 27 of the Protocol);
- Right to change the law applicable to the proceedings (Article 26(a) of the Protocol);
- Right to modify the jurisdiction of the Panel(Articles 21 and 23 of the Protocol);
- Right to modify the powers of the Panel (in general).

[157] In addition, it would be appropriate for consideration to be given to amending the Protocol whereby once the Rules of Procedure have been agreed and enacted pursuant to clause 26(c) of the Protocol, the Rules of Procedure might only be revoked or amended following consultation with this Panel and approval by the same.

[158] GGYC has also stated in its letter to the Panel dated July 27, 2007 that "*An adjudicatory proceeding over the validity of the Protocol in which a yacht club must accept the Protocol before they can challenge its validity, while SNG retains the right to terminate their standing if they challenge any provision of the Protocol, is a fatally flawed proceeding*". The Panel considers that this issue can be properly solved by interpreting the Protocol as it stands. In fact, as a matter of principle, an accepted Challenger is entitled to submit to the Panel any issue regarding the Protocol, including its provisions. By doing so, it is thus not in breach of the Protocol and its standing as Challenger cannot, for this simple reason, be terminated. Pursuant to Article 35 of the Protocol ("*Resort to Courts Prohibited*") – but this is a different issue – , there would be a breach of this Protocol if a "*person or entity, including its officers, members and employees, having the right to make an*

*application to the Sailing Jury or the Arbitration Panel hereunder [...] resort to any other court or tribunal than the Sailing Jury or the Arbitration Panel."*

[159] The Panel's suggestion that the above matters be reconsidered does not mean that, as a consequence, the Protocol as it stands does not comply with the Deed of Gift.

### 3.4. Conclusion

[160] The Panel determines that the Protocol signed by SNG and CNEV on July 3, 2007 complies with the Deed of Gift.

[161] The Panel however believes that it would be appropriate for the Defender and the Challenger of Record to reconsider the Protocol in respect of certain specific points referred above at points [155] and [156].

## SUMMARY OF THE DECISION

[162] The decision of the Panel is the following:

- The Panel (i) has the competence to rule on its own jurisdiction and (ii) also has jurisdiction to rule on the present matter;
- The challenge for the 33rd America's Cup made by CNEV on July 3, 2007 (i) is a valid challenge entitling CNEV to challenge for the America's Cup as Challenger of Record and (ii) SNG is obligated to accept (as it was the first valid challenge it received);
- The Protocol signed by SNG and CNEV on July 3, 2007 complies with the Deed of Gift; and
- Although this does not affect the compliance of the existing Protocol with the Deed of Gift, the Panel believes that SNG and CNEV should consider

amending the Protocol in respect of some of its provisions as stated in point points [155] and [156].

## PUBLICATION OF THE DECISION

[163]  This decision shall be immediately published by ACM by placing it on the 33rd America's Cup website (www.americascup.com).

## COSTS

[164]  Article 34(b) of the Protocol provides that:

> *"The Arbitration Panel shall award all costs it has or will incur to resolve the arbitration to one or more parties to an application as it considers equitable provided that the starting basis shall be that the losing party or a party seeking an interpretation will be liable for all costs to resolve the arbitration."*

[165]  The Panel was required in the circumstances of the case to carry out substantive activity and give consideration to significant issues raised by GGYC. The case is important and complex. Although no party required a hearing, recognizing the significance of the case the Panel members met in person prior to delivering the decision. The time spent by Panel members was accordingly substantial. Pursuant to Article 34(b) of the Protocol, the Panel costs on the Application are fixed at EURO 86,900 (Eighty Six Thousand Nine Hundred).

[166]  This Application has been made by SNG in order to obtain clarification about fundamental issues. The only opponent is GGYC, which has however chosen to limit its direct involvement in these proceedings to the filing of a letter, and which has not challenged and/or been accepted as Challenger.

[167]   Accordingly, all costs shall be payable by SNG. Taking into account their advance on costs of EURO 25.000. SNG shall pay to the Panel the balance amounting to EURO 61,900.

[168]   This is a unanimous decision.

The America's Cup Arbitration Panel



Professor Henry Peter, Chairman

Graham A. McKenzie and  Professor Luis María Cazorla Prieto, Members

**EXHIBIT I**

# 33rd America's Cup

## THREE PRESTIGIOUS MEMBERS NOMINATED FOR ARBITRATION PANEL

31-07-2007

AC Management (ACM), as the Event Authority for the 33rd America's Cup, is pleased to announce the nomination of the Arbitration Panel that will resolve disputes in the frame of the 33rd America's Cup, except sporting and technical issues which will be solved by a separate Sailing Jury to be established by the end of the year. The Arbitration Panel will also act as an appeal body for decisions of the Sailing Jury.

The Arbitration Panel will be composed of three members with a long-term experience in sports law: Professor Henry Peter, from Switzerland, who will chair the Panel, Graham McKenzie, from New Zealand and Luis María Cazorla Prieto, from Spain. Both Mr.McKenzie and Professor Peter served on the Jury of the 32nd America's Cup. Prof. Henry Peter was also a member of the 31st America's Cup Arbitration Panel.

### Arbitration Panel Member Profiles

**- Henry Peter**
Swiss and French nationality. Obtained a Law Degree (1976–1979) and Diploma of Superior Studies (DES) in commercial law at the Law School of the University of Geneva (1983). He was admitted to the Geneva bar after ranking first among all candidates (November 1981). Was a teaching assistant at the University of Geneva (1982-1983) and visiting scholar at the University of Berkeley, California (1983-1984). Worked with the law firm Carter, Ledyard & Milburn in New York before establishing himself as a Lawyer in Lugano (Ticino, Switzerland) in 1984. Obtained his PhD in Law in Geneva in 1988. Has been partner of his firm since 1988 (currently Peter, Bernasconi & Partners). Since October 1997, is Professor at the Department of commercial law of the University of Geneva and, since 1998, Head of the joint Master in Business Law (HBL) program of the Universities of Lausanne and Geneva.
Since November 2001 he is Vice-Chairman of the disciplinary chamber of the Swiss Olympic Association in charge of doping cases; between 2003 and 2006 he has been Chairman of the Geneva Business Law Association (AGBA); since 2003 he is member of the Swiss experts group on company reorganisation appointed by the Federal Office of Justice. Since 2004 he is member of the Swiss Takeover Board and, since 2007, of the Sanction Committee of the Swiss Stock Exchange (SWX). Since 1994 he is consul of Sweden for the Italian part of Switzerland.
Other merits: Member of the editing board of the Swiss Review of Business Law, member of the board of the Centre of banking and financial law of the University of Geneva,, frequently arbitrator in international disputes relating to commercial and sports matters, director of several Swiss and foreign companies. He is the author, co-author or editor of several books and numerous scientific publications.

**- Graham McKenzie**
A recently retired partner (1982-2006) in the major law firm Bell Gully, in New Zealand. He obtained a Bachelors of Law degree at Victoria University of Wellington (1974) and a Masters of law degree from Warwick University, England (1978). He is a Notary Public. He is admitted as a Barrister and Solicitor in New Zealand and Queensland, Australia.
He has extensive experience of acting for large corporates in share and asset acquisitions relating to either selling or purchasing of existing businesses. He has been involved with a number of substantial joint venture projects in New Zealand and overseas. His corporate experience includes advising a range of corporate sectors including the aircraft, super yacht, construction, food and technology and wine industries.
Mr.McKenzie is a Director of several public companies. He is Deputy Chairman of Saint Kentigern Trust Board (a substantial New Zealand educational Trust) and a Trustee of the Bruce McLaren Trust. He has sailed both competitively and for leisure in New Zealand and the Pacific for many years in a wide range of yachts.
He was a member of the Americas Cup Jury for the 32nd Americas Cup.

**- Luis María Cazorla Prieto**
Doctor of Law with Special and highest Distinction at the Complutense University, Madrid; Professor doctor of Financial and Taxation Law at the King Juan Carlos University, Madrid, at the present moment, Complutense University, Madrid (1977-1995) and Burgos University (1995-1999); practicing Lawyer, head of practice specialising in Taxation, Business, Administrative, Sport and Labour Law. He was awarded the Grand Cross of San Raimundo de Peñafort (2005), the highest Spanish distinction for a jurist, and the Medal of Sporting Merit (1998).
Cazorla is the author of more than forty books about law, sport, sociology and literature. Throughout his career he has held the following positions: Director General Tax Minister's Office (1979-1981), Secretary General of Congress of Deputies (1982-1988), Chief Counsel to the Spanish Parliament (1982-1988), Secretary General of the Central Electoral Commission (1982-1988), Vice-president Editorial Committee of Thomson-Aranzadi Press (1998), Member of the CDI 2000 Commission of the International Olympic

▣▣▣▣

**NEWS**

05-09-2007
» Alinghi and ACM forward with plans America's Cup

28-08-2007
» Golden Gate Yacht Société Nautique d Arbitration/Litigat (as of 24 August 2

31-07-2007
» Three prestigiou nominated for Arbi

25-07-2007
» 33rd America's C published: Valenci 2009...and more.

24-07-2007
» Two more Challe the 33rd America's

«   »

**ENTRY**
» 33rd America's C

**DOCUMENTS**
» Protocol
» Notice of Entry

**GGYC case court**
» Memorandum of opposition to Prelin Injunction
» Affidavit - Mique
» Affidavit - Hamis

**LINKS**
» Auction
» 32nd America's C Website

Committee and its Executive Committee (1999), Member of the Juridical Commission of the International Olympic Committee (2000-2002) and the Commission Law and Sport of the Olympic Committee (2005-2007), General Secretary of the Board of Directors of Bolsas y Mercados Españoles, Holding Society of Mercados y Sistemas Financieros, S.A. (Spanish Stock market) (2002), first Vice-president of the Spanish Olympic Committee (2005-2007), He was also Vice-Chairman of the Court of Arbitration of the Spanish Olympic Committee and Vice-president of the Spanish Sport Law Association.

**EXHIBIT J**

1

86KGTEAC

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   TEAM NEW ZEALAND LIMITED,

 4               Plaintiff,

 5          v.                          08 CV 2228 (WHP)

 6   NAUTIQUE DE GENEVE, et al.,

 7               Defendants.

 8   ------------------------------x
                                       New York, N.Y.
 9                                      June 20, 2008
                                       11:05 a.m.
10
     Before:
11
                     HON. WILLIAM H. PAULEY III,
12
                                       District Judge
13
                         APPEARANCES
14
     BOIES, SCHILLER & FLEXNER LLP
15        Attorneys for Plaintiff
     BY:  PHILIP M. BOWMAN
16        JOSH STILLMAN
          JOHN LASALLE
17
     SIMPSON THACHER & BARTLETT LLP
18        Attorneys for Defendants
     BY:  BARRY R. OSTRAGER
19        LAURA D. MURPHY
          CHRIS LEE
20

21

22

23

24

25

86KGTEAC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel for the plaintiff.

3          MR. BOWMAN:  Your Honor, Philip Bowman from the law

4     firm of Boies, Schiller & Flexner for Team New Zealand.  I'm

5     with my associate John LaSalle, and Josh Stillman is a summer

6     associate with our firm.

7          THE COURT:  Good morning, Mr. Bowman.

8          MR. BOWMAN:  Good morning.

9          MR. OSTRAGER:  Barry Ostrager from Simpson Thacher

10    with my colleague Laura Murphy and our summer associate Chris

11    Lee.

12          THE COURT:  Good morning, Mr. Ostrager.  All right.

13    This is an initial conference, and I see from the letters that

14    I have received that everyone wants to make motions of one kind

15    or another.  And I have a nearly completely briefed motion for

16    remand before me at this juncture.  Who wants to be heard on

17    how best to proceed?

18          MR. OSTRAGER:  I would, your Honor.  As reflected in

19    the letters that we sent with respect to each case, it's our

20    intent to move to compel arbitration in each of the matters by

21    virtue of the fact that the plaintiff participated in protocols

22    for the 33rd America's Cup, which contained a broad arbitration

23    clause which we contend compels them to be required to

24    arbitrate any complaints that they have before a fully

25    constituted arbitration panel that's been established pursuant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86KGTEAC

1  to the protocols of the 33rd America's Cup.

2      And so what we would propose is that we be allowed to

3  make our motion to compel arbitration and that motion be heard

4  simultaneously with the motion to remand.  I believe that my

5  colleagues from Boies Schiller have agreed that discovery could

6  be stayed in this matter until the motion to compel arbitration

7  is decided, which I think is the orderly way to proceed.  And

8  we can make our motion to compel arbitration within two weeks,

9  if that's satisfactory to the Court.

10      THE COURT:  My sense would be that we need to have the

11  motions to compel arbitration catchup to the remand motions so

12  that I can hear them together.  And to the extent that we can

13  minimize the delay with respect to hearing the remand motion by

14  accelerating the motion to compel arbitration, I'm on the same

15  page with the parties.

16      I take it, Mr. Bowman, you're in agreement?

17      MR. BOWMAN:  Your Honor, we're in agreement, for the

18  most part.  There's a couple of exceptions.  There's one other

19  issue, at least, which is their motion to dismiss and whether

20  that should be briefed at the same time as well or that that

21  should be put off until the motion to compel arbitration has

22  been heard and decided.

23      The other issue is that we agree that discovery should

24  be put off, but with one limited exception.  We may need to

25  take some discovery on the issue of the arbitrability of these

4

86KGTEAC

1   claims, some very limited discovery.  And we expect --

2        THE COURT:  What discovery would you have in mind?

3        MR. BOWMAN:  The issue, your Honor, is whether the

4   statutory rights of the plaintiff under the antitrust laws can

5   be fairly vindicated by the panel that has been appointed in

6   this case.  We believe that it wouldn't be, and we think that

7   by taking some limited discovery, we'd be able to establish

8   that.

9        THE COURT:  What discovery would you be seeking to

10  take?

11       MR. BOWMAN:  It would be discovery relating to the

12  contacts, the ex parte contacts between the defendants and the

13  arbitration panel during the course of a previous arbitration

14  and since that time.

15       THE COURT:  In one of your letter submissions, you've

16  also raised an issue about the impartiality of the panel.

17       MR. BOWMAN:  Right.  That's part of the issue.  We

18  believe that the panel has demonstrated its bias in the

19  previous arbitration that took place.  There's one arbitrator

20  in particular that has close ties to the defendant, we believe,

21  but we believe the entire panel is biased and therefore, as a

22  result, would be unable to fairly vindicate the plaintiff's

23  statutory claims.

24       THE COURT:  Mr. Ostrager?

25       MR. OSTRAGER:  Your Honor, I think these are all

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86KGTEAC

1    issues that should be addressed in the briefing.  Certainly the

2    arbitrability of the antitrust claims is something about which

3    there's extensive case law.

4         As respects the arbitration panel, it's a factual

5    matter that TNZ voluntarily subscribed to the protocols,

6    including the protocol provisions that identify who the

7    arbitrators would be.  Two of the three arbitrators to the 33rd

8    America's Cup were arbitrators in the 32nd America's Cup.  Team

9    New Zealand is no stranger to America's Cup racing and its

10   protocols.  Team New Zealand was an America's Cup holder in the

11   31st America's Cup and a finalist in the 32nd and 33rd

12   America's Cups.  So they're very familiar with the protocol

13   procedure.  There were protocols containing arbitration

14   provisions in the 31st America's Cup and the 32nd America's Cup

15   and in the 33rd America's Cup.

16        And I agree with Mr. Bowman that we can defer briefing

17   on the motion to dismiss the antitrust claims with contract

18   claims, and I agree that if we file our motion to compel

19   arbitration in two weeks, we won't be that far behind the

20   briefing schedule on the remand motion, because their reply

21   brief on the remand motion hasn't yet been filed.  And so I

22   would think we could have a fully submitted motion to compel

23   arbitration within a month.

24        And I don't believe that any discovery is required on

25   the issues Mr. Bowman raised, and if there is a need for

86KGTEAC

1    discovery, I think it's something that they have to

2    particularize in their briefing, because I see this as a fairly

3    straightforward legal issue.  The antitrust claims either are

4    or are not arbitrable, and the protocols either are or are not

5    binding on TNZ.

6         MR. BOWMAN:  Your Honor, there are some factual

7    issues.  It's not as clear-cut that the antitrust claims are

8    necessarily always arbitrable.  The leading case law, Supreme

9    Court case, is Mitsubishi Motors, and that says that antitrust

10   claims and other statutory claims can be arbitrated, provided

11   that the statutory rights of the plaintiff can be fairly

12   vindicated.

13        And so in that case it was clear the panel was subject

14   to the rules of the Japan Arbitration Association.  One of the

15   panel members was an expert in antitrust law.  Two of the

16   others were former dean of a law school and a former judge.

17   And so the Court found comfort that the statutory rights would

18   be vindicated but made quite clear that that wasn't necessarily

19   always the case.  So it was a factual question that we think we

20   need discovery on whether this panel can fairly vindicate the

21   plaintiff's rights.  And we can articulate that in our

22   briefing, if that's the way you would like to hear it.

23        THE COURT:  Actually, what I would like -- I think

24   what I would like to do is get letters -- I'm going to fix a

25   briefing schedule now that will culminate in an oral argument

7

86KGTEAC

1    date for both the remand motion and the motion to compel

2    arbitration, but rather than wait until opposition papers are

3    submitted in connection with the motion to compel arbitration

4    that the defendants want to make, I think that when the

5    plaintiff is prepared to articulate specifically what discovery

6    it believes it needs in connection with these motions, that a

7    letter should be submitted to the Court so that I can decide

8    that question promptly and not have us all come back for oral

9    argument to find out at that point that there is some discovery

10   that should be conducted.

11           MR. BOWMAN:  We'll do that, your Honor.

12           THE COURT:  Does that make sense --

13           MR. BOWMAN:  It does.  We'll do that, your Honor.

14           THE COURT:  Okay.  So if the defendants are prepared

15   to file their motion, Mr. Ostrager, two weeks from today is a

16   federal holiday, so how about Thursday, July 3rd?

17           MR. OSTRAGER:  That's fine.

18           THE COURT:  All right.  File your motion on Thursday,

19   July 3rd.  And when do you think you'd be in a position to

20   oppose the motion?

21           MR. BOWMAN:  As I said, I think we need a little bit

22   of limited discovery.  We could probably -- four to six weeks.

23           THE COURT:  Do you need to see their motion papers

24   before determining what discovery you need?

25           MR. BOWMAN:  I think we can have a pretty good idea

8

86KGTEAC

1    before we see it.  It depends a little bit on how quickly we

2    get the discovery that we need from the defendant.  That's why

3    I'm a little hesitant to say when we could put in our

4    opposition.

5         THE COURT:  Well, until we all understand the precise

6    parameters of that, I think it's going to be difficult.  Let me

7    set some dates.  You say you need -- do you want four weeks?

8         MR. BOWMAN:  If we can get the discovery promptly, I

9    think we can do it in four weeks.  Can we set that as a

10   tentative response time?

11        THE COURT:  You'll respond.  You'll oppose the motion

12   by July 31.  And we're going to back into this in a moment with

13   respect to the discovery issue, but let me just try to fix a

14   briefing schedule that makes sense.

15        July 31 for opposition.  Mr. Ostrager, how much time

16   do you want to submit a reply?

17        MR. OSTRAGER:  Just a week is fine.

18        THE COURT:  All right.  August 7th.  And I'll set the

19   matter down for oral argument on September 5 at eleven o'clock.

20        MR. OSTRAGER:  That's fine, your Honor.  This is all

21   without prejudice to our opposing their application for

22   discovery upon appropriate --

23        THE COURT:  I understand that.  Let's turn back to

24   that right now.  Of course I live in hope that to the extent

25   that the plaintiff has a need for discovery, that, together,

86KGTEAC

1    the defendant can accommodate that, but I think that the

2    plaintiff should -- let me put it to you, Mr. Bowman:  When is

3    it that you could frame the discovery issues for defendant, and

4    then ultimately for the Court, if there's no resolution?

5         MR. BOWMAN:  We could do that, your Honor, certainly

6    by the end of next week.

7         THE COURT:  All right.  So if the discovery issue --

8    if you can't work it out by July 7th -- actually, make it

9    Tuesday, July 8th -- you will submit a joint letter framing the

10   discovery dispute and the parties' respective positions, and I

11   will relax my page limitation on that letter so that the

12   parties can put it in one document no more than seven pages.

13   And as soon as I see that letter, I'll fix a time either to

14   hear further from you on the telephone or in person so that I

15   can rule on that matter promptly and minimize any impact on the

16   briefing schedule we fixed.

17        With respect to the case in which there's a pending

18   motion for remand, when does the plaintiff think it's

19   appropriate to put in your reply?

20        MR. BOWMAN:  I believe, your Honor, we intend to put

21   that in on the 25th, which is Wednesday of next week.

22        THE COURT:  All right.  That's fine.  So I'll enter an

23   order fixing this schedule, and I'll wait to hear as to whether

24   or not you have resolved any discovery issue among yourselves

25   or whether the Court will have to resolve that dispute.

10

86KGTEAC

1          I take it that one of the issues that's going to be

2   briefed is whether the protocol is void or voidable, in light

3   of the ruling from the palace of justice across the street.

4          MR. BOWMAN:  Well, your Honor, that's an issue on

5   the -- certainly an issue on the remand motion.  I think it's

6   less of an issue on the motion to compel arbitration, because

7   the arbitration clause is unenforceable for a variety of other

8   reasons, and it doesn't really matter whether the protocol is

9   void or not.  But there will be an issue on the motion to

10  remand.

11         THE COURT:  Is there any other litigation working

12  someplace relating to the America's Cup at this point?

13         MR. BOWMAN:  Well, maybe I should let Mr. Ostrager

14  answer that.

15         THE COURT:  I direct it to both of you.

16         MR. OSTRAGER:  No.  He's --

17         MR. BOWMAN:  He's involved in the other case, which

18  I'm not involved in.

19         MR. OSTRAGER:  There's just the one case in what your

20  Honor has referred to as the palace of justice across the

21  street.

22         THE COURT:  All right.  The Golden Gate case?

23         MR. OSTRAGER:  Yes.

24         THE COURT:  All right.  I'll docket a scheduling

25  order.  Incidentally, I issued an order in the state-removed

86KGTEAC

 1   case, just coinciding with what certainly all the parties

 2   understood, that this conference will deal with both cases

 3   today.  So that will be docketed electronically later today, if

 4   it hasn't already been docketed.  There's nothing new or

 5   alarming there.  It's just to make sure that both cases were on

 6   the same track.  And I'll see you all in September, if not in

 7   connection with the discovery issue.  I'm hoping it's

 8   September, but we'll wait to see.

 9              All right.  Thanks so much for coming in.

10             MR. OSTRAGER:  Thank you, your Honor.

11             THE COURT:  Have a good weekend.

12                            o0o

13

14

15

16

17

18

19

20

21

22

23

24

25